## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SIMON ATEBA,
1922 Park Road NW,
Washington, D.C., 20010

       *Plaintiff,*

 vs.

KARINE JEAN-PIERRE,
in her official capacity as Press Secretary
to the President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

the UNITED STATES SECRET SERVICE,     Case No.
950 H Street NW
Washington, D.C. 20223;

and

KIMBERLY CHEATLE,
in her official capacity as Director of the
United States Secret Service,
950 H Street NW #7800
Washington, D.C. 20223,

       *Defendants.*

## PLAINTIFF'S VERIFIED COMPLAINT

    Plaintiff Simon Ateba complaining against the above-named Defendants (collectively, the

"White House" or "Defendants") alleges as follows:

### INTRODUCTION

    1.    A free and robust press is vital to a healthy democracy. The Framers understood

this to be an unassailable truth, enshrining protection of the free press in the First Amendment as

an essential check on government power. This constitutional safeguard is at its zenith when the

government itself is the subject of scrutiny.

2.    "The press" does not just include a small class of elite journalists, credentialed by one another. The First Amendment's guarantees protect the *public's* right to engage in constitutionally protected press activity. Indeed, the "inclusion of the words 'the press' in the First Amendment does not confer upon [journalists] a title of nobility."[1]

3.    Mr. Ateba is the White House correspondent for Today News Africa, a daily online news publication primarily covering American politics and relations between the United States and African countries. Just like other White House correspondents, Mr. Ateba regularly interacts with, and requests information from, the White House Press Office for his coverage. But in the five years since joining the White House press corps, Mr. Ateba has been treated with contempt by the current Press Secretary, Karine Jean-Pierre, and her staff, receiving only a handful of responses to questions and almost no opportunity to meaningfully communicate with the White House.

4.    Given his publication's focus on U.S./African relations, Mr. Ateba's questions often relate to issues other White House correspondents do not cover. The White House's refusal to communicate with Mr. Ateba significantly undermines his ability to properly inform his readers. Mr. Ateba covers topics affecting millions of people around the world—and many of his colleagues have little interest in asking the questions to which Mr. Ateba wants answers.

5.     After months of not receiving answers to his inquiries from the White House press office, Mr. Ateba chose to utilize the only option available to him: speaking up during press briefings. On several occasions since December 2021, Mr. Ateba asserted himself in the briefing room, speaking over other reporters and the White House Press Secretary in an attempt to make

---

[1] Hon. David B. Sentelle, *Freedom of the Press: A Liberty for All or A privilege for a Few?*, Cato Institute (Sept. 17, 2013).

his concerns known.

6.      While Mr. Ateba has garnered national attention for his approach, he simply wants to do his job. To do this, he must be treated like any other correspondent—which includes having access to the White House and an open dialogue with the White House Press Office.

7.      But the White House has made clear it does not intend to treat Mr. Ateba like his colleagues. Quite this opposite: the White House Press Office recently revised its credentialing criteria for a media "hard pass" this past May in a brazen attempt to exclude Mr. Ateba from the White House briefing room. As of August 1, 2023, over 440 previously credentialed White House reporters no longer have "hard pass" access to the White House media facilities under the new requirements. [2] While other reporters were affected by the revisions, excluding Mr. Ateba was the primary objective because the White House no longer wanted deal with him or his questions.[3]

8.      Targeted changes to hard-pass credentialing qualifications to exclude specific journalists is troubling by itself, but the new credentialing criteria the White House adopted also raise grave First Amendment concerns for reporters generally. As a prerequisite to obtaining a

---

[2] Gabriel Hays, *More than 440 reporters lose press passes after White House changes requirements*, Fox News (Aug. 4, 2023), https://www.foxnews.com/media/440-reporters-lose-press-passes-white-house-changes-requirements.

[3] Steven Nelson, *White House unveils new press badge restrictions, rules for access*, The New York Post (May 5, 2023), https://nypost.com/2023/05/05/white-house-unveils-new-press-badge-restrictions-rules-for-access/ ("The move is widely believed to be spurred by interest in stripping African journalist Simon Ateba of his access to the briefing room after a series of disruptions, though people involved in discussions said that White House staff had talked about making changes even before Ateba became a minor celebrity."); Justin Baragona *White house wants new rules to shut down briefing room chaos*, Daily Beast (March 27, 2023), https://www.thedailybeast.com/white-house-wants-new-rules-to-shut-down-briefing-room-chaos; Paul Farhi, *New White House Rules: Reporters can be kicked out if not 'professional,'* Washington Post (May 9, 2023), https://www.washingtonpost.com/media/2023/05/09/white-house-press-rules-simon-ateba/; Brianna Lyman, *Exclusive: WHCA Advises Biden Admin On New Rules Governing Press Passes*, Daily Caller (May 11, 2023), https://dailycaller.com/2023/05/11/whca-advised-biden-admin-new-rules-potentially-ban-journalists/.

White House hard pass, the applicant must—among other things—first have press credentials from the Supreme Court or one of the four Congressional Press Galleries. For Mr. Ateba, like many journalists, this is no easy task, and it further bears no logical relation to covering the White House, a different branch of government.

9.      Obtaining credentials from the Supreme Court is generally effectively impossible for any White House-focused journalist, because the Court only gives out a limited number of passes—and only to reporters who cover the Court full-time.

10.      The Congressional Press Galleries are only slightly better. Executive committees self-selected by the journalists who make up the Congressional press corps govern each of the four press galleries. And these executive committees only issue press credentials to journalists they themselves deem to be "of repute." As a result, the entrenched, mainstream media have the power to pick and choose which reporters may access Congress and the White House. These decisions are subject to the final approval of the Speaker of the House and the Senate Committee on Rules and Administration. But in practice, whatever the Correspondents Committees say, goes.

11.      Mr. Ateba applied for credentials to the Congressional Daily Press Gallery on June 5, 2023, and has yet to receive any word on the progress of his application.

12.      Defendants' modification of the White House hard-pass criteria means Mr. Ateba is no longer able to set foot on the White House grounds without going through the daily process of receiving short-term approval. For a journalist seeking regular access to the White House briefing room, this cumbersome process is untenable long term.

13.      Moreover, the process adopted by the White House—*i.e.*, delegating access to the White House "hard pass" to the other branches of government—is an unconstitutional attempt to arbitrarily restrict who qualifies as "the press." Established media outlets control the Congressional

Correspondents Committees, which only provide press credentials to reporters who meet the vague standard of being a "reputable journalist." Congress gave the committees unbridled discretion to pick and choose which journalists can exercise their constitutional rights at the Capitol. The White House has incorporated this delegation into its own credentialing process—and with it, the same constitutional infirmities.

14.     Defendants do not like Mr. Ateba's behavior—or his questions—during press briefings. But instead of enforcing a decorum requirement equally across all White House correspondents, Defendants simply re-defined who is allowed in the door in the first place. And they did so to specifically exclude Mr. Ateba.

15.     Defendants' intentional discrimination against Mr. Ateba and the conditions the White House has placed on obtaining a "hard pass" violate the First Amendment. Mr. Ateba brings this action to vindicate his constitutional rights—the same rights shared by all other members of a free press.

## JURISDICTION AND VENUE

16.     This action arises under the First Amendment to the United States Constitution, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and Defendants are officers of the United States sued in their official capacities.

## PARTIES

18.     Mr. Ateba is the White House Correspondent for *Today News Africa* ("TNA"), an online publication that focuses on relations between the United States and African nations. Mr.

Ateba has been a journalist for over fifteen years and has regularly covered politics and public affairs in both Africa and in the United States. Mr. Ateba has been the White House Correspondent for TNA since 2018. He has held a White House hard pass since February 2021.

19.     Defendant Karine Jean-Pierre is Press Secretary to the President of the United States. As press secretary, Ms. Jean-Pierre is in charge of the White House Press Office, the organization responsible for credentialing reporters for the White House press facilities. She is sued in her official capacity.

20.     The United States Secret Service is the federal law enforcement agency that administers and oversees security at the White House. The Secret Service performs background checks on those seeking a White House hard pass and is the agency ultimately responsible for issuing the hard pass.

21.     Defendant Kimberly Cheatle is Director of the United States Secret Service. She is sued in her official capacity.

## STATEMENT OF FACTS
### The White House Press Room

22.     The James J. Brady Press Briefing Room is perhaps the most important forum for news media to interact with the President of the United States and his staff. Nearly every major media outlet in the country—and many others around the world—has a designated correspondent stationed at the White House to report on the daily activities of the President and his administration. The White House press corps, however, also includes reporters from smaller outlets, ranging from start-ups to regional publications. In the briefing room, correspondents from the *New York Times*, *Washington Post*, *CNN*, and *ABC News* sit shoulder to shoulder with correspondents from publications with a mere fraction of the viewership and subscriber base of the larger outlets.

23.     For all journalists, the White House briefing room serves as an essential access

point for those seeking to cover the President of the United States.

24.     But it is not a place for the faint of heart. Reporters must fend for themselves in order to do their job, which is to obtain information for their readers, viewers, and listeners.

25.     The unpredictable and volatile atmosphere of press briefings breeds disorder, tense exchanges, and, of course, raised voices. Yet the briefing room has historically operated under little more than an informal understanding that all correspondents would act professionally. And while some administrations have adopted more formal expressions of their decorum expectations, they largely exist on paper only. Despite the many instances where journalists failed to adhere to these expectations, formal punishment for decorum violations is exceedingly rare.

26.     Journalists seeking access to the White House press facilities and briefing room must have the proper credentials. The White House issues short-term passes for one day up to six months. These passes require the individual to submit to heightened Secret Service scrutiny each time they come to the White House.

27.     Some journalists can obtain a "hard pass," a special form of press credentials that allows unlimited access to the White House press facilities. As the White House Correspondents' Association previously advised, "'[a] hard pass is critical for anyone who reports regularly on the White House.' . . . It is no exaggeration to say that, without the access that a hard pass grants, a White House correspondent cannot effectively perform his or her duties, which include providing the public with on-the-spot-news coverage of unforeseen and unscheduled events, along with cataloguing the daily activities of the head of the executive branch."[4]

28.     The White House has had no shortage of controversy surrounding revocation of

---

[4] Brief of Amicus Curiae The White House Correspondents' Association in Support of Appellee Seeking Affirmance, *Karem v. Trump*, Case No. 19-5255 (D.C. Cir. Jan. 13, 2020) (citation omitted).

press credentials. The *Washington Post* has had press credentials revoked from its journalists on numerous occasions after provoking the ire of various Presidents and their staff over scandals, including Watergate and the Pentagon Papers.[5]  Arbitrary enforcement of the White House press credentialing regime has even resulted in litigation.[6]

29.    Strained relations between the White House and the press corps persisted during the Trump administration. High-profile examples include the Trump White House revoking the press credentials of CNN White House Correspondent Jim Acosta and Playboy Correspondent Brian Karem.

30.    The 2018 Acosta incident followed months of tense exchanges during press briefings between the CNN Correspondent and the White House press staff. Mr. Acosta regularly spoke over the press secretary during exchanges. Other White House correspondents expressed dismay at Mr. Acosta's behavior. During one particularly heated exchange, Mr. Acosta refused to give up the microphone during a briefing, prompting the White House to revoke his hard pass.

31.    The White House Correspondents' Association "strongly object[ed] to the Trump Administration's decision to use US Secret Service security credentials as a tool to punish a reporter with whom it has a difficult relationship."[7]

32.    The Trump White House also revoked the hard pass of Playboy Correspondent Brian Karem in 2019 following an incident at a Social Media Summit in the Rose Garden between Karem and a Trump Administration advisor. This prompted the White House to revoke his

---

[5] Jason Daly, *The Complicated History Between the Press and the Presidency*, Smithsonian Magazine (June 14, 2016), https://www.smithsonianmag.com/smart-news/complicated-history-between-press-and-presidency-180959406/.

[6] *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977); *Forcade v. Knight*, 416 F. Supp. 1025 (D.D.C. Cir. 1976).

[7] Richard Gonzales, *White House Revokes Press Pass of CNN's Jim Acosta*, NPR (Nov. 7, 2018), https://www.npr.org/2018/11/07/665497382/white-house-revokes-press-pass-of-cnns-jim-acosta.

credentials for "unprofessional conduct."

33.     Both reporters went to court over the revocation of their hard passes.[8] The district court found Acosta was likely to succeed on the merits of his claim and issued a preliminary injunction requiring the White House to reinstated Acosta's credentials. The White House did not appeal the district court's injunction.[9]

34.     Karem's case went to the DC Circuit, which held revocation of his press pass by the White House violated his due process rights. The court concluded that Karem had a liberty interest in his press pass and that he was not on notice that his conduct at the Rose Garden could lead to the revocation. This failure to provide notice was a deprivation of procedural due process.

35.     Following the lawsuit filed by Acosta, the Trump Administration revised the press credentialing requirements to obtain a hard pass.[10] The revisions included the onerous requirement that journalists appear on the White House grounds for 90 of the previous 180 days to qualify for a hard pass. The practical impact of this new requirement was that many long-time White House reporters lost their credentials.

36.     Though the Trump White House argued the new credentialing requirements were necessary due to "security concerns," many journalists speculated that the changes were intended

---

[8] *Karem v. Trump,* 960 F.3d 656 (D.C. Cir. 2020); *Cable News Network, Inc. v. Trump*, No. 18-2610 (D.D.C. Nov. 16, 2018).

[9] *Cable News Network, Inc. v. Trump*, No. 18-2610 (D.D.C. Nov. 16, 2018); *see also* Ed Pilkington, *CNN sues White House and demands return of Jim Acosta's press credentials*, the Guardian (Nov. 13, 2018), https://www.theguardian.com/media/2018/nov/13/cnn-sues-white-house-jim-acosta-return-press-pass-trump-revoked, ("A journalist may not be stripped of access because of distaste for his questions, a desire to retaliate against him for prior coverage or frustration at what the president may view as a hostile attitude.").

[10] Mathew Ingram, *White House revokes press passes for dozens of journalists*, Columbia Journalism Review (May 19, 2019), https://www.cjr.org/the_media_today/white-house-press-passes.php.

to prevent specific journalists from obtaining a hard pass.[11] Indeed, the Trump White House provided "exemptions" to certain journalists that it deemed worthy of keeping their hard pass.[12]

37.     The media's most powerful institutions and civil liberties advocates alike uniformly denounced the new credentialing requirements and practice of handing out exemptions. The ACLU blasted the move as "un-American."[13] The collective response from free press advocates was that the White House's new credentialing requirements were a direct assault on the First Amendment.

**Mr. Ateba's Coverage of the White House**

38.     Mr. Ateba is the White House correspondent for the daily online publication *Today News Africa*.[14] Mr. Ateba has been a journalist for the past fifteen years, covering politics and current affairs in both Africa and in the United States during most of that time. This includes covering both the United States State Department and the White House for the past five years.

39.     Mr. Ateba became a White House Correspondent in 2018. For his first three years covering the White House, Mr. Ateba obtained a temporary daily press pass, which required him to go through additional Secret Service security prior to entering the grounds.

40.     Mr. Ateba applied for, and received, a White House "hard pass" in February 2021.

41.     Since then, Mr. Ateba has covered the White House on a daily basis. He writes

---

[11] Chris Riotta, *Trump administration commits 'mass purge' of journalists allowed to enter White House*, Independent (May 10, 2019), https://www.independent.co.uk/news/world/americas/us-politics/trump-bans-journalists-white-house-reporters-press-hard-pass-a8906781.html.

[12] Paul Farhi, *White House imposes new rules on reporters' credentials, raising concerns about access*, Washington Post (May 8, 2019), https://www.washingtonpost.com/lifestyle/style/white-house-imposes-new-rules-on-reporters-credentials-raising-concerns-about-access/2019/05/08/793dc404-71dd-11e9-9eb4-0828f5389013_story.html.

[13] Pilkington, *supra.*

[14] https://todaynewsafrica.com.

regular stories for TNA, which requires regular communication with the White House Press Office. Thus, Mr. Ateba frequently sends questions to the White House Press Office and attend the White House press briefings.

42.    Over his five years as a White House correspondent, Mr. Ateba has rarely received any response—or even acknowledgement—of his questions from the White House. Regardless of what the questions are, the White House generally ignores them. This refusal to provide information to Mr. Ateba makes it increasingly difficult for Mr. Ateba to obtain the necessary information needed for the quality of coverage he seeks to provide his readers.

43.    Mr. Ateba has been allowed to attend President Biden's press conferences just once in nearly three years. When he attempts to attend, he is denied access. For the press conferences he was allowed to attend, he was not allowed to ask a question.

44.    Mr. Ateba requested an opportunity to interview President Biden in the lead up to an African Leaders Summit at the White House in December 2022. These requests were completely ignored.

45.    After months of not receiving responses to written questions from the White House and not receiving an opportunity to ask questions in the briefing room, Mr. Ateba resorted to one of the only options available to him: speaking up during press briefings.

46.    It is common for White House correspondents to raise their voices and even shout over each other during press briefings. Indeed, the D.C. Circuit has acknowledged that "[i]n the context of a White House press corps described as an 'unruly mob,'" behavior such as a journalist shouting questions and engaging in a sarcastic, "irreverent, caustic" back and forth with White House staff "was not so outrageous as to bring into fair contemplation" a suspension of a reporter's

hard pass.[15]

47.     Just like his colleagues, Mr. Ateba would engage in the scrum, shouting his questions to the White House Press Secretary questions during briefings. And on a few occasions, when the Press Secretary would not acknowledge him, Mr. Ateba would speak over his fellow journalists.

48.     The White House did not appreciate this "breach of decorum."

49.     One notable incident took place on March 20, 2023. The Press Secretary began the daily briefing by introducing the cast of the hit Apple TV show Ted Lasso. The White House invited the group to the briefing to discuss the President's mental-health initiatives. Before the Press Secretary could finish the introduction, Mr. Ateba began speaking, questioning why he has not received any responses to his written inquiries or been given the opportunity to ask a question during the press briefing. A tense exchange between Mr. Ateba and the Press Secretary followed, which included shouts from other correspondents for "decorum."

50.     The March 20 incident received national media attention.[16]

51.     Another notable incident took place on June 26, 2023. In another attempt to receive answers from the White House regarding its refusal to respond to his questions, Mr. Ateba interrupted a fellow correspondent during a daily press briefing. Mr. Ateba pressed forward with his questioning, despite his fellow correspondents asking him to stop. The White House went as far as to scrub video footage of this incident in which the Press Secretary told Mr. Ateba that he

---

[15] *Karem*, 960 F.3d at 665.

[16] Jamie Burton, *Ted Lasso's Visit to the White House Descends Into 'Chaos*,*'* Newsweek (March 21, 2023), https://www.newsweek.com/ted-lasso-cast-visit-white-house-descends-chaos-jason-sudeikis-1789180.

was "being incredibly rude" from its YouTube livestream.

52.    Since December 2021, Mr. Ateba has asserted himself during the press briefings on a number of occasions. The mainstream media coverage of these incidents has largely painted Mr. Ateba as disruptive, disrespectful, and even seeking attention for himself. But Mr. Ateba is simply seeking answers to his questions, which the White House refuses to give.[17]

53.    The White House did not like these exchanges and wanted them to end.[18]

### The White House Targets Mr. Ateba

54.    On information and belief, the significant media coverage focusing on Mr. Ateba's conduct in the briefing room prompted the Biden White House to act. On May 5, 2023, the White House notified all existing hard pass holders that it was restricting who could qualify for a hard pass. *See* Exhibit A (Email Announcing the New White House Press Office Policy). The White House Press Office issued a new list of stated criteria for obtaining a hard pass, and required that all existing hard passes terminate on July 31, 2023, and that journalists would have to apply for a new pass under the updated criteria.

55.    The new criteria include:

- Full-time employment with an organization whose principal business is news dissemination (If you are freelance, we will need letters from two news organizations describing your affiliation, or, if you freelance primarily for one organization, a letter from that organization describing the extent and duration of your relationship with the organization);

---

[17] *E.g.*, Joseph Bernstein, *Why Won't Simon Ateba Stop Shouting?*, (July 27, 2023) New York Times https://www.nytimes.com/2023/07/26/style/simon-ateba-white-house-today-news-africa.html; Paul Farhi, *White House warns reporter Simon Ateba about his press-room outbursts*, The Washington Post (July 12, 2023), https://www.washingtonpost.com/media/2023/07/12/simon-ateba-white-house-warning/.

[18] Ian Schwartz, *White House Scrubs Video of Reporter Simon Ateba Confronting Karine Jean-Pierre*, Real Clear Politics (June 26, 2023), https://www.realclearpolitics.com/video/2023/06/26/white_house_scrubs_video_of_reporter_simon_ateba_confronting_karine_jean-pierre.html.

- Physical address (either residential or professional) in the greater Washington, D.C. area;

- Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;

- Assignment to cover (or provide technical support in covering) the White House on a regular basis;

- Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and

- Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

56.    Mr. Ateba objected to the new hard pass requirements and requested the White House delay implementation for one year to allow him time to obtain press credentials from a Congressional Press Gallery. The White House never responded to his request.

57.    Media outlets widely reported that the new hard pass requirements were targeted directly at Mr. Ateba.[19] His high-profile exchanges with the White House Press Secretary during briefings had garnered both international media attention, and a provoked the anger of the Biden Administration.

58.    Additional actions taken by the White House confirm that the new hard pass criteria targeted Mr. Ateba. On July 27, 2023, the White House took the rare step of issuing a written warning to Mr. Ateba regarding this conduct during daily press briefings. *See* Exhibit B (Letter of

---

[19] Steven Nelson, *White House unveils new press badge restrictions, rules for access*, The New York Post (May 5, 2023), https://nypost.com/2023/05/05/white-house-unveils-new-press-badge-restrictions-rules-for-access/; Justin Baragona *White house wants new rules to shut down briefing room chaos*, Daily Beast (March 27, 2023), https://www.thedailybeast.com/white-house-wants-new-rules-to-shut-down-briefing-room-chaos.

Reprimand to Mr. Ateba). The letter described four specific instances in which Mr. Ateba allegedly disrupted the daily press briefings. If Mr. Ateba continued this conduct, the letter warned, his "hard pass may be suspended or revoked, following notice and an opportunity to respond."[20]

59.     In the letter, the White House also pointed to the new decorum criteria it announced in May and advised Mr. Ateba that he must adhere to these expected standards or risk revocation of his press credentials.

## The Press Credential Gatekeepers

60.     The threat of revoking Mr. Ateba's press credentials was largely meaningless because the White House knew he would not qualify for a hard pass under the new criteria. Indeed, excluding Mr. Ateba was the goal of the specific revisions.

61.     The White House Press Office's new criteria for a hard pass includes a requirement that an applicant must first be credentialed by the press gallery of the United States Supreme Court, or one of the press galleries in either chamber of Congress.

62.     Consistent with the White House Press Office's warning, the U.S. Secret Service terminated Mr. Ateba's hard pass on July 31, 2023.

63.     Mr. Ateba's hard pass was not scheduled to expired, and would automatically renew so long as he continued covering the White House.

64.     On August 4, 2023, Mr. Ateba requested the White House Press delay termination of his hard pass until his application to the Daily Congressional Press Gallery or Supreme Court was approved or denied. The White House refused this request.

65.     The termination of Plaintiff's hard pass represents the culmination of agency action, and thus, is a final agency action. *See* 7 U.S.C. § 704. While Plaintiff can (and did) apply for a new

---

[20] *Id.*

hard pass, this is a new agency action, not a reinstatement of Plaintiff's prior pass.

66.     The Secret Service's termination of Mr. Ateba's hard pass is arbitrary and capricious. When agencies change their policy, they are required to "provide reasoned explanation for its action," including showing "that there are good reasons for the new policy." The Secret Service has failed to do so, relying instead on the White House Press Office policy, which itself was issued without any explanation, let alone reasoned explanation.

67.     The Supreme Court Public Information Office is responsible for issuing press credentials to journalists seeking to cover the Court.[21] The press gallery at the Supreme Court is notoriously small with only 18 seats for journalists in the argument room. As a result, the Supreme Court only issues press credentials to journalists whose full-time beat involves coverage of the Supreme Court.[22] Reporters who primarily cover the White House cannot qualify for a Supreme Court pass.

68.     Obtaining credentials from one of the Congressional Press Galleries is Mr. Ateba's only option for obtaining a White House hard pass. This is not a viable option, either.

69.     The media has been covering Congress since its earliest sessions.[23] The press have designated galleries in both chambers of Congress. These "galleries" include office space and work

---

[21]Supreme              Court              Public              Information              Office, https://www.supremecourt.gov/publicinfo/press/Media_Requirements_And_Procedures_Revised _071023.pdf (Press Credential Requirements).

[22]*Id.* ("The PIO has traditionally reserved hard passes for full-time professional journalists employed by media organizations that have records of substantial and original news coverage of the Court and a demonstrated need for regular access to the Court's press facilities.").

[23] Sarah J. Eckman, *Congressional News Media and the House and Senate Press Galleries*, Congressional Research Service (April 17, 2023).

resources for credentialed journalists covering Congress.

70.     Ever since the late nineteenth century, Congress delegated regulation of access to the Congressional Press Galleries to the Correspondents Committees—a group of journalists elected to oversee credentialing and other administrative aspects of the Congressional press galleries. Today, there are four Correspondents Committees: the Daily Press Galleries (for daily news publications); the Periodical Press Galleries (for weekly, monthly, and quarterly publications); the Radio and Television Galleries; and the Press Photographers' Gallery. Each chamber of Congress has provided professional staff for each respective press gallery.

71.     The Correspondents Committee for each gallery is made up of five or six members—all journalists who already have press credentials. The executive committee of the Daily Press Gallery, for example, is made up of journalists from the *Detroit News*, *CQ-Roll Call*, the *Associated Press,* the *Pittsburgh Post-Gazette*, and *States Newsroom*.[24] These standing committees process applications based on the respective credentialing criteria adopted by each gallery. They are the gatekeepers to the press credentials.

72.     To qualify for press credentials for the Daily Press Gallery, a journalist must be:

- A bona fide correspondents of repute in their profession;

- A full-time, paid correspondent who requires on-site access to congressional members and staff;

- Employed by a news organization:  with General Publication periodicals mailing privileges under U.S. Postal Service rules, and which publishes daily; . . . or "whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published

---

[24] Standing   Committee   of   Correspondents,   U.S.   Senate   Press   Gallery, https://www.dailypress.senate.gov/about/standing-committee-of-correspondents/   (last   visited Aug. 8, 2023 at 11:00 p.m.).

continuously for 18 months;

- Reside in the Washington, D.C. area;

- Not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation, organization, or agency of the U.S. Government, or in prosecuting any claim before Congress or any federal government department, and will not do so while a member of the Daily Press Galleries;

- And they must be editorially independent of any institution, foundation or interest group that lobbies the federal government, or that is not principally a general news organization.[25]

73.    The other press galleries have similar requirements.[26]

74.    This gatekeeping function has had a dramatic effect on outlet diversity in Congress over the past decade. In 2017, the Congressional Research Services found that the number of credentialed correspondents in Congress increased from around 2,500 in 1976 to 6,000 in 2016. But during that same period, the number of credentialed media outlets dropped from over 1,200 to fewer than 600. This drop in the number of media outlets covering Congress supports the notion that the Correspondents Committees responsible for credentialing have become increasingly insular and hostile to "outsiders."

**Mr. Ateba Persists**

75.    In response to the new restrictions the White House adopted for hard passes in May 2023, Mr. Ateba applied for press credentials with the Standing Committee of Correspondents for

---

[25] *See* https://www.dailypress.senate.gov/membership/gallery-rules/ (criteria for press credentials).

[26]*See* https://periodical.house.gov/accreditation/rules-and-regulations (criteria for press credentials); https://www.radiotv.senate.gov/membership/ (same); https://www.pressphotographers.senate.gov/wp-content/uploads/2022/08/Annual-Membership-Regulation-Agreement.pdf (same).

the Daily Press Gallery.

76.     Mr. Ateba submitted his application on June 5, 2023. *See* Exhibit C (Letter from to Senate Daily Press Gallery). He has yet to receive a response.

77.     Mr. Ateba applied for press credentials from the Supreme Court Press office on August 3, 2023. *See* Exhibit D (Letter to the Supreme Court Public Information Office). The Supreme Court press office informed Mr. Ateba that he was not eligible for Court press credentials because he does not cover the Supreme Court full time for his publication.

78.     On information and belief, the Supreme Court Public Information Office has informed the White House that it will not issue hard passes for any White House journalists due to space constraints at the Court. The Supreme Court's Public Information Office indicated as much to Mr. Ateba. Mr. Ateba intends to prove this through discovery.

79.     Knowing he would be denied for not having the requisite credentials from a Congressional Press Gallery or the Supreme Court, Mr. Ateba initially did not apply for a White House hard pass renewal by the July 31 deadline.

80.      Out of an abundance of caution, Mr. Ateba reapplied for a White House hard pass on August 4, 2023.

81.     Despite being specifically targeted by the White House for exclusion, and despite being subject to the unbridled discretion of the Standing Committee for the Congressional Press Gallery, Mr. Ateba will continue to cover the White House for TNA. Though this job has become exceedingly more difficult without a hard pass, Mr. Ateba is determined to continue providing quality coverage for his readers.

82.     But without a hard pass, Mr. Ateba is, and will continue to be, irreparably harmed. Defendants have infringed on his constitutional rights. And this infringement will persist absent

intervention by this court.

## FIRST CLAIM FOR RELIEF
### Violation of the First and Fifth Amendments
### (Delegation of Unbridled Discretion)

83.    Mr. Ateba hereby incorporates by reference all other paragraphs of this Verified Complaint as though fully set forth herein.

84.    The hard-pass criteria adopted by the White House Press office in May 2023 violate the First Amendment. By requiring that all applicants obtain press credentials from the Supreme Court or one of the Congressional Press Galleries, Defendants have adopted a regime that gives the government unbridled discretion to permit the exercise of First Amendment rights.

85.    The four Congressional Press Gallery Standing Committees wield this unbridled discretion, only approving credentials for journalists they deem are "reputable." The failure to adopt and apply purely objective standards for congressional press credentials renders the credentialing process unconstitutional. The White House has incorporated this credentialing process into its own hard pass criteria, rending the White House process constitutionally impermissible as well.

86.    Defendants have no compelling reason to justify this impermissible credentialing process, nor is this process narrowly tailored.

87.    Mr. Ateba has no adequate remedy at law, has suffered, and will suffer serious and irreparable harm to his constitutional rights unless the White House is enjoined.

88.    Mr. Ateba is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining the White House from violating his constitutional rights.

89.    Mr. Ateba found it necessary to engage the services of private counsel to vindicate his rights under the law. Mr. Ateba is therefore entitled to an award of attorneys' fees and costs

pursuant to 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF
## Violation of the First Amendment
## (Viewpoint Discrimination)

90.     Mr. Ateba hereby incorporates by reference all other paragraphs of this Verified Complaint as though fully set forth herein.

91.     Defendants violated Mr. Ateba's First Amendment rights by changing the criteria for hard pass credentials to intentionally prevent Mr. Ateba from obtaining hard pass access. Defendants did so by adopting credentialing criteria specifically designed to exclude Mr. Ateba from eligibility. Such discrimination amounts to a content-based regulation and viewpoint discrimination against Mr. Ateba in violation of the First Amendment.

92.     Defendants have no compelling reason to exclude Mr. Ateba from obtaining a White House hard pass. Even if they did, this exclusion is not narrowly tailored to achieve this interest.

93.     Mr. Ateba has no adequate remedy at law, has suffered, and will suffer serious and irreparable harm to his constitutional rights unless the White House is enjoined.

94.     Mr. Ateba is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining the White House from violating his constitutional rights.

95.     Mr. Ateba found it necessary to engage the services of private counsel to vindicate his rights under the law.  Mr. Ateba is therefore entitled to an award of attorneys' fees and costs pursuant to 28 U.S.C. § 2412.

## THIRD CLAIM FOR RELIEF
## Violation of the Administrative Procedure Act (5 U.S.C. § 702)

96.     Mr. Ateba hereby incorporates by reference all other paragraphs of this Verified

Complaint as though fully set forth herein.

97.     The Secret Service is an agency within the meaning of the Administrative Procedure Act.

98.     On July 31, 2023, the Secret Service terminated Mr. Ateba's hard pass.

99.     The termination of Mr. Ateba's hard pass is a final agency action.

100.    The termination of Mr. Ateba's hard pass is also a change in agency policy or position.

101.    The Secret Service has failed to provide *any* reason to justify terminating Mr. Ateba's hard pass, let alone a "good reason" or "reasoned explanation."  Instead, the Secret Service appears to be relying on a policy issue by the White House Press Office, which likewise provides no explanation for the change in policy.

102.    By failing to provide a reasoned explanation for its change in policy or position, the Secret Service has acted arbitrarily and capriciously in cancelling Mr. Ateba's hard pass, in violation of 5 U.S.C. § 702.

103.    By virtue of the ongoing violation of Mr. Ateba's rights, Mr. Ateba is entitled to a declaration that the Secret Service's cancellation of Mr. Ateba's hard pass was arbitrary and capricious, and an injunction preventing the Secret Service from cancelling Mr. Ateba's previously issued hard pass.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Simon Ateba prays this Honorable Court grant the following relief in his favor:

1.      Declaratory relief in the form of an order and declaratory judgment holding and declaring that the White House Press Office's revised credentialing requirements are

unconstitutional on their face and as applied under the First Amendment to the United States Constitution for the reasons set forth above;

2.      Injunctive relief in the form of a temporary, preliminary, and permanent injunction requiring the Government, its agents, employees, and all persons acting in concert with them to not enforce the revised White House credentialing requirements;

3.      Declaratory relief in the form of an order and declaratory judgement holding and declaring that the U.S. Secret Service's termination of Mr. Ateba's hard pass was arbitrary and capricious, in violation of law;

4.      Injunctive relief in the form of a temporary, preliminary, and permanent injunction enjoining the U.S. Secret Service from terminating Mr. Ateba's hard pass without reasoned explanation;

5.      That the Court issue the requested injunctive relief without a condition of bond or surety or other security being required of Mr. Ateba;

6.      An award of Mr. Ateba's reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412;

7.      That the Court retain jurisdiction of this matter for the purposes of enforcing the Court's order(s); and

8.      Such other relief as the Court deems necessary and proper.

Dated: August 10, 2023

                                      Respectfully submitted,

                                      By: /s/ Harmeet K. Dhillon
                                      Harmeet K. Dhillon
                                      (D.D.C. Bar ID: CA00078)
                                      Mark Trammell*
                                      Josh Dixon*
                                      Eric A. Sell
                                      (D.D.C. Bar ID: 1742565)

CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

Gary M. Lawkowski
(D.D.C. Bar ID: VA00125)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Jesse D. Franklin-Murdock
(D.D.C. Bar ID: CA00147)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108


*Counsel for Plaintiff Simon Ateba*
*\*Pro Hac Vice Motions Forthcoming*

## VERIFICATION

I, Simon Ateba, declare as follows:

      1.     I am over the age of eighteen years old, I am competent to make this verification, and have personal knowledge of the matters set forth herein.

      2.     I have reviewed the Verified Complaint to be filed on my behalf in this matter.

      3.     The allegations in paragraphs 1–15, 38–66, and 75–82 of the Verified Complaint are within my personal knowledge and are true and correct to the best of my knowledge.

      4.     All exhibits attached in support of this Verified Complaint are true and correct copies of the original documents.

      5.     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed on August 10, 2023

SIMON ATEBA