## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIMON ATEBA,<br>1922 Park Road NW,<br>Washington, D.C. 20010<br><br>        *Plaintiff,*<br><br> vs.<br><br>KARINE JEAN-PIERRE,<br>in her official capacity as Press Secretary<br>to the President of the United States,<br>1600 Pennsylvania Avenue NW<br>Washington, D.C. 20500;<br><br>the UNITED STATES SECRET SERVICE,<br>950 H Street NW<br>Washington, D.C. 20223;<br><br>and<br><br>KIMBERLY CHEATLE,<br>in her official capacity as Director of the<br>United States Secret Service,<br>950 H Street NW #7800<br>Washington, D.C. 20223,<br><br>        *Defendants.* | Case No. |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Simon Ateba, by and through undersigned counsel, hereby moves for a preliminary injunction against Defendants Karine Jean-Pierre, in her official capacity as Press Secretary to the President of the United States, the United States Secret Service, and Kimberly Cheatle, in her official capacity as Director of the United States Secret Service.

As set forth in the accompanying Memorandum of Law and Mr. Ateba's Verified Complaint, Defendants violated Mr. Ateba's constitutional rights when they changed the criteria by which journalists could obtain the hard pass necessary to access White House media facilities.

1

In addition, Defendants' new hard pass criteria are unconstitutional on their face because they vest committees in other branches of government with unbridled discretion to decide which journalist can and cannot exercise their First Amendment right to report on the White House. Further, the Secret Service's adoption of the new credentialing process also violates the Administrative Procedure Act. Mr. Ateba therefore seeks a preliminary injunction prohibiting Defendants from enforcing their new hard pass credentialing regime so that Mr. Ateba can continue to report on the White House using the hard pass he obtained prior to the change in the rules.

This motion is made pursuant to Federal Rule of Civil Procedure 65(a) and Local Civil Rule 65(c) and is supported by the accompanying memorandum of law, Mr. Ateba's Verified Complaint, and the entire record and file herein. Expedition is essential under Local Civil Rule 65(d) as Defendants' new hard pass credentialing system is inhibiting the First Amendment rights of Mr. Ateba; Mr. Ateba therefore requests that the Court set a hearing on the application within twenty-one days. Mr. Ateba further requests an oral hearing pursuant to Local Civil Rule 7(f).

Dated: August 10, 2023

Respectfully submitted,

By: /s/ Harmeet K. Dhillon
Harmeet K. Dhillon*
(D.D.C. Bar ID: CA00078)
Mark Trammell*
Josh Dixon*
Eric A. Sell
(D.D.C. Bar ID: 1742565)
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

Gary M. Lawkowski
(D.D.C. Bar ID: VA125)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Jesse D. Franklin-Murdock
(D.D.C. Bar ID: CA00147)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108

*Counsel for Plaintiff Simon Ateba*
*\*Pro Hac Vice Motions Forthcoming*

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

### I.    INTRODUCTION

Plaintiff Simon Ateba has been a journalist for over fifteen years. For the past five years, he has been part of the White House press corps, covering the White House for *Today News Africa*, a daily online news publication primarily covering American politics and relations between the United States and African nations.

Despite his fifteen years of journalistic experience and two years of White House specific experience, the White House Press Office has adopted new criteria for obtaining a "hard pass"—a "special press credential[] that allow[s] on-demand access to the White House Complex"[1]—that effectively shut the White House doors to Mr. Ateba, preventing him from doing his job as a journalist.

Worse, excluding Mr. Ateba is a feature, not a bug, of Defendants' actions.[2]  Like many journalists before him, Mr. Ateba has a reputation for asking tough questions and taking unconventional approaches towards seeking answers from high-ranking White House officials. And like many journalists before him, his critical approach has earned the ire of White House officials, who have threatened to revoke his hard pass before. These same officials adopted new criteria for granting hard passes specifically to exclude Mr. Ateba, in violation of his constitutional and statutory rights.

---

[1] *Karem v. Trump*, 960 F.3d 656, 659 (D.C. Cir. 2020).

[2] *See* Steven Nelson, *White House unveils new press badge restrictions, rules for access*, The New York Post (May 5, 2023), https://nypost.com/2023/05/05/white-house-unveils-new-press-badge-restrictions-rules-for-access/ ("The move is widely believed to be spurred by interest in stripping African journalist Simon Ateba of his access to the briefing room after a series of disruptions, though people involved in discussions said that White House staff had talked about making changes even before Ateba became a minor celebrity.").

.

## II.    STATEMENT OF FACTS

### A.  Mr. Ateba's Role as a *Today News Africa* White House Correspondent

Since 2018, Mr. Ateba has been the White House Correspondent for *Today News Africa* ("TNA"), an online publication that focuses on relations between the United States and African nations. Verified Complaint ("VC") ¶ 18. Mr. Ateba has been a journalist for over fifteen years, and he has regularly covered politics and public affairs in both the United States and Africa. *Id.* For the first three years as a White House correspondent, Mr. Ateba obtained a temporary daily press pass, which required him to go through additional Secret Service security prior to entering the White House grounds. *Id.* ¶ 39.

### B.  The White House Briefing Room

As Press Secretary to the President of the United States, Defendant Karine Jean-Pierre is in charge of the White House Press Office, an organization responsible for credentialing reporters for the White House's press facilities. *Id.* ¶ 19. As part of its role in overseeing security at the White House, the Secret Service performs background checks on reporters seeking White House press credentials and ultimately issues the hard pass at issue in this case. *Id.* ¶ 20. Defendant Kimberly Cheatle is the Director of the Secret Service. *Id.* ¶ 21.

The James J. Brady Press Briefing Room is perhaps the most important forum for news media to interact with the President of the United States and his staff. *Id.* ¶ 22. Nearly every major media outlet in the country—and many others around the world—has a designated correspondent stationed at the White House to report on the daily activities of the President and their administration. *Id.* The White House press corps, however, also includes reporters from smaller outlets, ranging from start-ups to regional publications. *Id.* In the briefing room, correspondents

from the *New York Times*, *Washington Post*, *CNN*, and *ABC News* sit shoulder to shoulder with correspondents from publications with a mere fraction of the viewership and subscriber base of the larger outlets. *Id.* For all journalists, the White House briefing room serves as an essential access point for those seeking to cover the President of the United States. *Id.* ¶ 23.

The briefing room is not for the faint of heart; reporters must fend for themselves in order to do their job, which is to obtain information for their readers, viewers, and listeners. *Id.* ¶ 24. The unpredictable and volatile atmosphere of press briefings breeds disorder, tense exchanges, and, of course, raised voices. *Id.* ¶ 25. Yet the briefing room has historically operated under little more than an informal understanding that all correspondents would act professionally. *Id.* And while some administrations have adopted more formal expressions of their decorum expectations, they largely exist on paper only. *Id.* Despite the many instances where journalists failed to adhere to these expectations, formal punishment for decorum violations is exceedingly rare. *Id.*

### C.  The White House's Hard Pass Credentialing System

Journalists seeking access to the White House press facilities and briefing room must have the proper credentials. *Id.* ¶ 26. The White House issues short-term passes for one day up to six months. *Id.* These passes require the individual to submit to heightened Secret Service scrutiny each time they come to the White House. *Id.* Some journalists can obtain a "hard pass," a special form of press credentials that allows unlimited access to the White House press facilities. *Id.* ¶ 27. A White House correspondent generally must have a hard pass to properly cover the President over an extended period, regardless of the size of their publication. *Id.*

### D.  Recent Controversies Relating to White House Press Credentials

The White House has had no shortage of controversy surrounding revocation of press credentials. *Id.* ¶ 28. The *Washington Post* has had press credentials revoked from its journalists

on numerous occasions after provoking the ire of various Presidents and their staff over scandals including Watergate and the Pentagon Papers.[3] *Id.* Arbitrary enforcement of the White House press credentialing regime has even resulted in litigation.[4] *Id.*

Strained relations between the White House and the press corps persisted during the Trump administration. *Id.* ¶ 29. High-profile examples include the Trump White House revoking the press credentials of CNN White House Correspondent Jim Acosta and Playboy Correspondent Brian Karem. *Id.* The 2018 Acosta incident followed months of tense exchanges during press briefings between the CNN Correspondent and the White House press staff. *Id.* ¶ 30. Mr. Acosta regularly spoke over the press secretary during exchanges. *Id.* Other White House correspondents expressed dismay at Acosta's behavior. *Id.* During one particularly heated exchange, Mr. Acosta refused to give up the microphone during a briefing, prompting the White House to revoke his press pass. *Id.* The White House Correspondents' Association "strongly object[ed] to the Trump Administration's decision to use US Secret Service security credentials as a tool to punish a reporter with whom it has a difficult relationship."[5] *Id.* ¶ 31. The White House also revoked the hard pass of Playboy Correspondent Brian Karem in 2019 following an incident at the Social Media Summit in the Rose Garden between Karem and a Trump Administration advisor. This prompted the White House to revoke his credentials for "unprofessional conduct." *Id.* ¶ 32.

---

[3] Jason Daly, *The Complicated History Between the Press and the Presidency*, Smithsonian Magazine (June 14, 2016), https://www.smithsonianmag.com/smart-news/complicated-history-between-press-and-presidency-180959406/.

[4] *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977); *Forcade v. Knight*, 416 F. Supp. 1025 (D.D.C. 1976).

[5] Richard Gonzales, *White House Revokes Press Pass of CCNN's Jim Acosta,* NPR (Nov. 7, 2018), https://www.npr.org/2018/11/07/665497382/white-house-revokes-press-pass-of-cnns-jim-acosta.

Both reporters went to court over the revocation of their hard pass.[6] *Id.* ¶ 33. The district court found Acosta was likely to succeed on the merits of his claim and issued a preliminary injunction requiring the White House to reinstate Acosta's credentials. *Id.* The White House did not appeal the district court's injunction.[7] *Id.* Karem's case went to the D.C. Circuit, which held revocation of his press pass by the White House violated his due process rights. *Id.* ¶ 34. The court concluded that Karem had a liberty interest in his press pass and that he was not on notice that his conduct at the Rose Garden could lead to the revocation. *Id.* This failure to provide notice was a deprivation of procedural due process. *Id.*

Following the lawsuits filed by Acosta and Karem, the Trump Administration revised the press credentialing requirements to obtain a hard pass.[8] *Id.* ¶ 35. The revisions included the onerous requirement that journalists appear on the White House grounds for 90 of the previous 180 days to qualify for a hard pass. *Id.* The practical impact of this new requirement was that many long-time White House reporters lost their credentials. *Id.* The change in credentialing policies was met with a strong outcry from media organizations and civil liberties advocates. *See id.* ¶ 37.

---

[6] *Karem v. Trump,* 960 F.3d 656 (D.C. Cir. 2020).

[7] *Cable News Network, Inc. v. Trump*, No. 18-2610 (D.D.C. Nov. 16, 2018); Ed Pilkington, *CNN sues White House and demands return of Jim Acosta's press credentials*, the Guardian (Nov. 13, 2018), https://www.theguardian.com/media/2018/nov/13/cnn-sues-white-house-jim-acosta-return-press-pass-trump-revoked, ("A journalist may not be stripped of access because of distaste for his questions, a desire to retaliate against him for prior coverage or frustration at what the president may view as a hostile attitude.").

[8]Mathew Ingram, *White House revokes press passes for dozens of journalists*, Columbia Journalism Review (May 19, 2019), https://www.cjr.org/the_media_today/white-house-press-passes.php.

### E.  The White House's Clash with Mr. Ateba

Mr. Ateba applied for, and received, a White House hard pass in February 2021. *Id.* ¶ 40. Since then, Mr. Ateba has covered the White House on a daily basis. *Id.* ¶ 41. He writes regular stories for TNA, which requires regular communication with the White House Press Office. *Id.* Thus, Mr. Ateba frequently sends questions to the White House Press Office and attends the White House press briefings. *Id.*

Over his five years as a White House correspondent, Mr. Ateba has rarely received any response—or even acknowledgement—of his questions from the White House. *Id.* ¶ 42. Regardless of what the questions are, the White House generally ignores them. *Id.* This refusal to provide information to Mr. Ateba makes it increasingly difficult for Mr. Ateba to obtain the necessary information needed for the quality of coverage he seeks to provide his readers. *Id.*

After months of not receiving responses to written questions from the White House and not receiving an opportunity to ask questions in the briefing room, Mr. Ateba resorted to one of the only options available to him: speaking up during press briefings. *Id.* ¶ 45. It is common for White House correspondents to raise their voices and even shout over each other during press briefings. *Id.* ¶ 46. Just like his colleagues, Mr. Ateba would engage in the scrum, shouting his questions to the White House Press Secretary questions during briefings. *Id.* And on a few occasions, when the Press Secretary would not acknowledge him, Mr. Ateba would speak over his fellow journalists. *Id.*

One notable incident took place on March 20, 2023. *Id.* ¶ 49. The Press Secretary began the daily briefing by introducing the cast of the hit Apple TV show Ted Lasso. *Id.* The White House invited the group to the briefing to discuss the President's mental-health initiatives. *Id.* Before the Press Secretary could finish the introduction, Mr. Ateba began speaking, questioning why he has

not received any responses to his written inquiries or been given the opportunity to ask a question during the press briefing. *Id.* A tense exchange between Mr. Ateba and the Press Secretary followed, which included shouts from other correspondents for "decorum." *Id.* This incident received national media attention.[9] *Id.* ¶ 49.

Another notable incident took place on June 26, 2023. *Id.* ¶ 51. In another attempt to receive answers from the White House regarding its refusal to respond to his questions, Mr. Ateba interrupted a fellow correspondent during a daily press briefing. *Id.* Mr. Ateba pressed forward with his questioning, despite his fellow correspondents asking him to stop. *Id.*

Since December 2021, Mr. Ateba has asserted himself during the press briefings on a number of occasions. *Id.* ¶ 52. The mainstream media coverage of these incidents has largely painted Mr. Ateba as disruptive, disrespectful, and even seeking attention for himself. *Id.* But Mr. Ateba is simply seeking answers to his questions, which the White House refuses to give.[10] *Id.*

**F.  The White House's Targeting of Mr. Ateba**

Following Mr. Ateba's clash with the Press Secretary and others in the briefing room, the White House sought to end Mr. Ateba's exchanges with a change to its press credentialing policy. *See id.* ¶¶ 54–55.

On May 5, 2023, the White House notified all existing hard pass holders that it was restricting who could qualify for a hard pass. *Id.* ¶ 54. The White House Press Office issued a new

---

[9]Jamie Burton, *Ted Lasso's Visit to the White House Descends Into 'Chaos,*' Newsweek (March 21, 2023), https://www.newsweek.com/ted-lasso-cast-visit-white-house-descends-chaos-jason-sudeikis-1789180.

[10] *E.g.*, Joseph Bernstein, *Why Won't Simon Ateba Stop Shouting*?, New York Times (July 27, 2023) https://www.nytimes.com/2023/07/26/style/simon-ateba-white-house-today-news-africa.html; Paul Farhi, *White House warns reporter Simon Ateba about his press-room outbursts*, The Washington Post (July 12, 2023), https://www.washingtonpost.com/media/2023/07/12/simon-ateba-white-house-warning/.

list of stated criteria for obtaining a hard pass, and required that all existing hard passes terminate

on July 31, 2023, and that journalists would have to apply for a new pass under the updated criteria.

*Id.* In order to receive a hard pass, journalists, including existing hard pass holders, would have to

satisfy six criteria:

- Full-time employment with an organization whose principal business is news dissemination (If you are freelance, we will need letters from two news organizations describing your affiliation, or, if you freelance primarily for one organization, a letter from that organization describing the extent and duration of your relationship with the organization);

- Physical address (either residential or professional) in the greater Washington, D.C. area;

- Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;

- Assignment to cover (or provide technical support in covering) the White House on a regular basis;

- Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and

- Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

*Id.* ¶¶ 54–55.

As media outlets widely reported, these new hard pass requirements were targeted directly

at Mr. Ateba.[11] *Id.* ¶ 57. His high-profile exchanges with the White House Press Secretary during

---

[11] Steven Nelson, *White House unveils new press badge restrictions, rules for access*, The New York Post (May 5, 2023), https://nypost.com/2023/05/05/white-house-unveils-new-press-badge-restrictions-rules-for-access/; Justin Baragona *White house wants new rules to shut down briefing room chaos*, Daily Beast (March 27, 2023), https://www.thedailybeast.com/white-house-wants-new-rules-to-shut-down-briefing-room-chaos .

briefings had both garnered international media attention, and provoked the anger of the Biden Administration. *Id.*

Additional actions taken by the White House provide even more evidence that the new hard pass criteria targeted Mr. Ateba. *Id.* ¶ 56. On July 27, 2023, the White House took the rare step of issuing a formal warning to Mr. Ateba regarding this conduct during daily press briefings.[12] *Id.* The letter described four specific instances in which Mr. Ateba allegedly disrupted the daily press briefings. *Id.* If Mr. Ateba continued this conduct, the letter warned, his "hard pass may be suspended or revoked, following notice and an opportunity to respond."[13] *Id.* In the letter, the White House also pointed to the new decorum criteria it announced in May and advised Mr. Ateba that he must adhere to these expected standards or risk revocation of his press credentials. *Id.* ¶ 57.

### G.  The Unreasonableness of the New Credentialing System

The White House's threat of revoking Mr. Ateba's press credentials was largely meaningless because the White House knew he would not qualify for a hard pass under the new criteria. Indeed, excluding Mr. Ateba was the goal of the specific revisions. *Id.* ¶ 60. The White House Press Office's new criteria for a hard pass includes a requirement that an applicant must first be credentialed by the press gallery of the United States Supreme Court, or one of the press galleries in either chamber of Congress. *Id.* ¶ 61.

The Supreme Court Public Information Office is responsible for issuing press credentials to journalists seeking to cover the Court.[14] *Id.* ¶ 67. The press gallery at the Supreme Court is

---

[12] VC, Exhibit B.

[13] *Id.*

[14] Supreme Court Public Information Office, https://www.supremecourt.gov/publicinfo/press/Media_Requirements_And_Procedures_Revised _071023.pdf (Press Credential Requirements).

notoriously small with only eighteen seats for journalists in the argument room. *Id.* As a result, the Supreme Court only issues press credentials to journalists whose full-time beat includes the Supreme Court.[15] *Id.* Reporters who primarily cover the White House cannot qualify for a Supreme Court pass. *Id.*

Obtaining credentials from one of the Congressional Press Galleries is therefore Mr. Ateba's only option for obtaining a White House hard pass. *Id.* ¶ 68. The media has been covering Congress since its earliest sessions.[16] *Id.* ¶ 69. The press have designated galleries in both chambers of Congress. *Id.* These "galleries" include office space and work resources for credentialed journalists covering Congress. *Id.*

Ever since the late nineteenth century, Congress delegated regulation of access to the Congressional Press Galleries to the Correspondents Committees—a group of journalists elected to oversee credentialing and other administrative aspects of the Congressional press galleries. *Id.* ¶ 70. Today, there are four Correspondent Committees: the Daily Press Galleries (for daily news publications); the Periodical Press Galleries (for weekly, monthly, and quarterly publications); the Radio and Television Galleries; and the Press Photographers' Gallery. *Id.* Each chamber of Congress has provided professional staff for each respective press gallery. *Id.*

The Correspondents Committee for each gallery is made up of five or six members—all journalists who already have press credentials. *Id.* ¶ 71. The executive committee of the Daily Press Gallery, for example, is made up of journalists from the *Detroit News*, *CQ-Roll Call*, the

---

[15] *Id.* ("The PIO has traditionally reserved hard passes for full-time professional journalists employed by media organizations that have records of substantial and original news coverage of the Court and a demonstrated need for regular access to the Court's press facilities.").

[16] Sarah J. Eckman, *Congressional News Media and the House and Senate Press Galleries*, Congressional Research Service (April 17, 2023).

*Associated Press,* the *Pittsburgh Post-Gazette*, and *States Newsroom*.[17] *Id.* These standing committees process applications based on the respective credentialing criteria adopted by each gallery. *Id.* They are the gatekeepers to the press credentials. *Id.*

To qualify for press credentials for the Daily Press Gallery, a journalist must be:

- A bona fide correspondents of repute in their profession;

- A full-time, paid correspondent who requires on-site access to congressional members and staff;

- Employed by a news organization:  with General Publication periodicals mailing privileges under U.S. Postal Service rules, and which publishes daily; . . . or "whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published continuously for 18 months;

- Reside in the Washington, D.C. area;

- Not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation, organization, or agency of the U.S. Government, or in prosecuting any claim before Congress or any federal government department, and will not do so while a member of the Daily Press Galleries;

- And they must be editorially independent of any institution, foundation or interest group that lobbies the federal government, or that is not principally a general news organization.

*Id.* ¶ 72. [18] The other press galleries have similar requirements.[19] *Id.* ¶ 73.

---

[17] Standing Committee of Correspondents, U.S. Senate Press Gallery, https://www.dailypress.senate.gov/about/standing-committee-of-correspondents/ (last visited Aug. 8, 2023 at 11:00 p.m.).

[18] https://www.dailypress.senate.gov/membership/gallery-rules/ (criteria for press credentials).

[19] *See* https://periodical.house.gov/accreditation/rules-and-regulations (criteria for press credentials); https://www.radiotv.senate.gov/membership/ (same); https://www.pressphotographers.senate.gov/wp-content/uploads/2022/08/Annual-Membership-Regulation-Agreement.pdf (same).

The Correspondents Committees' gatekeeping function has had a dramatic effect on outlet-diversity in Congress over the past decade. *Id.* ¶ 74. In 2017, the Congressional Research Services found that the number of credentialed correspondents in Congress increased from around 2,500 in 1976 to 6,000 in 2016. *Id.* But during that same period, the number of credentialed media outlets dropped from over 1,200 to fewer than 600. *Id.* This drop in the number of media outlets covering Congress supports the notion that the Correspondents Committees responsible for credentialing have become increasingly insular and hostile to "outsiders." *Id.*

**H.  Mr. Ateba's Efforts to Obtain a Hard Pass Under the New Credentialing System**

In response to the new restrictions the White House adopted for hard passes in May 2023, Mr. Ateba applied for press credentials with the Standing Committee of Correspondents for the Daily Press Gallery. *Id.* ¶ 75. Mr. Ateba submitted his application on June 5, 2023. *Id.* ¶ 76. He has yet to receive a response. *Id.* Mr. Ateba applied for press credentials from the Supreme Court Press office on August 3, 2023. *Id.* ¶ 77. The Supreme Court press office informed Mr. Ateba that he was not eligible for Court press credentials because he does not cover the Supreme Court full time for his publication. *Id.* It is Mr. Ateba's understanding that the Supreme Court Public Information Office has informed the White House that it will not issue hard passes for any White House journalists due to space constraints at the Court. *Id.* ¶ 78.

Knowing he would be denied for not having the requisite credentials from a Congressional Press Gallery or the Supreme Court, Mr. Ateba did not apply for a hard pass renewal by the July 31 deadline. *Id.* ¶ 79. On August 4, 2023, Mr. Ateba requested the White House Press Office delay termination of his hard pass until his application to the Daily Congressional Press Gallery or Supreme Court was approved or denied. The White House refused this request.

Despite being specifically targeted by the White House for exclusion, and despite being subject to the unbridled discretion of the Standing Committee for the Congressional Press Gallery, Mr. Ateba will continue to cover the White House for TNA. *Id.* ¶ 81. Though this job has become exceedingly more difficult without a hard pass, Mr. Ateba is determined to continue providing quality coverage for his readers. *Id.* But without a hard pass, Mr. Ateba is, and will continue to be, irreparably harmed. *Id.* ¶ 82. Defendants have infringed on his constitutional rights. And this infringement will persist absent intervention by this Court. *Id.*

### III.   LEGAL STANDARD

"To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted). "A district court must 'balance the strengths of the requesting party's arguments in each of the four required areas,'" and "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id.* (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

### IV.   ARGUMENT

Mr. Ateba seeks a preliminary injunction that prohibits the White House from enforcing the revised credentialing requirements pending the outcome of this litigation.

#### A.  Mr. Ateba Is Likely to Succeed on the Merits.

The White House's revised press credentialing requirements are unconstitutional. The White House revamped its hard pass eligibility requirements for the express purpose of ejecting

Mr. Ateba from the White House briefing room, which constitutes content-based and viewpoint discrimination in contravention of the First Amendment. The new credentialing requirements are also unconstitutional on their face because the White House granted the Congressional Press Gallery Standing Committees unbridled discretion to permit or not permit the exercise of First Amendment rights. The Secret Service further violated the Administrative Procedure Act by acting arbitrarily and capriciously in refusing to issue a hard pass to Mr. Ateba.

>   1.  **The White House is engaging in content-based and viewpoint discrimination with respect to Mr. Ateba.**

The White House violated Mr. Ateba's First Amendment rights when it revised its credentialing requirements in order to prevent him from obtaining a hard pass, thereby excluding him from the White House press briefing room.

"[V]iewpoint discrimination is prohibited in all forums[.]" *Zukerman v. United States Postal Service*, 961 F.3d 431, 444 (D.C. Cir. 2020) (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995)). "Viewpoint discrimination is a subset of content-based discrimination[.]" *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d 395, 407 (D.D.C. 2016), *aff'd in part sub nom. A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*, 845 F.3d 1199 (D.C. Cir. 2017). "The government therefore violates the First Amendment where it 'denies access to a speaker solely to suppress the point of view [the speaker] espouses on an otherwise includible subject.'" *Am. C.L. Union v. Mineta*, 319 F. Supp. 2d 69, 78 (D.D.C. 2004), *appeal dismissed*, No. 04-5285, 2005 WL 263924 (D.C. Cir. Feb. 2, 2005) (quoting *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985)) (brackets in original).

In the context of a case involving the closure of a forum, the DC Circuit explained that while "direct evidence of viewpoint discrimination would be highly probative," "'the government rarely flatly admits it is engaging in viewpoint discrimination.'" *Am. Freedom Def. Initiative v.*

14

*Washington Metro. Area Transit Auth., WMATA*, 901 F.3d 356, 365 (D.C. Cir. 2018) (quoting *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004)). Accordingly, the plaintiff may introduce retrospective evidence that the government "acted in order to suppress a disfavored view," and prospective evidence of "what happened" after the policy change at issue. *Id.* at 365–66.

### a.  Mr. Ateba has retrospective evidence of viewpoint discrimination.

Mr. Ateba's Verified Complaint makes clear that there is retrospective evidence that the White House changed its hard pass eligibility requirements to eliminate him from the White House press briefing room. The White House stonewalled Mr. Ateba from the time he obtained a hard pass in February 2021, as White House personnel almost never acknowledge, let alone respond to, Mr. Ateba's questions. VC ¶ 42. The White House's disdain for Mr. Ateba has thus been on display for the duration of Mr. Ateba's tenure as a White House correspondent.

The timing of the White House's policy changes also displays the White House's illicit motive. Following the repeated stonewalling, Mr. Ateba began to engage in more assertive tactics in order to ask questions at press briefings. The March 20, 2023, incident in which Mr. Ateba confronted the Press Secretary about her refusal to engage with him (when the Press Secretary was focused on the cast of a popular television show) resulted in a tense exchange and national media attention. *Id.* ¶¶ 49–50. The March 20 incident was followed by another incident on June 26, 2023, in which Mr. Ateba again received attention when he interrupted another correspondent during a daily press briefing in an effort to ask a question. *Id.* ¶ 51. The White House went as far as to scrub video footage of this incident in which the Press Secretary told Mr. Ateba that he was "being incredibly rude" from its YouTube livestream. *Id.*

The White House's policy changes followed Mr. Ateba's confrontations with the Press Secretary like clockwork. The White House announced it would be changing its hard pass eligibility requirements on May 5, 2023—mere weeks after the March 20 incident. *Id.* ¶ 54.

The *New York Post* thus reported that the White House's revised hard pass eligibility requirements "is widely believed to be spurred by interest in stripping African journalist Simon Ateba of his access to the briefing room after a series of disruptions." VC ¶ 7. (The *Post* also reported that "people involved in discussions said that White House staff had talked about making changes even before Ateba became a minor celebrity," but this self-serving disclaimer does not change the obvious truth of the situation.) Accordingly, Mr. Ateba has compelling evidence that the White House was motivated by the unconstitutional purpose of silencing Mr. Ateba when it revamped its hard pass requirements.

**b.  Mr. Ateba has prospective evidence of viewpoint discrimination.**

The White House's intent to engage in viewpoint discrimination is further evidenced by the fact that the White House accomplished its goal of sidelining Mr. Ateba. Despite submitting his application for press credentials with the Standing Committee of Correspondents for the Daily Press Galley on June 5, 2023, Mr. Ateba has yet to receive a response. VC ¶ 76. While Mr. Ateba has applied for a hard pass, *id.*, Mr. Ateba's lack of accreditation by a press gallery in the Supreme Court, the U.S. Senate, or the U.S. House of Representatives makes him ineligible for a hard pass. *Id.* ¶ 55. The White House is hence able to continue its press briefings with Mr. Ateba *in absentia*, revealing that the policy change had the effect of silencing Mr. Ateba.

The White House's hard pass eligibility requirements are therefore unconstitutional as applied to Mr. Ateba. While the White House has not admitted that it revamped its hard pass

eligibility requirements with the purpose of targeting Mr. Ateba, there is nonetheless strong circumstantial evidence, both retrospective and prospective, that this is the case.

> ### 2. The White House's hard pass requirements impermissibly vest the government with unbridled discretion to permit the exercise of First Amendment rights.

The White House's policy of only issuing hard passes to reporters who have obtained press credentials from the Supreme Court or one of the Congressional Press Galleries violates longstanding prohibitions on policies that vest the government with unbridled discretion in deciding whether to permit First Amendment activity.

The Supreme Court, "[r]ecognizing the explicit protection accorded speech and the press in the text of the First Amendment, . . . ha[s] long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity," an individual who is "subject to the law may challenge it facially," even without first being denied a license. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755–56 (1988). "At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Id.* at 757.

The Court identified two risks posed by grants of unbridled discretion: first "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually applied;" and second, "the absence of express standards makes it difficult to distinguish . . . between a licensor's legitimate denial of a permit and its illegitimate use of censorial power." *Id.* at 757–58. "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Id.* at 759. For a law to be subject to a facial

challenge based on unbridled discretion, the "law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.*

Courts around the country have made it clear that a government official's unbridled discretion cannot serve as the barrier between an individual and their exercise of First Amendment rights. In *McDaniel v. Lombardi*, the court held that a policy in which a government official was given "sole decision-making authority when selecting execution witnesses" amounted to "impermissible viewpoint discrimination" when "there is no official policy for how that decision is made." 227 F. Supp. 3d 1031, 1039 (W.D. Mo. 2016), *aff'd sub nom. McDaniel v. Precythe*, 897 F.3d 946 (8th Cir. 2018) (citing *Lakewood*, 486 U.S. at 758). The Eleventh Circuit concluded that a school district's policy that those wishing to speak at school board meetings must first schedule a meeting with the superintendent (who had discretion whether and when to set such a meeting) was unconstitutional because it "pose[d] enough of a risk that speech will be chilled or effectively censored on the basis of content or viewpoint." *Barrett v. Walker Cnty. School Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017). The Fourth Circuit similarly held that a school district could not reserve for itself unbridled discretion in deciding which flyers outside groups could send home with students to show their parents. *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Public Schools*, 457 F.3d 376, 389 (4th Cir. 2006).

It is undeniable that the hard pass necessary to access the White House press briefing room without obtaining temporary passes has a "nexus to expression" such that the regulation of hard passes "pose[s] a real and substantial threat of . . . censorship risks." *Lakewood*, 486 U.S. at 759. The D.C. Circuit previously recognized that there are "important first amendment rights implicated by refusal to grant White House press passes to bona fide Washington journalists[.]" *Sherrill v.*

*Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977). Both "newsmen and the publications for which they write" and "the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information." *Id.* at 129–30. Access to the White House press briefing room (and by extension, the hard pass necessary to do so) is thus an expressive First Amendment activity.

Both of the risks associated with grants of unbridled discretion that the *Lakewood* court identified are present here. Grants of unbridled discretion are "pernicious not merely by reason of the censure of particular comments but by the reason of the *threat to censure comments on matters of public concern*." *Lakewood*, 486 U.S. at 757 (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 97 (1940)). In effect, the decision on which journalists can obtain hard passes now lies with the four Correspondents Committees in the Congress. The Supreme Court Public Information Office only issues passes to journalists whose full-time beat includes the Supreme Court and the Correspondents Committees determine who has access to the Congressional Press Galleries.

The Correspondents Committee of the Daily Press Gallery can deny any journalist access to a Congressional press pass if it deems the journalist not to be a "bona fide correspondent[] of repute in their profession." VC ¶ 72. Whether a journalist satisfies this criterion is entirely subjective. Thus, a journalist's right to cover the White House is now dependent on whom a committee of journalists from a handful of large, established newspapers deem to be "bona fide" and "of repute in their profession." This carries a natural risk of self-censorship as journalists may be dissuaded from taking editorial stances unpopular with their colleagues out of fear of being considered "disreputable," and then losing their ability to conduct journalism in Congress and at the White House. This risk is not theoretical in Mr. Ateba's case. The Verified Complaint made

19

clear that Mr. Ateba's efforts to fight the White House's de facto policy of never calling on him made Mr. Ateba unpopular with colleagues in the press corps. Mr. Ateba—and other journalists— are now faced with a policy that requires them to self-censor so that they can ingratiate themselves with their colleagues to ensure they can obtain and maintain hard passes.

Next, there are no "express standards" that the Congressional Correspondents Committees must employ, which makes it "difficult to distinguish" between a "legitimate" denial of a Congressional Correspondents Committee pass and the "illegitimate use of censorial power." *Lakewood*, 486 U.S. at 758. Mr. Ateba's ability to obtain the Congressional Press Gallery pass necessary for a White House hard pass depends on whether the Correspondents Committee deems him to be a bona fide journalist of repute in his profession. But there are no standards that govern this inherently subjective determination. In the absence of such standards, there is no way of determining whether the Correspondents Committee denied an applicant a pass based on impermissible, censorial reasons, or legitimate reasons. The lack of a deadline by which the Correspondents Committee must act on applications can allow applications to languish indefinitely, which itself is an impermissible exercise in unbridled discretion. *See Barrett*, 872 F.3d at 1229 (explaining that the requirement that those who wish to speak at school board meetings must first meet with the superintendent is also unconstitutional "because the initial-meeting provision lacks any time limit with which the Superintendent must comply").

The White House's revised credentialing policy therefore constitutes an unconstitutional grant of unbridled discretion as it allows the Congressional Correspondents Committees the right to grant or not grant a pass necessary for a White House hard pass to issue based on subjective criteria that paves the way for self-censorship and the abuse of censorial power.

### 3.   The Secret Service's Policy Actions Regarding White House Hard Passes Violated the Administrative Procedure Act.

The Secret Service violated the Administrative Procedure Act ("APA") when it changed the rules regarding White House hard passes and caused Mr. Ateba's hard pass to lapse on August 1, 2023. The Secret Service is an agency within the meaning of the APA. *See Oryszak v. Sullivan*, 576 F.3d 522, 526 (D.C. Cir. 2009) (analyzing a challenge to a Secret Service action under the APA). As an agency under the APA, the Secret Service was therefore obligated to follow the APA with respect to final agency actions and changes in agency policies and positions. The Secret Service engaged in final agency action when it caused Mr. Ateba's hard pass to expire, and it changed its policies and positions when it accepted the White House's new eligibility requirements for hard passes.

*First,* the Secret Service violated the APA when it engaged in final action—causing Mr. Ateba's hard pass to expire—in a manner that violated the APA. "An agency action reflects the consummation of the agency's decision making process when the action is 'definitive[,]' . . . , and is not 'tentative, open to further consideration, or condition[ed] on future agency action[.]'" *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 60 (D.D.C. 2015) (first quoting *Fourth Branch Assocs. (Mechanicville) v. FERC,* 253 F.3d 741, 746 (D.C. Cir. 2001), then quoting *City of Dania Beach, Fla. v. FAA,* 485 F.3d 1181, 1188 (D.C. Cir. 2007)) (some alterations in original). The expiration of Mr. Ateba's hard pass is the end of the road for him; once August 1 arrived, Mr. Ateba's right to access White House press facilities was gone. There is no appeal process or means by which his previous hard pass can be reinstated. The Secret Service thus took final action with respect to Mr. Ateba when it enacted a policy change that led to the expiration of his hard pass on August 1, 2023.

"When reviewing agency action pursuant to the APA, the Court must determine whether the challenged decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Shays v. Fed. Election Comm'n*, 424 F. Supp. 2d 100, 109 (D.D.C. 2006) (quoting 5 U.S.C. § 706(2)(A)) (other citation omitted). "In applying the 'arbitrary and capricious' standard, a court 'may not supply a reasoned basis for the agency's action that the agency itself has not given[.]'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1974)). Here, the Secret Service's final action of causing Mr. Ateba's hard pass to expire was arbitrary and capricious because there was *no reason at all* provided for the expiration of the pass—let alone a reasoned basis that would satisfy arbitrary and capricious review.

*Second,* the Secret Service's adoption of the new hard pass eligibility requirements constitutes a change in policies and positions. While "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citations omitted). When enacting a policy change, "the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Here, the change in hard pass eligibility requirements represents a change in policy by an agency because the Secret Service, the agency that ultimately issues the hard pass, is now issuing hard passes based on a different set of criteria than those under which Mr. Ateba originally secured his hard pass. Yet the Secret Service provided no reasoned explanation for its change, let alone an explanation that passes muster under the APA.

The Secret Service therefore violated the APA when it took final action with respect to Mr. Ateba's hard pass and changed its policy regarding hard pass eligibility, both without a reason that satisfies arbitrary and capricious review.

**B.  Mr. Ateba Will Suffer Irreparable Injury Without a Preliminary Injunction.**

Without a preliminary injunction, Mr. Ateba will suffer irreparable harm. The White House's adoption of an unconstitutional hard pass eligibility policy that infringes on the freedom of the press is itself irreparable harm that justifies a preliminary injunction. In *Karem*, which involved only a suspension of a hard pass (as opposed to an expiration with no reasonable hope of a new pass), the D.C. Circuit explained that "'a prospective violation of a constitutional right constitutes irreparable injury for . . . purposes' of 'seeking equitable relief.'" *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)) (ellipsis in original). Thus, the White House's adoption of a policy that both violates Mr. Ateba's First Amendment rights as applied to him and violates the First Amendment on its face is irreparable harm that warrants injunctive relief. Mr. Ateba has further shown specific irreparable harm as he has extremely limited access to the White House press facilities now that he no longer has a hard pass, which substantially limits his ability to cover the White House for TNA.

**C.  The Public Interest and Balance of Equities Favor an Injunction.**

The "balance of equities and public interest . . . factors 'merge when' . . . 'the Government is the opposing party." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ((quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The White House will be unable to prove any harm, either to its own operations or to the public, if it is enjoined from enforcing its unconstitutional press credentialing policy pending the outcome of this litigation. Mr. Ateba is simply requesting that the status quo as of July 2023 be preserved, and that the prior hard pass credentialing system remain

in place. Neither the White House nor the public suffered harm as a result of the prior policy, so there will be no harm caused by reverting to that policy. In contrast, "'enforcement of an unconstitutional law is always contrary to the public interest.'" *Id.* (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)). As explained above, the new hard pass eligibility requirements are unconstitutional, so the public will benefit from their enjoinment. The public further has an interest in a free press, and removing unconstitutional and unreasonable barriers on the White House press corps will indubitably make the freedom of the press more robust.

## V.    CONCLUSION

Based on the foregoing arguments and authorities, Plaintiff Simon Ateba requests that the Court issue a preliminary injunction prohibiting the White House Press Office from enforcing the revised press credentialing requirements pending the outcome of this litigation.

Dated: August 10, 2023

Respectfully submitted,

By: /s/ Harmeet K. Dhillon
Harmeet K. Dhillon*
(D.D.C. Bar ID: CA00078)
Mark Trammell*
Josh Dixon*
Eric A. Sell
(D.D.C. Bar ID: 1742565)
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

Gary M. Lawkowski
(D.D.C. Bar ID: VA125)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Jesse D. Franklin-Murdock
(D.D.C. Bar ID: CA00147)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700

24

San Francisco, CA 94108

*Counsel for Plaintiff Simon Ateba*
*\*Pro Hac Vice Motions Forthcoming*