**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SIMON ATEBA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 23-2321 (JDB)** |
| **KARINE JEAN-PIERRE, in her official capacity as Press Secretary to the President of the United States, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION AND ORDER

The D.C. Circuit has long recognized that journalists' access to the White House may implicate First Amendment interests. See Karem v. Trump, 960 F.3d 656, 665 (D.C. Cir. 2020); Sherrill v. Knight, 569 F.2d 124, 129–30 (D.C. Cir. 1977). Simon Ateba, a journalist covering the White House for Today News Africa, an online publication focusing on American politics and the relationship between the United States and African countries, challenges a recent change in White House policy related to access for journalists. The new policy alters the requirements for obtaining a "hard pass"—a special press credential that allows a journalist to enter the White House press areas "on-demand." Karem, 960 F.3d at 106. Ateba, who previously held a hard pass, lost his credential under the new rule.

On August 10, 2023, Ateba sued Karine Jean-Pierre, the White House Press Secretary; Kimberly Cheatle, the Director of the Secret Service; and the Secret Service (collectively, the "White House"), alleging that the new policy violates his First Amendment rights and runs afoul of the Administrative Procedure Act ("APA").[1]   Before the Court is Ateba's motion for a

---

[1] Ateba alleges that all defendants violated his First Amendment rights, but only the Secret Service violated his rights under the APA.  The Court will differentiate among defendants when it reaches the merits of this dispute at a later stage in the litigation.

preliminary injunction reinstating his hard pass and prohibiting the White House from enforcing the new policy. The Court will deny the motion because Ateba has not shown he is likely to suffer irreparable harm during the pendency of this litigation. The Court will, however, order expedited summary judgment briefing so that the merits of Ateba's challenge can be swiftly adjudicated.

**Background**

For decades, the White House has offered press credentials to journalists who cover the President and his administration. See Sherrill, 569 F.2d at 126. These credentials allow journalists to access the press areas of the White House complex, including the James S. Brady Press Briefing Room, where they can attend press conferences, interview White House officials, and report on the day-to-day of the administration. See Pl.'s Verified Compl. [ECF No. 1] ("Compl.") ¶¶ 22, 26–27. The White House press corps includes reporters from a wide range of outlets, who rely on the "essential access point" of the briefing room to do their jobs. Id. ¶¶ 22–23.

Given the "strict security requirements" necessary to protect the President, access to the White House is "tightly controlled." Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. [ECF No. 17] ("Opp'n") at 2; see Sherrill, 569 F.2d at 130 (recognizing a "compelling, even . . . overwhelming interest" in the President's safety (internal quotation marks omitted)). Today, the White House offers two principal forms of access: First, a reporter can obtain a "hard pass," a credential that allows him to come and go freely from the press areas of the White House. Decl. of Nathan Fleischer [ECF No. 17-1] ("Fleischer Decl.") ¶ 6. Second, a reporter may get a "day pass," a daily credential issued upon application to the Secret Service. Id. ¶ 7. As discussed further below, day pass and hard pass holders can access the same parts of the White House at the same times. Id. ¶¶ 6–7. However, day pass holders must undergo additional initial security screening and be escorted from the White House gate to the press areas. Id. ¶¶ 7–9.

Ateba is the White House Correspondent for <u>Today News Africa</u>, an "online publication that focuses on relations between the United States and African nations." Compl. ¶ 18. A longtime journalist, Ateba began covering the White House in 2018. <u>Id.</u> ¶¶ 38–39. For the first three years, he entered the White House with a day pass. <u>Id.</u> ¶ 39. From February 2021 through July 2023, he held a hard pass. <u>Id.</u> ¶¶ 40, 62. During his time as correspondent, Ateba has become increasingly frustrated by the reception he has received from the White House Press Office. Ateba asserts that he "has rarely received any response—or even acknowledgment—of his questions from the White House" and has been denied access to press conferences held by President Biden (even before he lost the hard pass). <u>Id.</u> ¶ 42; <u>see</u> <u>id.</u> ¶ 43. As a result, faced with this situation, Ateba claims he "resorted to one of the only options available to him: speaking up during press briefings." <u>Id.</u> ¶ 45. Ateba is known to "shout[] his questions to the White House Press Secretary . . . during briefings . . . [and] speak over his fellow journalists." <u>Id.</u> ¶ 47; <u>see</u> <u>id.</u> ¶¶ 47–52. In one notable incident, Ateba interrupted a press conference featuring the cast members of the comedy TV series "Ted Lasso," who were invited to speak on mental health, to ask why he was not allowed to ask questions. <u>Id.</u> ¶ 49. Ateba's outbursts have not ingratiated him with the White House Press Office or his fellow correspondents. <u>Id.</u> ¶¶ 48–53. His conduct has been the subject of considerable news coverage, and he received a letter from the White House warning him that his hard pass could be suspended or revoked if he continued disrupting press briefings. <u>Id.</u> ¶¶ 52, 58.

On May 5, 2023, the White House announced a new set of criteria for obtaining a hard pass: (1) full-time employment with a news organization; (2) a D.C.-area address; (3) access of the White House within the last six months for work; (4) an assignment to regularly cover the White House; (5) accreditation by a press gallery of the Supreme Court, the U.S. Senate, or the U.S. House of Representatives; and (6) willingness to submit to a Secret Service background

check.  Compl. ¶ 55; see Ex. A [ECF No. 1-1].  Ateba asserts that these new criteria were "targeted" at keeping him out of the White House.  Compl. ¶ 57; see id. ¶ 54.  Specifically, Ateba claims that "excluding [him] was the goal of the specific revisions" requiring press gallery accreditation, since "the White House knew he would not qualify for a hard pass under the new criteria."  Id. ¶ 60; see id. ¶ 61.  He asserts that Supreme Court press passes are difficult to come by, and he argues that the criteria for obtaining a congressional press credential are subjective and prone to abuse, particularly as to journalists who, like him, have spoken out of turn.  Id. ¶¶ 67–74.  Ateba fears he will not be able to obtain a credential from the committees of journalists responsible for congressional press credentialing because, he contends, they are "insular and hostile to 'outsiders,'" id. ¶ 74, and use an amorphous criterion of being a "bona fide correspondent[] of repute in the[] profession" to determine eligibility, id. ¶ 72; see also Mem. of Law in Supp. of Prelim. Inj. [ECF No. 2] ("Mot.") at 19–20.  The White House, for its part, notes that this same requirement of a congressional press gallery credential has been employed by many administrations, including those of Presidents Obama and Trump.  See Opp'n at 3; Sherrill, 569 F.2d at 126 & n.3, 129.

    Since the White House announced the new policy, Ateba has been unable to secure either accreditation.  He was denied the requisite credentials by the Supreme Court and continues to await an answer regarding congressional press credentialing.  Compl. ¶¶ 76–77.

    Ateba's hard pass expired when the new policy became effective on July 31, 2023.  Compl. ¶¶ 54, 62.  On August 4, 2023, he requested an extension of his prior hard pass, which was denied. Email from Allyson N. Bayless to Today News Africa (Aug. 6, 2023) [ECF No. 17-2].  He has not applied for a new hard pass, he says, because it would be futile without the required congressional or Supreme Court credential.  Decl. of Simon Ateba [ECF No. 18-1] ("Ateba Decl.") ¶ 6.  Since

the expiration of his hard pass, Ateba has sought a day pass on only one occasion.  See id. ¶¶ 12, 15–16; Defs.' Surreply in Opp'n to Pl.'s Mot. for Prelim. Inj. [ECF No. 20] ("Surreply") at 1–2. His request was granted but he did not enter the White House.  Surreply at 2.  Ateba claims he was confused about whether the request was granted.  See Ateba Decl. ¶ 17.

On August 10, 2023, Ateba simultaneously filed a complaint and a motion for a preliminary injunction, asking the Court to enjoin enforcement of the new hard pass policy and reinstate his hard pass for the duration of the litigation.  He claims the White House Press Office engaged in viewpoint discrimination by adopting a hard pass policy intended to exclude him and impermissibly vested "unbridled discretion" in the congressional press gallery committees. Compl. ¶¶ 83–95.  He further asserts that the Secret Service's failure to provide a reasoned explanation for terminating his hard pass by allowing it to expire violates the APA.  Id. ¶¶ 96–103. The preliminary injunction motion is fully briefed and ripe for resolution.

## Legal Standard

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 10 (D.C. Cir. 2019) (per curiam) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  The moving party bears the burden of persuasion to establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in its favor; and (4) an injunction is in the public interest.  Id.  A failure to show irreparable harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).

### Analysis

Because preliminary injunctive relief is never warranted in the absence of irreparable harm, the Court may begin there.  See, e.g., Chaplaincy, 454 F.3d at 297; Nat'l Treasury Emps. Union v. United States ("NTEU"), 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.).  For purposes of this analysis, the Court will "assume[], without deciding, that [Ateba] has demonstrated a likelihood that the [White House's] conduct violates the law."  Chaplaincy, 454 F.3d at 303.  To satisfy this prong, Ateba must demonstrate harm that is "certain and great," "actual and not theoretical," "imminent" and "beyond remediation."  League of Women Voters of United States v. Newby, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting Chaplaincy, 454 F.3d at 297).  In this Circuit, "a prospective violation of a constitutional right constitutes irreparable injury," Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013), but only if the violation is "ongoing or 'imminent.'"  Singh v. Berger, 56 F.4th 88, 109 (D.C. Cir. 2022) (quoting Chaplaincy, 454 F.3d at 297) (cleaned up).

### I.    Alleged Deprivation of White House Access

Ateba argues that he faces irreparable harm because, without a hard pass, "he has extremely limited access to the White House press facilities . . . which substantially limits his ability to cover the White House for [Today News Africa]."  Mot. at 23.  While the parties are at odds over the equivalence of a day pass, certain facts are not in dispute.  On a weekly basis, journalists can request links to a form that would allow them to register for visitor passes to enter the White House each day.  Ateba Decl. ¶ 8; Fleischer Decl. ¶ 8.  After a journalist submits this form, which includes biographical data, the Secret Service conducts a background check and authorizes access to the White House press areas.  Fleischer Decl. ¶ 8; Mot. at 2.  When a journalist visits the White House on a day pass, he must undergo additional security screening and then be escorted to the press areas.  Compl. ¶ 39; Fleischer Decl. ¶¶ 7, 9.  But once inside, the day pass allows a journalist to enter the White House grounds during the same times as a hard pass holder and attend the same

press events.  Fleischer Decl. ¶ 7; <u>see</u> Compl. ¶ 26.   Ateba is eligible to apply for a day pass.  <u>See</u> Suppl. Decl. of Nathan Fleischer [ECF No. 20-1] ("Fleischer Suppl. Decl.") ¶ 3; Ateba Decl. ¶ 15. For three years before he obtained a hard pass, Ateba used day passes to enter the White House. Compl. ¶ 39; Surreply at 2.

Ateba disputes the convenience and reliability of this day pass system.  He contends that it limits his ability to cover breaking news because he needs to request day pass links the Thursday prior and submit a form by 5:00 p.m. the day before he intends to access the White House.  Ateba Decl. ¶¶ 8–9.  He claims that it can be confusing whether a request for a day pass was in fact granted.  <u>Id.</u> ¶¶ 14–17.  And he asserts that journalists arriving on a day pass must wait "as much as a half hour" for an escort, which "mak[es] the process quite cumbersome."  <u>Id.</u> ¶ 11.  Without a hard pass, Ateba says he is "unable to provide the quality of coverage of the White House that . . . [his] readers deserve."  <u>Id.</u> ¶ 5; <u>see</u> Compl. ¶ 27 (noting that the White House Correspondents' Association has said a hard pass is necessary for a correspondent to "effectively perform his or her duties, which include providing the public with on-the-spot news coverage of unforeseen and unscheduled events, along with cataloguing the daily activities of the head of the executive branch" (quoting Br. of Amicus Curiae The White House Correspondents' Association in Supp. of Appellee Seeking Affirmance at 3, <u>Karem</u>, 960 F.3d 656 (No. 19-5255)).

The White House, by contrast, characterizes the security clearance process as simple, requiring only a short form with the journalist's biographical data.  Fleischer Decl. ¶ 8.  Security screening takes "[o]n average . . . one minute longer" for the journalist to clear security, although they "might need to wait for [an] escort . . . to the Press Area."  <u>Id.</u> ¶ 9.  The White House submitted further evidence suggesting that a journalist can apply for a day pass shortly before arrival, irrespective of the policy Ateba describes requiring submission by 5:00 p.m. the day before.  <u>See</u>

Ateba Decl. ¶ 8.  For example, on the one occasion Ateba sought a day pass since losing his hard pass, he requested the day pass application links at 9:40 p.m. on Sunday, August 27, 2023, and received them the next day at 9:07 a.m.  Ex. 4 to Surreply [ECF No. 20-2].  He filled out the form by 11:00 a.m., and his same-day request to attend a press briefing was granted.  Fleischer Suppl. Decl. ¶¶ 2–3.

Ateba contends that he is irreparably harmed by the loss of his hard pass, which requires him to use the day pass system when he plans to enter the White House.  He claims that the D.C. Circuit's holding in <u>Karem</u>, 960 F.3d 656, that a reporter suffered irreparable harm when his hard pass was merely suspended, supports his position.  Mot. at 23.  But in <u>Karem</u>, it was the fact of the suspension, without requisite Fifth Amendment due process, that squarely supported a finding of irreparable harm.  960 F.3d at 667–68 (citing <u>Sherrill</u>, 568 F.2d at 131).  And, moreover, it appears that Karem (the reporter) was actually unable to access the White House.  <u>See id.</u> at 665 (characterizing Karem's punishment as a "month's exile").  Ateba does not allege that he was denied due process,[2] and he can still access the White House with a day pass.

Rather, Ateba asserts that the deprivation of a hard pass causes irreparable harm to his First Amendment rights.  The D.C. Circuit has recognized that "White House press facilities having been made publicly available as a source of information for [newspersons], the protection afforded newsgathering under the [F]irst [A]mendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons."  <u>Sherrill</u>, 569 F.2d at 129

---

[2] As argued in the White House's opposition, Ateba likely cannot demonstrate similar harm here since the White House issued this policy months in advance and gave Mr. Ateba an opportunity to apply for renewal of his hard pass—something he has not done—while simultaneously setting forth the standards and procedures that would govern both issuance of a hard pass in the first instance and revocation of a hard pass once granted.

Opp'n at 24.  Ateba's passing allegation of a Fifth Amendment violation in his reply brief will not be considered.  <u>See</u> Pl.'s Reply in Supp. of Mot. for Prelim. Inj. [ECF No. 18] ("Reply") at 14.

(footnote and citations omitted).  Sherrill may imply that a journalist suffers a First Amendment harm when he or she is arbitrarily denied access to the White House press areas.  But cf. Zemel v. Rusk, 381 U.S. 1, 17 (1965) (noting there is no general First Amendment right to enter the White House).  Even accepting this premise, Ateba has not demonstrated that he has suffered harm since he still has access to White House press areas with a day pass.  See Opp'n at 24.  The Court recognizes that Ateba is inconvenienced by needing to fill out the form and wait on a press escort.  Further, it is possible he would miss an event occurring on short notice because he had not requested credentials in advance.  But this latter result may be avoided if Ateba applies for a week's worth of day passes in advance, even if he is unsure whether he will use them.  Ultimately, he remains able to enter the White House using the day pass system, which, on the evidence before the Court, appears to be an acceptable alternative for the duration of the litigation.

Ateba points to a recent Ninth Circuit order in support of his position that being required to use a day pass instead of a hard pass constitutes irreparable harm.  A panel of that court recently concluded that a journalist was irreparably injured when he was excluded from Maricopa County press briefings because "constitutional injury is not 'rendered de minimis or otherwise mitigated by requiring [him] to avail [himself] of a less desirable, even if somewhat effective alternative.'" Reply at 19 (quoting TGP Commc'ns, LLC v. Sellers, No. 22-16826, 2022 WL 17484331, at *6 (9th Cir. Dec. 5, 2022)).  But that journalist, unlike Ateba, was denied access to the briefings and left to watch a livestream.  See TGP Commc'ns, 2022 WL 17484331, at *6 (describing "the County's exclusion of [the journalist] from its limited forum"); cf. Consumer's Union of U.S., Inc. v. Periodical Correspondents' Ass'n, 365 F. Supp. 18, 26 (D.D.C. 1973) (condemning arbitrary "[e]xclusion from the [congressional] press galleries"), rev'd on other grounds, 515 F.2d 1341 (D.C. Cir. 1975).  On the evidence before the Court, Ateba has not made a "clear showing," Winter,

555 U.S. at 22, that <u>denial</u> of access to the White House is "likely to occur," <u>Henke v. Dep't of Interior</u>, 842 F. Supp. 2d 54, 59 (D.D.C. 2012), such that he would be irreparably harmed during the litigation.

## II.   Other Alleged Harms

Ateba further argues that "adoption of an unconstitutional hard pass eligibility policy that infringes on the freedom of the press is itself irreparable harm that justifies a preliminary injunction." Mot. at 23.  It is often said that when a party seeks a preliminary injunction to prevent the deprivation of a First Amendment right, the only question for the Court is whether "the deprivation is shown to be likely." <u>Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d 314, 334 (D.C. Cir. 2018).  Because a "prospective violation of a constitutional right constitutes irreparable injury," <u>Gordon</u>, 721 F.3d at 653, even if it lasts only "minimal periods of time," <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976), a preliminary injunction should issue if the violation is shown to be likely to occur and the plaintiff is likely to succeed on the merits, <u>Archdiocese of Wash.</u>, 897 F.3d at 334.

However, "[t]hat abstract principle must be applied to the relevant factual setting." <u>Getty Images News Servs. Corp. v. Dep't of Def.</u>, 193 F. Supp. 2d 112, 123 (D.D.C. 2002).  It is not enough to "merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong." <u>Chaplaincy</u>, 454 F.3d at 301; <u>see also</u> <u>Sanders v. McClellan</u>, 463 F.2d 894, 903 (D.C. Cir. 1972) (weighing "indirect and incidental chill" of government action that did not result in "direct suppression of speech or press").  A plaintiff "must show that their 'First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'" <u>Chaplaincy</u>, 454 F.3d at 301 (quoting <u>NTEU</u>, 927 F.3d at 1254–55).  Where speech is not directly curtailed, a

plaintiff must "demonstrate that the allegedly impermissible government action would chill allowable individual conduct." Id. at 301.

The D.C. Circuit's opinion in NTEU is instructive.  See Chaplaincy, 454 F.3d at 301. NTEU involved a suit by government employees to enjoin an ethics law prohibiting them from receiving compensation for delivering speeches or writing articles.  927 F.2d at 1253–54.  The D.C. Circuit affirmed the denial of a preliminary injunction since the employees failed to show they would "cease speaking or writing before the district court resolves their constitutional challenges." Id. at 1255.  Since the employees could still get reimbursed for their expenses, it was unconvincing that they were unable to afford to continue engaging in First Amendment activities. Id.  And any lack of financial incentive to "continue writing or speaking" was a "foreseeable long-term effect[]" that "did not entitle the [plaintiffs] to preliminary, injunctive relief." Id.

Because the White House policy does not limit what Ateba can publish, his bare assertion that the policy violates the freedom of the press does not suffice to establish a likelihood of irreparable harm.  And Ateba has not demonstrated the hard pass policy is likely to chill his newsgathering activities to the detriment of his readers.  Ateba has indicated that, despite the difficulties he faces without a hard pass, he "will continue to cover the White House" and remains "determined to continue providing quality coverage for his readers." Compl. ¶ 81.  The evidence suggests he will be able to do so:  "For his first three years covering the White House, Mr. Ateba obtained a temporary daily press pass . . . ." Id. ¶ 39; see Opp'n at 25.  And since his hard pass expired, he has only tried to seek entry to the White House one time.  Ateba asserts that on the prior two occasions the White House held a press briefing in August, he was not aware in time to request a day pass.  Ateba Decl. ¶ 13.  It is not clear to the Court whether this was a failure of Ateba's diligence or the White House Press Office's advance planning.  In any event, the fact that

the White House was willing to clear an 11:00 a.m. request for access, see Fleischer Suppl. Decl. ¶¶ 2–3, suggests Ateba could cover most if not all press briefings, allowing him to gather the news and deliver it effectively to his readers.   See Getty Images, 193 F. Supp. 2d at 123 (finding no irreparable harm when it was unclear how the challenged regulation would affect journalists' right of access to Guantanamo Bay).

Ateba also argues that his speech (and that of other journalists) will be chilled because his "efforts to fight the White House's de facto policy of never calling on him made [him] unpopular with colleagues in the press corps," and accordingly the new policy "requires" him and other journalists to "self-censor so that they can ingratiate themselves with their colleagues" who decide whether he can obtain the press gallery credential that is now a prerequisite to obtaining a White House hard pass.   Mot. at 20.   This alleged harm is too speculative to support relief, particularly in light of the evidence Ateba supplies of his own behavior—years of acting in ways that disgruntle other correspondents, despite the contemporaneous cost to his relationship with the White House. See Compl. ¶¶ 46–53.   While self-censorship could possibly be a "long-term effect" of the hard pass policy, the evidence at this stage does not support a finding that First Amendment interests are "threatened or in fact being impaired."   NTEU, 927 F.2d at 1255 (internal quotation marks omitted).

Finally, in reply, Ateba argues that he suffers a competitive harm because he is at a "disadvantage to the other White House journalists who are allowed to have hard-pass access." Reply at 20.   The Court has found on the evidence before it that Ateba retains access to the White House facilities on substantially similar terms.   Indeed, he has the very access most reporters do in terms of entry.   To the extent "Mr. Ateba's competition gets more—and more efficient—access to the White House press areas and the President," id. at 19, any resulting competitive harm is

unlikely to "accrue 'in the absence of preliminary relief'—that is, before the district court can resolve the case on the merits." <u>Singh</u>, 56 F.4th at 109 (quoting <u>Winter</u>, 555 U.S. at 20).

In sum, the Court concludes that Ateba has not demonstrated a likelihood of irreparable harm.  Hence, a preliminary injunction is not warranted.

*       *       *

For the foregoing reasons, and upon consideration of the entire record herein, it is hereby

**ORDERED** that [2] plaintiff's motion for a preliminary injunction is **DENIED**; it is further

**ORDERED** that the following schedule shall govern further proceedings:

1. Defendants shall file any motion for summary judgment, including any Administrative Record, by not later than September 20, 2023.  Briefing shall be limited to 25 pages.

2. Plaintiff shall file any opposition to defendants' motion combined with any cross-motion for summary judgment by not later than October 4, 2023.  Briefing shall be limited to 25 pages.

3. Defendants shall file any reply in support of their motion combined with any opposition to plaintiff's cross-motion by not later than October 11, 2023.  Briefing shall be limited to 15 pages.

4. Plaintiff shall file any reply in support of his cross-motion by not later than October 18, 2023.  Briefing shall be limited to 15 pages.

**SO ORDERED.**

/s/<br>
_____<br>
JOHN D. BATES<br>
United States District Judge

Dated: <u>September 6, 2023</u>