**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SIMON ATEBA,

        *Plaintiff,*

 v.

KARINE JEAN-PIERRE,
in her official capacity as Press Secretary
to the President of the United States, *et al*.,

        *Defendants.*

Case No. 1:23-cv-02321-JDB

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 1

I.    THE HARD PASS PROGRAM IS UNCONSTITUTIONAL ......................................... 1

       A.    Independent of Forum Analysis, the First Amendment Prohibits Arbitrary
             Regulation of Access to Designated Press Facilities ................................ 1

             1.    The unbridled discretion doctrine applies to property the government has
                   designated for the press........................................................................... 1

             2.    The unbridled discretion doctrine applies to newsgathering at the White House. 2

             3.    The hard-pass program violates the unbridled discretion doctrine. ..................... 4

             4.    The hard-pass program arbitrarily requires Congressional approval.................. 5

       B.    Under Forum Analysis, the First Amendment Prohibits Arbitrary Regulation of
             Access to Designated Press Facilities ....................................................... 6

             1.    The White House Press Area is a limited public forum. ..................................... 6

             2.    Regardless of the type of forum, the unbridled discretion doctrine applies. ....... 8

       C.    Mr. Ateba Has Suffered a Cognizable Injury ........................................... 9

II.   MR. ATEBA IS ENTITLED TO SUMMARY JUDGMENT ON HIS APA CLAIM ..... 10

III.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON MR.
       ATEBA'S FIRST AMENDMENT DISCRIMINATION CLAIM.................................. 13

       A.    Mr. Ateba Is Entitled to Discovery Under Fed. R. Civ. P. 56(d).......................... 13

       B.    Defendants Fail to Establish as a Matter of Law that They Did Not Discriminate
             Against Mr. Ateba Based on Viewpoint or Content................................. 14

CONCLUSION............................................................................................................ 15

# TABLE OF AUTHORITIES

## Cases

*Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*,
   901 F.3d 356 (D.C. Cir. 2018) ................................................................................ 8, 9

*Ambrose v. Township of Robinson, Pa.*,
   303 F.3d 488 (3d Cir. 2002) ...................................................................................... 14

*Associated Press v. United States*,
   326 U.S. 1 (1945) ........................................................................................................ 6

*Bell v. Wolfish*,
   441 U.S. 520 (1979) .................................................................................................. 10

*Boardley v. U.S. Dep't of Interior*,
   615 F.3d 508 (D.C. Cir. 2010) .................................................................................... 5

*\*Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*,
   457 F.3d 376 (4th Cir. 2006) ................................................................................... 8, 9

*Comley v. Town of Rowley*,
   296 F. Supp. 3d 327 (D. Mass. 2017) ...................................................................... 15

*\*Consumers Union v. Periodical Correspondents' Ass'n*,
   365 F. Supp. 18 (D.D.C. 1973) ................................................................................... 2

*Consumers Union v. Periodical Correspondents' Ass'n*,
   515 F.2d 1341 (D.C. Cir. 1975) .................................................................................. 2

*\*Convertino v. U.S. Department of Justice*,
   684 F.3d 93 (D.C. Cir. 2012) .................................................................................... 13

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
   473 U.S. 788 (1985) .................................................................................................... 7

*Detroit International Bridge Company v. Canada*,
   883 F.3d 895, 903 (D.C. Cir. 2013) ......................................................................... 12

*Eichenlaub v. Township of Indiana*,
   385 F.3d 274, 281 (3d Cir. 2004) ............................................................................. 15

*Foman v. Davis*,
   371 U.S. 178 (1962) .................................................................................................... 6

*\*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) .................................................................................................... 4

*\*Getty Images News Servs. Corp. v. Dep't of Def.*,
   193 F. Supp. 2d 112 (D.D.C. 2002) ............................................................... 2, 3, 7, 8

*Griffin v. Sec'y of Veterans Affs.*,
   288 F.3d 1309 (Fed. Cir. 2002) .................................................................................. 9

*Haynes v. D.C. Water & Sewer Auth.*,
   924 F.3d 519 (D.C. Cir. 2019) .................................................................................. 14

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ................................................................................................ 7

*Huminski v. Corsones*,
  386 F.3d 116 (2d Cir. 2004) ............................................................................... 3

*\*Int'l Refugee Assistance Project v. Trump*,
  373 F. Supp. 3d 650 (D. Md. 2019) ................................................................. 12

*Jefferson v. Collins*,
  905 F. Supp. 2d 269 (D.D.C. 2012) ................................................................... 6

*Jeffries v. Barr*,
  965 F.3d 843 (D.C. Cir. 2020) ................................................................... 13, 14

*John K. MacIver Inst. v. Evers*,
  994 F.3d 602 (7th Cir. 2021) .............................................................................. 7

*Judicial Watch, Inc. v. United States Secret Service*,
  726 F.3d 208 (D.C. Cir. 2013) .......................................................................... 12

*Kaahumanu v. Hawaii*,
  682 F.3d 789 (9th Cir. 2012) .............................................................................. 9

*\*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020) .......................................................................... 11

*Los Angeles Police Dep't v. United Reporting Pub. Corp.*,
  528 U.S. 32 (1999) .............................................................................................. 7

*\*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) .................................................................................... 8, 9

*Nebraska Press Ass'n v. Stuart*,
  427 U.S. 539 (1976) ............................................................................................ 3

*New Jersey Env't Fed'n v. Monroe Twp.*, No. CIV.A.05-143 (KSH),
  2008 WL 2982598 (D.N.J. July 31, 2008) ......................................................... 4

*Nicholas v. Bratton*, No. 15-CV-9592 (JPO),
  2019 WL 2223407 (S.D.N.Y. May 23, 2019) .................................................... 3

*Price v. Garland*,
  45 F.4th 1059 (D.C. Cir. 2022) .......................................................................... 7

*Pueschel v. Chao*,
  955 F.3d 153 (D.C. Cir. 2020) .......................................................................... 14

*Serv. Emp. Int'l Union Local 200 United v. Trump*,
  420 F. Supp. 3d (W.D.N.Y. 2019) ................................................................... 12

*\*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977) ................................................................ 2, 3, 5, 11

*Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*,
  307 F.3d 566 (7th Cir. 2002) .............................................................................. 9

*TGP Commc'ns, LLC v. Sellers*, No. 22-16826,
    2022 WL 17484331 (9th Cir. Dec. 5, 2022) ........................................................ 7

*Thomas v. Chi. Park Dist.*,
    534 U.S. 316 (2002) .......................................................................................... 5

*\*Zukerman v. U.S. Postal Serv.*,
    961 F.3d 431 (D.C. Cir. 2020) .......................................................................... 8

**Statutes**

11 C.F.R. § 409.1 ..................................................................................................11

18 U.S.C. § 1752 ...................................................................................................11

18 U.S.C. § 3056 ...................................................................................................11

18 U.S.C. § 3056A ............................................................................................... 12

31 C.F.R. § 409.1 ................................................................................................. 12

**Rules**

Fed. R. Civ. P. 15(a)(2) ........................................................................................ 6

Federal Rules of Evidence 402 ............................................................................ 4

Federal Rules of Evidence 803 ............................................................................ 4

Federal Rules of Evidence 901 ............................................................................ 4

**U.S. Constitution**

U.S. const. art. II, § 1, cl. 1 ................................................................................. 12

## INTRODUCTION

The First Amendment requires equal access to government-designated press areas. The government's credentialing schemes must therefore be free from arbitrary and unreasonable restrictions. Granting superior access based on the unbridled discretion of a decisionmaker is arbitrary and unreasonable *per se*. The White House hard-pass program violates this principle by providing superior access to journalists deemed "of repute" by the Congressional Press Galleries (the "Galleries"). Moreover, Defendants fail to explain why the Secret Service is exempt from the APA. The APA requires adequate explanation for any final agency action. It is not enough for the Secret Service to say it acted pursuant to an order from the White House. Such an interpretation would allow agencies to avoid judicial review of their most controversial actions simply by saying "the White House told us to do it." This excuse is untenable. Finally, Defendants failed to meet their burden on Mr. Ateba's First Amendment discrimination claim. Mr. Ateba is entitled to discovery under Rule 56(d) and has presented sufficient evidence to defeat Defendants' Motion.

## ARGUMENT

### I.   THE HARD PASS PROGRAM IS UNCONSTITUTIONAL

The hard-pass program violates the First Amendment's prohibition against arbitrary and unreasonable classifications when regulating access to a designated press area. This is true under *Sherrill* or forum analysis. And because this impermissible classification excludes Mr. Ateba from the hard pass program, he has suffered a cognizable constitutional injury.

#### A. Independent of Forum Analysis, the First Amendment Prohibits Arbitrary Regulation of Access to Designated Press Facilities

1. *The unbridled discretion doctrine applies to property the government has designated for the press.*

Once the government designates certain property as open to the press, it may not draw arbitrary distinctions when regulating access to it. Pl.'s Mem. (ECF 23) at 5–6. Regulating access pursuant to the unbridled discretion of a decisionmaker violates this command. *Id.*

Defendants dispute this contention, arguing that the cases Mr. Ateba cited in his Memorandum stand only for the proposition "that journalists enjoy no greater (or lesser) rights of

1

access than does the public generally." Defs.' Opp'n (ECF 26) at 2. But in making this argument, Defendants ignore half of the cases Mr. Ateba cited, including *Sherrill* and this Court's decision in *Getty Images*. And in *Getty Images*, this Court could not have been clearer: "equal access claims by the press warrant careful judicial scrutiny." *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 119 (D.D.C. 2002) (Bates, J.); *see also id.* at 122 ("[W]hen press access is granted to some, others have a constitutional right to equal access."). Moreover, *Getty Images* held that the government violates the First Amendment when it lacks meaningful "criteria to guide its determinations" in deciding who receives access. *Id.* at 121. Thus, regulating preferential access according to the unbridled discretion of the decisionmaker is impermissible. *See Consumers Union v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 25–26 (D.D.C. 1973) (holding restrictions on access to the Congressional Press Galleries "can only be sanctioned under carefully drawn definite rules") *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975).

Defendants make no effort to distinguish *Getty Images*. They just ignore it. And as for *Sherrill*, Defendants argue that it was not a First Amendment case but a "due process case." Defs.' Opp'n at 9. But *Sherrill*'s prohibition on "arbitrary" decision-making arose "under the *first amendment*." 569 F.2d at 128 (emphasis added). Regardless, Mr. Ateba's Complaint invoked both the First *and* Fifth Amendments. Compl. ¶ 83. Defendants also argue the right *Sherrill* recognized is "limited to those who meet the hard pass criteria"—including the "of repute" standard. Defs.' Opp'n at 9. But the Court in *Sherrill* pointed out that the plaintiff did not challenge this criterion. *Id.* at 130 n.19. In any event, this argument is mere wordplay—it is no answer to a charge of unbridled discretion to say the scope of the right is limited to those the government selects in the exercise of its unbridled discretion. *Cf. Getty Images*, 193 F. Supp. 2d at 121.

2. *The unbridled discretion doctrine applies to newsgathering at the White House.*

Defendants contend that the unbridled discretion doctrine does not apply because the White House Press Area is not a public forum. Defs.' Opp'n at 5–7. But the prohibition against unbridled discretion does not depend on forum analysis. Indeed, *Getty Images* applied the unbridled discretion doctrine even though the government property at issue there—Guantanamo Bay

Military Base—was "not a public forum." 193 F. Supp. 2d at 121. Because the government has opened the White House Press Area, it may not draw arbitrary distinctions among journalists. *See Huminski v. Corsones*, 386 F.3d 116, 146–47 (2d Cir. 2004) (warning against "granting favorable treatment to certain members of the media") (cleaned up). Regulating access by standardless criteria violates this command. *Sherrill*, 569 F.2d at 128; *Getty Images*, 193 F. Supp. 2d at 121.

Defendants contend that the unbridled discretion doctrine does not apply to "newsgathering" because that activity is not "expressive." Defs.' Opp'n. at 6. But this argument runs headlong into *Getty Images*, which applied the unbridled discretion doctrine to newsgathering. 193 F. Supp. 2d at 121. In any event, Defendants fail to explain why this distinction would matter. As Defendants admit, newsgathering "is undoubtedly protected by the First Amendment." Defs.' Opp'n at 4. Any prior restraint on exercising a First Amendment right comes with a "heavy presumption against its constitutional validity." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558 (1976). And credentialing schemes that arbitrarily limit journalists' access to designated press facilities constitute such a prior restraint. *See Nicholas v. Bratton*, No. 15-CV-9592 (JPO), 2019 WL 2223407, at *6 (S.D.N.Y. May 23, 2019) (concluding government press credentials may not be used to arbitrarily regulate access). Because the prior restraint burdens First Amendment activity, the unbridled discretion doctrine applies.

Moreover, even if newsgathering *generally* is not expressive*, newsgathering at press briefings* most certainly is. Mr. Ateba speaks through his questions, which express a point of view regarding the events he thinks are worthy of discussion. Mr. Ateba also regularly "live posts" White House press briefings on social media—which includes posting his thoughts on the briefing—to his over 500,000 followers. ECF 23-2 (Second Declaration of Simon Ateba) at ¶ 3. Because Mr. Ateba's newsgathering here is expressive, Defendants' argument fails on its own terms.

It does not matter that the Galleries—and not the White House—determine which journalists are "of repute." *See* Defs.' Opp'n at 7. The White House relies on this determination in regulating access to the Press Area. Compl. ¶¶ 55, 72. Because the White House maintains this requirement as a prerequisite for obtaining a hard pass, the hard-pass program violates the First

Amendment. *See New Jersey Env't Fed'n v. Monroe Twp.*, No. CIV.A.05-143 (KSH), 2008 WL 2982598, at *5 (D.N.J. July 31, 2008) (observing injury from prior restraint occurs "regardless of which official or office" issues the license). And Defendants' Supreme Court and FDA hypotheticals do not support their theory. Defs.' Opp'n at 7 n.5. Neither expedited access to Supreme Court oral arguments for bar members nor an FDA conference for licensed medical professionals involve access to government property *designated* for newsgathering or expressive activity. The First Amendment interests implicated here simply are not present in those scenarios.

       3.   *The hard-pass program violates the unbridled discretion doctrine.*

By issuing hard passes only to correspondents whom the Galleries deem to be "of repute," the White House regulates access to hard passes based on a standardless criterion. Compl. ¶ 72. Defendants do not offer a definition of the phrase "of repute," nor do they provide any objective metrics to determine what "repute" is sufficient. Defs.' Opp'n at 7–9. Moreover, the fact that the Galleries are not required to issue decisions within a required period also violates the unbridled discretion doctrine. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990).

In their Opposition—their *third* substantive brief in this case—Defendants finally try to give content to the "of repute" standard, asserting that "established norms of journalistic professionalism look to issues like avoidance of conflicts of interest and plagiarism." Defs.' Opp'n at 8 (citing Society of Professional Journalist's *Code of Ethics* and Reuters' *Standards and Values*). But even if these documents were admissible—they are not and Mr. Ateba objects to their use under Federal Rules of Evidence 402 (relevance), 803 (hearsay), and 901 (authenticity)— Defendants are literally just making this up. There is not a shred of evidence that the Galleries look to these issues and documents when considering whether a journalist is "of repute."

Relatedly, Defendants' efforts to distinguish *McDaniel v. Lombardi* are unavailing. Defs.' Opp'n at 8. Defendants contend that *McDaniel* does not apply because it arose "outside of the journalism context." *Id.* But Defendants have not introduced any evidence that the "of repute" standard has taken on an "associated meaning" within the journalism context, much less what that meaning is. *Id.* What is more, Defendants cannot muster even a single case holding that the "of

repute" standard is sufficiently determinate. Considering Defendants' remarkable assertion that this standard is so prevalent it has taken on a meaning beyond its words, this failure is telling.

Defendants argue that the "of repute" standard is no less definite than the Secret Service's standard of "potential source of physical danger to the President." Defs.' Opp'n at 8. But even a superficial comparison of the two standards reveals the latter is much more specific than the former. Whether someone presents a danger to the President is a clearly defined standard applied by highly trained law enforcement professionals charged with a statutory duty. "Of repute" is a subjective vagary. Moreover, as *Sherrill* acknowledged, due to the nature of Presidential safety, courts must be "appropriately deferential" to the Secret Service. 569 F.2d at 130. There is no such justification to give the government the same leeway when interpreting the "of repute" standard.

Defendants also argue the Galleries' lack of a deadline does not render the White House's hard-pass program deficient. Defs.' Opp'n at 9. But unlike the national parks in *Boardley*, the Galleries are not even required to act "without unreasonable delay." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 518 (D.C. Cir. 2010). Instead, the Galleries have no deadline whatsoever. And in *Boardley*, the official generally acted "between three and ten days," 615 F.3d at 518 (cleaned up); *see also Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) (14 days). Here, the Periodical Press Gallery admits applications can take from *six months to one year* to process. RJN Ex. D. This is inadequate to "guide [the] decision and render it subject to effective judicial review." *Boardley*, 5615 F.3d at 517 (quotations omitted).

### 4. *The hard-pass program arbitrarily requires Congressional approval.*

The hard-pass program is also arbitrary because it outsources the credentialing decision to other members of the press and requires applicants to obtain a press pass from another branch of government. Defendants assert these features are reasonable, without explanation. Considering the obvious risk of journalistic cliques and the irrationality of requiring credentials from a different branch of government than the one being covered, the hard-pass program is arbitrary.

Defendants argue that delegating the decision to the Galleries "minimizes the concern about viewpoint discrimination that the unbridled discretion cases address." Defs.' Opp'n at 8. To

the contrary, such delegation *heightens* the concern over viewpoint discrimination. The Galleries'
executive committees are the "institutional press," and like all journalists, they have a vested
interest in limiting the level of competition in their industry. *Associated Press v. United States*, 326
U.S. 1, 17–20 (1945) (discussing interest in stifling competition among news outlets). By retaining
the authority to decide which of their competition are sufficiently "of repute"—and to delay the
decision indefinitely—these journalists have the unbridled discretion to limit their competition's
access to government property open to the press.

Finally, Defendants assert that Mr. Ateba did not allege that the White House's outsourcing
was arbitrary. Defs.' Opp'n at 10. But Mr. Ateba's first claim for relief set forth these features of
the hard-pass program, Compl. ¶¶ 55, 60–74, and alleged that the White House's hard-pass
program "violate[s] the First Amendment," *id.* ¶ 84. These allegations are "fairly encompassed"
in his complaint and are sufficient to raise these claims. *Jefferson v. Collins*, 905 F. Supp. 2d 269,
284 (D.D.C. 2012). If the Court concludes otherwise, given the expedited schedule in place, the
Court should grant Mr. Ateba leave to amend. *See* Fed. R. Civ. P. 15(a)(2) (courts "should freely
give leave [to amend] when justice so requires."); *Foman v. Davis*, 371 U.S. 178, 182 (1962)
("[T]he purpose of pleading is to facilitate a . . . decision on the merits.").

### B. Under Forum Analysis, the First Amendment Prohibits Arbitrary Regulation of Access to Designated Press Facilities

The hard pass program is also unconstitutional under forum analysis. The White House
Press Area is a limited public forum—access must be provided to journalists on equal terms. But
even if it were a non-public forum, the unbridled discretion doctrine still applies.

#### 1. *The White House Press Area is a limited public forum.*

The White House created, and by long practice has sustained, the Press Area for the
purpose of allowing journalists access to the White House to communicate with the President and
his staff and to gather and disseminate the news. The Press Area is a limited public forum. Pl.'s
Mem. at 7. Defendants argue that forum analysis does not apply because newsgathering is not
communicative. Defs.' Opp'n at 4. But for the same reasons as discussed in the context of the
unbridled discretion doctrine, *supra* at I.A.3, there is no reason to carve out a special exemption

from the forum doctrine for newsgathering generally, much less the newsgathering at issue here. The cases Defendants cite do not help them. *See Price v. Garland*, 45 F.4th 1059, 1065 (D.C. Cir. 2022) (declining to conduct a forum analysis because filmmaking was not expressive); *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) (holding First Amendment does not protect a right to access "all sources of information within government control"); *Los Angeles Police Dep't v. United Reporting Pub. Corp.,* 528 U.S. 32, 40 (1999) (holding no viable facial challenge to statute restricting access to information in government's possession). Moreover, holding that newsgathering is not subject to forum analysis would go against every Circuit Court that has decided the question. *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, *4 (9th Cir. Dec. 5, 2022); *John K. MacIver Inst. v. Evers*, 994 F.3d 602, 607 (7th Cir. 2021).[1]

Defendants contend that the White House Press Area is at most a nonpublic forum. Defs.' Opp'n at 4. But "the Government has 'created a forum that is limited to use by certain groups"— journalists who want to cover the White House. *Price*, 45 F.4th at 1070; *see also Getty Images*, 193 F. Supp. 2d at 120 (observing that the White House Press Area is a "facility for permanent accommodation of journalists engaged in day-to-day reporting of the President"). Defendants assert that the Press Area is a nonpublic forum because journalists must obtain "permission" to access it, but Defendants admit the access criteria do not allow them to make "discretionary judgments." Defs' Opp'n. at 15. This admission forecloses any argument the Press Area is not a limited public forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 804 (1985) (concluding that non-"ministerial" admission criteria make the forum non-public). Defendants suggest that they will be required to close the White House Press Area if it is deemed a limited public forum because they will be overrun with journalists seeking access, Defs.' Opp'n at 4, but this parade of horribles is overblown. There are myriad ways Defendants could permissibly limit access in a way that do not violate the unbridled discretion doctrine. *See, e.g.*,

---

[1] Mr. Ateba's discussion of *MacIver* is not "misleading" in the least. Defs.' Opp'n at 3 n.2. Unlike the White House Press Area, *MacIver* involved a "limited-access press conference" that was "not held on government property dedicated to open communication." 994 F.3d at 610.

*Getty Images*, 193 F. Supp. 2d at 120.[2] The previous hard-pass regime did not delegate unbridled discretion to the Galleries and did not result in the doomsday scenario Defendants discuss.

>        2.   *Regardless of the type of forum, the unbridled discretion doctrine applies.*

In the end, it does not matter whether the White House Press Area is a limited public forum or a nonpublic forum. The unbridled discretion doctrine applies either way. In both types of fora, regulation must be "reasonable in light of the purposes served by the forum" and "viewpoint neutral." *CEF*, 457 F.3d at 386–87 (collecting cases).

Defendants do not dispute that this standard imports the unbridled discretion doctrine in limited public fora, and there is no reason for any different rule in nonpublic fora. Indeed, both the Supreme Court and the D.C. Circuit have recently held that the unbridled discretion doctrine applies in nonpublic fora. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018) (holding, in non-public forum, that government must have "objective, workable standards"); *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 450 (D.C. Cir. 2020) (striking down rule in non-public forum because it was "too broad to guide the discretion of the [government's content reviewers]"); *Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 372 (D.C. Cir. 2018) ("*AFDI*") (remanding to district court to determine whether regulation in non-public forum was sufficiently determinate); *see also Getty Images*, 193 F. Supp. 2d at 121 (holding that regulator must have "some criteria to guide its determinations" even in nonpublic forum). Because licensing and credentialing regimes are prior restraints that threaten to inhibit the exercise of First Amendment rights through self-censorship—even in nonpublic fora—they must not be implemented in a way that gives the government unbridled discretion to regulate when those rights may be exercised. *See Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012); *CEF*, 457 F.3d at

---

[2] Defendants claim—in a footnote—that Mr. Ateba is outside of the class for which the forum is opened because he is not a credentialed journalist. Defs.' Opp'n at 5 n.3. But because that criterion violates the unbridled discretion doctrine, Defendants may not permissibly use it to exclude him from the limited public forum. *See, e.g., Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 389 (4th Cir. 2006) ("*CEF*") (holding classifications based on unbridled discretion cannot serve as the basis for excluding an individual from any forum).

386–87; *Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002); *Griffin v. Sec'y of Veterans Affs.*, 288 F.3d 1309, 1324 (Fed. Cir. 2002).

Defendants attempt to avoid this obvious conclusion by arguing that *Mansky*, *Zukerman*, and *AFDI* "do not apply the unbridled discretion doctrine itself, but merely consider whether, in the specific circumstances before them, the challenged regulations were 'reasonable.'" Defs.' Opp'n at 6. Regardless of whether these cases applied the unbridled discretion doctrine by name, they held regulations that vest discretion "to permit or prohibit speech" must be "guided by objective, workable standards." *AFDI*, 901 F.3d at 372 (quoting *Mansky*, 138 S. Ct. at 1891); *see also id.* (noting that the unbridled discretion doctrine and *Mansky* "pose a single challenge" to overbroad regulation of speech). The White House's hard-pass criteria violate this standard.

### C.  Mr. Ateba Has Suffered a Cognizable Injury

By excluding Mr. Ateba from the hard-pass program on an arbitrary and unreasonable basis, the White House has injured him. Whether Mr. Ateba can *mitigate* this injury is immaterial to whether he is *suffering* injury in the first place. In any event, the alternative access available to him is insufficient to mitigate his injury. To gain access to the White House Press Area, Mr. Ateba must apply for a day pass every day by 5:00 p.m., no matter whether he is traveling or has internet access on that day. Second Ateba Decl. ¶ 12.a. Because of this requirement, Mr. Ateba is unable to cover spontaneous press briefings when breaking news occurs unless he applies for a day pass every day by 5:00 p.m., which, some days, is impossible. In addition, every day, Mr. Ateba must wait for a White House chaperone, which can take up to 45 minutes, thus occupying time he could otherwise use for reporting. His competition suffers none of these burdens, and this inferior access is a significant burden on both his constitutional rights and his ability to do his job.[3]

---

[3] Defendants note (rightly) that Mr. Ateba has no First Amendment right "to be called on," Defs.' Opp'n at 3, but this is a non-sequitur. Defendants' actions have interfered—and are interfering— with both Mr. Ateba's right of access to White House Press Area and his right to gather news by asking questions within the context of press briefings. This is true regardless of whether the Press Secretary actually calls on him.

Defendants argue that Mr. Ateba has not been harmed because the First Amendment protects only a journalists' right "to communicate information" and not "access" to government property. Defs.' Opp'n at 2. But as Mr. Ateba has explained, because the White House has opened the Press Area, the First Amendment protects his right to access that area free from arbitrary or unreasonable restrictions.

Defendants cite *Bell v. Wolfish*, but that citation shows just how weak their argument really is. Defs.' Opp'n at 2. In *Bell*, prisoners challenged a prison regulation that allowed them to receive hardback books from outside sources only if sent directly from publishers. 441 U.S. 520 (1979). Applying a deferential standard of review necessary in the prison context, the Supreme Court held that the regulation was a "rational response by prison officials to an obvious security problem." *Id.* at 550. The Court did not hold that the prisoners suffered no cognizable injury. Rather, the Court observed the reasonableness of the regulation was evidenced by the fact that prisoners' "alternative means of obtaining reading material . . . have not been shown to be burdensome or inefficient." *Id.* at 551. Moreover, the regulation did not apply to "soft-bound books," nor did it preclude prisoners from checking-out hardback books from the prison's "relatively large" library. *Id.* at 552 *Bell* plainly has no application here—there is no similarly deferential standard of review to the White House Press Area and Mr. Ateba's access to the Press Area is both "burdensome [and] inefficient." *Id.* at 551. Mr. Ateba has suffered a cognizable injury.

## II.    MR. ATEBA IS ENTITLED TO SUMMARY JUDGMENT ON HIS APA CLAIM

Defendants characterized Mr. Ateba's hard pass as "effectively" having no expiration date. Defs' Reply in Opp'n to Prelim. Injunc. (ECF 17) at 3. Yet, Mr. Ateba's hard pass was canceled on or before August 1, 2023. In three rounds of briefing, Defendants have yet to provide an explanation justifying the cancellation. The proffered explanation for the new hard-pass program—reducing the number of inactive hard passes—is inapplicable to Mr. Ateba. Thus, Defendants effectively concede the cancellation of Mr. Ateba's pass was arbitrary and capricious.

Defendants advance two claims: that the cancellation of the hard pass is not a "final agency action" and that the Secret Service's action is not subject to the APA. Both are unavailing.

The cancellation of Mr. Ateba's hard pass is final agency action. Defendants try to evade this conclusion by claiming the White House's decision to deactivate a hard pass cannot be the culmination of the Secret Service's decision-making process, but this is just another way of arguing that the cancellation is a White House, not Secret Service, action. The Secret Service deactivated Mr. Ateba's hard pass. There is no further decision for the Secret Service to make. Once it cancelled Mr. Ateba's pass, it was cancelled. It no longer works. There is no appeal. The cancellation was the culmination of the Secret Service's decision making and thus final agency action.

Second, Defendants claim that the Secret Service's cancellation of Mr. Ateba's hard pass is not an action with "legal consequences." This is plainly untrue. The D.C. Circuit has repeatedly recognized that a hard pass is a "liberty [interest]." *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (quoting *Sherrill*, 569 F.2d at 130). Mr. Ateba's hard pass allowed him to access the White House Press Area. Its cancellation prevents him from doing so. Attempting to access the White House without a proper pass can carry severe legal consequences, including arrest. *See* 18 U.S.C. § 1752. The cancellation of Mr. Ateba's hard pass thus has legal consequences.

Defendants claim that the policy resulting in the cancellation of Mr. Ateba's hard pass is a White House, rather than Secret Service, action, and thus outside of the scope of the APA. This misses the mark. First, this conflates a facial challenge to the White House hard-pass program with a challenge to Secret Service implementing actions. Mr. Ateba is not bringing a facial challenge to the White House policy under the APA. He is only bringing an as-applied challenge to the Secret Service's cancellation of his hard pass. Second, the issuance of hard passes is not a matter solely committed to Presidential discretion. The Secret Service has independent discretionary authority to issue hard passes based on security criteria. *See* 11 C.F.R. § 409.1; *see also* 18 U.S.C. §§ 3056, 3056A; 31 C.F.R. § 409.1; Third Fleisher Decl. at ¶ 3 (acknowledging the Secret Service's statutory role in protecting the White House, President, Vice President, and their immediate families).

Defendants claim that "a Presidential directive to an agency to implement his *own* discretionary authority" is not reviewable under the APA. Defs.' Opp'n at 11. This proves too much. The whole of the executive power rests with the President. U.S. const. art. II, § 1, cl. 1. At

some level, *all* discretionary authority vested in the executive branch is delegated from the President. Yet agency actions implementing Presidential directives are still subject to the APA. *Serv. Emp. Int'l Union Local 200 United v. Trump*, 420 F. Supp. 3d, 75 (W.D.N.Y. 2019) ("'[A]gency actions *implementing* a presidential action may be reviewed under the APA, even when the agency accomplishes a presidential directive.'" (quoting *Int'l Refugee Assistance Project v. Trump*, 373 F. Supp. 3d 650, 665 (D. Md. 2019)) (emphasis added)).

The case law Defendants cite does not compel a contrary conclusion. In *Detroit International Bridge Company v. Canada*, the D.C. Circuit looked to both the grant of discretionary authority under statute and the President's inherent authority in foreign affairs, rather than general principles related to presidential action. 883 F.3d 895, 903 (D.C. Cir. 2013). As the Court stated, "the context surrounding issuance of a Section 4 Presidential Permit under the IBA involves a determination rife with executive discretion in an area that the U.S. Constitution principally vests in the political branches …. Because the challenged issuance is not subject to judicial review, the court need not decide whether the issuance is presidential action under *Franklin*." *Id.* (citation omitted). Similarly, contrary to Defendants' suggestion, ruling in favor of Mr. Ateba's as-applied challenge does not "constitute a potentially serious congressional intrusion into the conduct of the President's daily operations." Defs.' Opp'n at 11. Defendants rely heavily on *Judicial Watch, Inc. v. United States Secret Service*, 726 F.3d 208 (D.C. Cir. 2013). But *Judicial Watch* concerned a Freedom of Information Act request for White House visitor logs. *Id.* White House visitor logs inherently reveal information about who a President is meeting with. This "kind of information … [was] in many ways sui generis," *id.* at 232, and directly implicated separation of powers concerns by interposing Congress into the confidential communications of the President.

The cancellation of Mr. Ateba's hard pass is readily distinguishable. A ruling in Mr. Ateba's favor does not require intruding into the President's confidential associations. It does not require the President to meet with anyone. It does not involve an intrusion into the President's constitutional authority to conduct foreign affairs. And it does not concern a specific statutory grant

of discretionary authority. It merely acknowledges that the Secret Service cannot arbitrarily and capriciously deprive Mr. Ateba of his liberty interest in a White House hard pass.

The Secret Service is a federal agency. It acted as such in implementing a White House policy decision. The termination of Mr. Ateba's hard pass was a final agency action; Mr. Ateba's hard pass was terminated, it no longer works, and there is no further administrative appeal process. Defendants violated the APA by cancelling Mr. Ateba's pre-existing hard pass.

## III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON MR. ATEBA'S FIRST AMENDMENT DISCRIMINATION CLAIM

Mr. Ateba's Complaint tells a plausible story of First Amendment discrimination: the White House wanted to silence Mr. Ateba, so it changed the rules. Defendants simultaneously (1) argue (without evidence) that they did not target Mr. Ateba; (2) say that if they did target Mr. Ateba, it was because of his conduct, not his speech; and (3) refuse to explain why the White House changed its hard-pass program. Discovery will surely yield further evidence that the White House targeted Mr. Ateba when it changed the hard-pass program. Moreover, even on the current record, Mr. Ateba has articulated a genuine issue of material fact on this claim. The Court should therefore deny Defendants' Motion for summary judgment on this claim.

### A.  Mr. Ateba Is Entitled to Discovery Under Fed. R. Civ. P. 56(d)

Mr. Ateba established that he is entitled to take discovery under the three-part test in *Convertino v. U.S. Department of Justice*, 684 F.3d 93 (D.C. Cir. 2012). Pl.'s Mem. at 22. Defendants ignore *Convertino* and argue instead that Mr. Ateba's First Amendment discrimination claim is not plausible. Defs.' Opp'n at 15. Defendants rely on dicta in Judge Pillard's partial concurrence in *Jeffries v. Barr*, 965 F.3d 843 (D.C. Cir. 2020), for the proposition that discovery under Rule 56(d) is only allowed for a "legally viable claim" *Id.* But the majority in *Jeffries* emphasized that "a Rule 56(d) motion 'must be resolved through application of the *Convertino* criteria to the specific facts and circumstances presented in the request.'" 965 F.3d at 855 (quoting *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 530 (D.C. Cir. 2019)). Defendants failed to

dispute Mr. Ateba's showing as to any of the three *Convertino* factors. There is therefore no dispute that Mr. Ateba made a sufficient showing for a Rule 56(d) continuance.

### B. Defendants Fail to Establish as a Matter of Law that They Did Not Discriminate Against Mr. Ateba Based on Viewpoint or Content

Even if the Court departs from *Jeffries*, Mr. Ateba has stated a plausible First Amendment discrimination claim. Mr. Ateba's Complaint sets forth sufficient facts from which the Court can reasonably infer that the White House intentionally rejiggered its hard-pass criteria and canceled existing passes because of Mr. Ateba's protected speech. This includes his focus on U.S. relations with African nations, which Mr. Ateba seeks to cover at the White House, Compl.¶ 3, 4, 44, and which Defendants completely ignore, Defs.' Opp'n at 13. Mr. Ateba's discrimination case is clear: Defendants had the motive (Mr. Ateba's questions); means (the ability to change the hard pass criteria); and opportunity (using new criteria as a pretext for canceling existing hard passes). Yet Defendants do not offer even the pretense of a good-faith basis for their actions vis-à-vis Mr. Ateba.

Defendants' attempt to poke holes in Mr. Ateba's evidence falls flat. Defendants argue that the seven-week gap between the *Ted Lasso* incident and its changes to the hard-pass program is insufficient to infer a causal link, citing *Pueschel v. Chao*, 955 F.3d 153 (D.C. Cir. 2020) for the proposition that "temporal proximity" only supports an inference of causation "when the two events are very close in time." Defs.' Opp'n at 13–14. But the Court in *Pueschel* (analyzing a fifteen-year gap) explained that the D.C. Circuit "has often analyzed temporal proximity in terms of months—not years." 955 F.3d at 192. As explained in Mr. Ateba's opening brief, the seven-week gap here is shorter than gaps other courts found sufficiently narrow to support an inference of causality. Pl.'s Mem. at 24. While Defendants suggest that temporal proximity is insufficient outside the employment context, the caselaw says otherwise. *See, e.g., Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 494 (3d Cir. 2002) ("[O]ther courts of appeal have more explicitly recognized the relevance of temporal proximity in First Amendment retaliation cases.") (collecting cases); *Comley v. Town of Rowley*, 296 F. Supp. 3d 327, 334 (D. Mass. 2017) (explaining that "temporal proximity alone may sometimes suffice" for a First Amendment retaliation claim where

it is "close") (citation omitted). The short gap between Mr. Ateba's confrontation with Ms. Jean-Pierre and the change in the hard-pass program establishes discriminatory intent.

Defendants' remaining arguments fare no better. Defendants suggest that they did not know Mr. Ateba would not qualify for a hard pass under the new criteria, Defs.' Opp'n at 14, but they fail to introduce any evidence in support of this suggestion. Defendants are either concealing exculpatory or inculpatory evidence, and there is no reason why they would hide the former. Defendants' failure to dispute Mr. Ateba's evidence of discriminatory intent points to one conclusion: the news report that the hard-pass revisions targeted Mr. Ateba is true. Compl. ¶ 7.

Defendants insist that even if they did discriminate against Mr. Ateba, it was because of his behavior, not his speech. Defs.' Opp'n at 13–15. Mr. Ateba provided the Court with evidence from which it can infer that the White House was intent on stripping Mr. Ateba of his hard pass following the *Ted Lasso* incident and then did exactly that. Pl.'s Mem. at 23–24. Defendants do not deny that the change in policy was a reaction to Mr. Ateba. Defendants' citation to *Eichenlaub v. Township of Indiana* is inapposite as that case upheld reasonable time, place, and manner restrictions that governed conduct in public meetings. 385 F.3d 274, 281 (3d Cir. 2004). Yet Defendants claim they already disciplined Mr. Ateba under such a restriction by issuing him a "formal warning letter" under its Conduct Policy. ECF 22-3 ¶ 12. Thus, Defendants' suggestion that the White House's mass cancelation of hard passes combined with the adoption of criteria Mr. Ateba could not meet was simply a response to Mr. Ateba's conduct is inconsistent with its own evidence. Rather, Mr. Ateba's unrebutted evidence shows that the White House did not like Mr. Ateba's speech in the briefing room, so it took steps to exclude him.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Mr. Ateba's motion for Summary Judgment, enter judgment in Mr. Ateba's favor on Counts I and III, and deny Defendants' Motion.

Dated: October 18, 2023

Respectfully submitted,

By: /s/ Harmeet K. Dhillon
Harmeet K. Dhillon
Josh Dixon*
Eric A. Sell
(D.D.C. Bar ID: 1742565)
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

Gary M. Lawkowski
(D.D.C. Bar ID: VA125)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Jesse D. Franklin-Murdock
(D.D.C. Bar ID: CA00147)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108

*Counsel for Plaintiff Simon Ateba*
*Admission Pending*