APPEAL,CLOSED,TYPE–D

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:23–cv–02321–JDB</u>
### *Internal Use Only*

ATEBA v. JEAN–PIERRE et al

Assigned to: Judge John D. Bates

Cause: 28:1331 Fed. Question

Date Filed: 08/10/2023

Date Terminated: 12/07/2023

Jury Demand: None

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**SIMON ATEBA**                          represented by    **Eric Arthur Sell**
1311 South Main Street
Suite 301
Mt. Airy, MD 21771
202–627–0121
Email: Esell@libertycenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gary Lawkowski**
DHILLON LAW GROUP, INC..
2121 Eisenhower Avenue
Suite 608
Alexandria, VA 22314
703–574–1654
Email: glawkowski@dhillonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Harmeet Dhillon**
DHILLON LAW GROUP INC
177 Post St.
Suite #700
San Francisco, CA 94108
415–433–1700
Email: harmeet@dhillonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jesse Franklin–Murdock**
DHILLON LAW GROUP
177 Post Street
Suite 700
San Francisco, CA 94108
415–433–1700
Email: jfranklin–murdock@dhillonlaw.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **KARINE JEAN–PIERRE** *in her official capacity as Press Secretary to the President of the United States* | represented by | **Joseph Evan Borson** U.S. DEPARTMENT OF JUSTICE Civil Division, Federal Programs Branch 1100 L Street NW Washington, DC 20005 (202) 514–1944 Fax: (202) 616–8470 Email: joseph.borson@usdoj.gov *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Michael Fraser Knapp**
U.S. DEPARTMENT OF JUSTICE
1100 L Street NW
Washington, DC 20005
(202) 514–2071
Fax: (202) 616–8470
Email: michael.f.knapp@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES SECRET SERVICE** | represented by | **Joseph Evan Borson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Michael Fraser Knapp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **KIMBERLY CHEATLE** *in her official capacity as Director of the United States Secret Service* | represented by | **Joseph Evan Borson** (See above for address) *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |

**Michael Fraser Knapp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| 08/10/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ADCDC–10268599) filed by SIMON ATEBA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet, # 6 Summons, # 7 Summons, # 8 Summons)(Dhillon, Harmeet) (Entered: 08/10/2023) |
| --- | --- | --- |
| 08/10/2023 | 2 | MOTION for Preliminary Injunction by SIMON ATEBA. (Attachments: # 1 Proposed Order)(Dhillon, Harmeet) (Entered: 08/10/2023) |
| 08/11/2023 | | Case Assigned to Judge John D. Bates. (zcb) (Entered: 08/11/2023) |
| 08/11/2023 | 3 | SUMMONS (5) Issued Electronically as to KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zcb) (Entered: 08/11/2023) |
| 08/14/2023 | 4 | ERRATA by SIMON ATEBA re 1 Complaint,. (Dhillon, Harmeet) (Entered: 08/14/2023) |
| 08/17/2023 | 5 | NOTICE of Appearance by Michael Fraser Knapp on behalf of All Defendants (Knapp, Michael) (Entered: 08/17/2023) |
| 08/17/2023 | 6 | NOTICE of Appearance by Eric Arthur Sell on behalf of SIMON ATEBA (Sell, Eric) (Main Document 6 replaced on 8/17/2023) (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 7 | Consent MOTION for Extension of Time to File Response/Reply as to 2 MOTION for Preliminary Injunction by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Text of Proposed Order)(Knapp, Michael) (Entered: 08/17/2023) |
| 08/17/2023 | 8 | NOTICE of Appearance by Jesse Franklin–Murdock on behalf of SIMON ATEBA (Franklin–Murdock, Jesse) (Entered: 08/17/2023) |
| 08/17/2023 | 9 | NOTICE of Appearance by Gary Lawkowski on behalf of SIMON ATEBA (Lawkowski, Gary) (Entered: 08/17/2023) |
| 08/17/2023 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General August 15, 2023. (Franklin–Murdock, Jesse) (Entered: 08/17/2023) |
| 08/17/2023 | 11 | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General August 15, 2023. (Franklin–Murdock, Jesse) Modified on 8/17/2023 (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KIMBERLY CHEATLE served on 8/14/2023 (Franklin–Murdock, Jesse) Modified on 8/17/2023 to correct date served (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KARINE JEAN–PIERRE served on 8/14/2023 (Franklin–Murdock, Jesse) Modified on 8/18/2023 to correct date of service (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES SECRET SERVICE served on 8/14/2023 (Franklin–Murdock, Jesse) Modified on 8/18/2023 to correct the date served (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | | MINUTE ORDER: Upon consideration of 7 defendants' consent motion to extend the deadline to respond to 2 plaintiff's motion for a preliminary injunction, and the entire |

| | | |
|---|---|---|
| | | record herein, it is hereby ORDERED that defendants' motion is GRANTED; and it is further ORDERED that defendants shall respond to the motion for a preliminary injunction by not later than August 24, 2023. SO ORDERED. Signed by Judge John D. Bates on 8/17/2023. (lcjdb3) (Entered: 08/17/2023) |
| 08/17/2023 | | NOTICE OF ERROR regarding 11 Summons Returned Executed as to U.S. Attorney General. The following error(s) need correction: Incorrect event. Please refile using Summons Returned executed as to US Attorney. Please enter date of **delivery** (not date mailed). Please refile. (zjm) (Entered: 08/17/2023) |
| 08/17/2023 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 8/15/2023. Answer due for ALL FEDERAL DEFENDANTS by 10/14/2023. (Franklin–Murdock, Jesse) (Entered: 08/17/2023) |
| 08/23/2023 | 16 | NOTICE of Appearance by Joseph Evan Borson on behalf of KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE (Borson, Joseph) (Entered: 08/23/2023) |
| 08/24/2023 | 17 | Memorandum in opposition to re 2 Motion for Preliminary Injunction filed by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Exhibit 1 – Fleischer Decl, # 2 Exhibit 2 – Aug 6 email, # 3 Text of Proposed Order)(Knapp, Michael) (Entered: 08/24/2023) |
| 08/25/2023 | | MINUTE ORDER: Upon consideration of 2 plaintiff's motion for preliminary injunction and 17 defendants' opposition to plaintiff's motion, it is hereby ORDERED that plaintiff shall file any reply in support of his motion by not later than August 29, 2023, at 12:00 p.m. SO ORDERED. Signed by Judge John D. Bates on 8/25/2023. (lcjdb3) (Entered: 08/25/2023) |
| 08/25/2023 | | Set/Reset Deadlines : Plaintiff's Reply in Support of 2 Plaintiff's Motion for Preliminary Injunction due by 12:00 PM on 8/29/2023. (kk) (Entered: 08/25/2023) |
| 08/29/2023 | 18 | REPLY to opposition to motion re 2 MOTION for Preliminary Injunction filed by SIMON ATEBA. (Attachments: # 1 Declaration of Simon Ateba)(Dhillon, Harmeet) (Entered: 08/29/2023) |
| 08/29/2023 | 19 | Unopposed MOTION for Leave to File *Surreply* by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Supplement Proposed Surreply, # 2 Exhibit 3 – Supplemental Fleischer Dec, # 3 Exhibit 4 – Aug. 28 Emails, # 4 Text of Proposed Order)(Borson, Joseph) (Entered: 08/29/2023) |
| 08/30/2023 | | MINUTE ORDER: Upon consideration of 19 defendants' unopposed motion for leave to file a surreply, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that [19–1] defendant's surreply and the appended exhibits [19–2] and [19–3], are deemed filed as of the date of this Order. SO ORDERED. Signed by Judge John D. Bates on 8/30/2023. (lcjdb3) (Entered: 08/30/2023) |
| 08/30/2023 | 20 | SURREPLY to re 2 MOTION for Preliminary Injunction filed by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Exhibit 3 – Supplemental Fleischer Dec, # 2 Exhibit 4 – Aug. 28 Emails)(zjm) (Entered: 09/01/2023) |
| 09/06/2023 | 21 | |

| | | |
|---|---|---|
| | | MEMORANDUM OPINION AND ORDER denying 2 plaintiff's motion for preliminary injunction and setting schedule for expedited summary judgment briefing. See text of Order for details. Signed by Judge John D. Bates on 9/6/2023. (lcjdb3) (Entered: 09/06/2023) |
| 09/06/2023 | | Set/Reset Deadlines: Defendants Summary Judgment / Administrative Record due by 9/20/2023. Plaintiffs Cross Motion and Response to Motion for Summary Judgment due by 10/4/2023. Defendants Response to Cross Motion and Reply to Motion for Summary Judgment due by 10/11/2023. Plaintiffs Reply to Cross Motion due by 10/18/2023. (zed) (Entered: 09/07/2023) |
| 09/20/2023 | 22 | MOTION for Summary Judgment by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 – Third Fleischer Decl, # 3 Statement of Facts, # 4 Text of Proposed Order)(Knapp, Michael) (Entered: 09/20/2023) |
| 10/04/2023 | 23 | Cross MOTION for Summary Judgment *and Opposition to Defendants' Motion for Summary Judgment* by SIMON ATEBA. (Attachments: # 1 Declaration Declaration of Jesse D. Franklin–Murdock, # 2 Declaration Second Declaration of Simon Ateba, # 3 Statement of Facts Response to Defendants' Statement of Material Facts as to which there is No Genuine Dispute, # 4 Statement of Facts Statement of Undisputed Material Facts and Opposition to Defendants Statement of Undisputed Material Facts, # 5 Cross–Motion for Summary Judgment on Motion for Additional Discovery as to Count 2 of the Verified Complaint, # 6 Text of Proposed Order Proposed Order)(Dhillon, Harmeet) Modified event title on 10/5/2023 (znmw). (Entered: 10/04/2023) |
| 10/04/2023 | 24 | MOTION to Take Judicial Notice by SIMON ATEBA. (Attachments: # 1 Declaration Declaration of Eric A. Sell, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E)(Dhillon, Harmeet) (Entered: 10/04/2023) |
| 10/04/2023 | 25 | Memorandum in opposition to re 22 Motion for Summary Judgment, filed by SIMON ATEBA. (See Docket Entry 23 to view document). (znmw) (Entered: 10/05/2023) |
| 10/11/2023 | 26 | Memorandum in opposition to re 23 Motion for Summary Judgment,, filed by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Statement of Facts (Defs.' Resp. to Pl.'s Stmt), # 2 Text of Proposed Order)(Knapp, Michael) (Entered: 10/11/2023) |
| 10/11/2023 | 27 | REPLY to opposition to motion re 22 MOTION for Summary Judgment filed by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Knapp, Michael) (Entered: 10/11/2023) |
| 10/12/2023 | | NOTICE of Hearing: Oral Arguments Hearing set for 11/2/2023 at 10:00 AM in Courtroom 30A– In Person before Judge John D. Bates. (zed) (Entered: 10/12/2023) |
| 10/13/2023 | 28 | Consent MOTION to Stay re 1 Complaint, by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Text of Proposed Order)(Knapp, Michael) Modified on 10/13/2023 to correct relief (zjm). (Entered: 10/13/2023) |
| 10/13/2023 | | MINUTE ORDER: Upon consideration of 28 defendants' consent motion to stay the deadline to respond to the complaint, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the |

| | | |
|---|---|---|
| | | defendants' deadline to answer or otherwise respond to the complaint is STAYED pending further order of the Court. SO ORDERED. Signed by Judge John D. Bates on 10/13/2023. (lcjdb3) (Entered: 10/13/2023) |
| 10/18/2023 | 29 | REPLY to opposition to motion re 23 Cross MOTION for Summary Judgment *and Opposition to Defendants' Motion for Summary Judgment* filed by SIMON ATEBA. (Dhillon, Harmeet) (Entered: 10/18/2023) |
| 11/02/2023 | | Minute Entry for proceeding held on 11/2/2023 before Judge John D. Bates: Oral Arguments heard before the Court. Both sides presented their arguments on the record. Order forthcoming. (Court Reporter Bryan Wayne.) (zed) (Entered: 11/02/2023) |
| 12/04/2023 | 30 | NOTICE *of Correspondence* by KIMBERLY CHEATLE, KARINE JEAN–PIERRE, UNITED STATES SECRET SERVICE (Attachments: # 1 Exhibit)(Borson, Joseph) (Entered: 12/04/2023) |
| 12/07/2023 | 31 | ORDER granting 22 defendants' motion for summary judgment as to Counts One and Three; denying 22 defendants' motion for summary judgment as to Count Two; denying 23 plaintiff's motion for summary judgment; granting 24 plaintiff's motion to take judicial notice; and dismissing Count Two without prejudice. See text of Order and accompanying Memorandum Opinion for details. Signed by Judge John D. Bates on 12/7/2023. (lcjdb3) (Entered: 12/07/2023) |
| 12/07/2023 | 32 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 12/7/2023. (lcjdb3) (Entered: 12/07/2023) |
| 01/04/2024 | 33 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 32 Memorandum & Opinion, 31 Order on Motion for Summary Judgment,,,, Order on Motion to Take Judicial Notice, by SIMON ATEBA. Filing fee $ 605, receipt number ADCDC–10595674. Fee Status: Fee Paid. Parties have been notified. (Dhillon, Harmeet) (Main Document 33 replaced on 1/4/2024) (zjm). (Entered: 01/04/2024) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SIMON ATEBA
_____
                    Plaintiff

            vs.                              Civil Action No. 1:23-cv-02321-JDB
                                                             _____

KARINE JEAN-PIERRE, et al.
_____
                    Defendant

# NOTICE OF APPEAL

        Notice is hereby given this  4       day of  January              , 20 24    , that

 Plaintiff Simon Ateba

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the judgment of this Court entered on the   7           day of  December          , 20 23

in  favor of   Defendants Karine Jean-Pierre, Kimberly Cheatle, and the United States Secret Service

against said   Plaintiff Simon Ateba


                                        Harmeet K. Dhillon
                                _____
                                     Attorney or Pro Se Litigant


(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil
action must be filed within 30 days after the date of entry of judgment or 60 days if the United
States or officer or agency is a party)


**CLERK**       Please mail copies of the above Notice of Appeal to the following at the addresses
                indicated:

 Joseph Evan Borson
 Michael Fraser Knapp
 U.S. DEPARTMENT OF JUSTICE
 Civil Division, Federal Programs Branch
 1100 L Street NW
 Washington, DC 20005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SIMON ATEBA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 23-2321 (JDB)** |
| **KARINE JEAN-PIERRE, in her official capacity as White House Press Secretary, et al.,** | |
| **Defendants.** | |

**<u>ORDER</u>**

Upon consideration of [22] defendants' motion for summary judgment, [23] plaintiff's cross-motion for summary judgment, and [24] plaintiff's motion for judicial notice, and the entire record herein, and for the reasons stated in the accompanying Memorandum Opinion issued on this date, it is hereby

**ORDERED** that [22] defendants' motion for summary judgment is **GRANTED** as to Counts One and Three of the Complaint, and **DENIED** as to Count Two of the Complaint; it is further

**ORDERED** that [23] plaintiff's cross-motion for summary judgment is **DENIED**; it is further

**ORDERED** that [24] plaintiff's motion for judicial notice is **GRANTED**; and it is further

**ORDERED** that Count Two of the Complaint is **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>December 7, 2023</u>

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SIMON ATEBA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 23-2321 (JDB)** |
| **KARINE JEAN-PIERRE, in her official capacity as White House Press Secretary, et al.,** | |
| **Defendants.** | |

**<u>MEMORANDUM OPINION</u>**

For decades, the White House has granted special access passes—known as hard passes—to journalists tasked with reporting on the President and his administration. <u>See generally</u> <u>Sherrill v. Knight</u>, 569 F.2d 124 (D.C. Cir. 1977). Hard pass holders can generally come and go from the White House as they wish, subject to a security screening at the door. On May 5, 2023, the White House announced changes to the criteria for obtaining a hard pass, reimplementing a requirement that had been in place for most of the last 50 years—that the applicant hold a press credential from the Supreme Court or one of the press galleries of the United States Congress. Journalists who could not satisfy these requirements by July 31, 2023, would lose their expedited access. Simon Ateba, the White House correspondent for <u>Today News Africa</u>, was one of about 500 journalists whose hard passes were deactivated under this policy. Ateba, who is known for interrupting press briefings and attracting the ire of the Press Secretary, alleges that the new policy was designed to exclude him from the press room. In this lawsuit, he claims White House Press Secretary Karine Jean-Pierre (the "White House") engaged in unconstitutional viewpoint discrimination against him by changing the criteria, and that the new hard pass policy unreasonably confers unbridled discretion on the congressional press galleries. He also claims that Director of the United States

1

Secret Service Kimberly Cheatle and the United States Secret Service (collectively "the Secret Service") acted arbitrarily and capriciously in deactivating his hard pass. Before the Court are the parties' cross-motions for summary judgment.

**Background**

### I. Factual Background

#### A. Press Access to the White House

As the residence and offices of the President, his family, and his personal staff, access to the White House is tightly controlled. However, "the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom." Sherrill, 569 F.2d at 124. The press facilities include the James S. Brady Briefing Room, the press offices, the press apron, the North Grounds Stand Up Area, and the Driveway (collectively, the "Press Area"). Defs.' Resp. to Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute [ECF No. 26-1] ("Defs.' Resp. to Pl.'s Facts") ¶ 1.

The White House offers journalists two principal ways of accessing the Press Area. First, a reporter may obtain a "temporary press pass," known as a "day pass," which is a daily credential issued upon application to the Secret Service. Pl.'s Resp. to Defs.' Statement of Material Facts as to Which There Is No Genuine Dispute [ECF No. 23-3] ("Pl.'s Resp. to Defs.' Facts") ¶¶ 2–3. Second, a reporter can obtain a "permanent press pass," known as a "hard pass," which is a credential that allows him or her to come and go freely once the pass is issued. Id. ¶ 2.[1] Day pass and hard pass holders can access the Press Area at the same times (from 5:30 a.m. to 10:30 p.m.). Id. ¶ 5; Third Decl. of Nathan Fleischer, Asst. to the Special Agent in Charge, Presidential Protective Div., U.S. Secret Service [ECF No. 22-2] ("3d Fleischer Decl.") ¶¶ 7–8. However, a

---

[1] A third form of access, the "appointment press pass," is not at issue here. Pl.'s Resp. to Defs.' Facts ¶ 2.

reporter with a day pass must await an escort from the gate to the Press Area, which can take up to 45 minutes.  Defs.' Resp. to Pl.'s Facts ¶¶ 3–4; see id. ¶ 4 (White House disputing to the extent chaperones are available at the top of each hour).

Unlike a hard pass holder who can access the White House as long as his or her pass is active, a day pass user must submit a brief, online Secret Service form for each day that he or she wants to access the Press Area.  Pl.'s Resp. to Defs.' Facts ¶ 3; 3d Fleischer Decl. ¶ 9.  Journalists are directed to submit the form by 5:00 p.m. the night before, although the White House has also submitted evidence that passes have been granted day-of, including to Ateba.  Defs.' Resp. to Pl.'s Facts ¶ 2.  Because day passes are good for one day only, journalists must resubmit the form for every day they plan to access the Press Area.  Id.

Journalists seeking long-term hard passes must secure approval from the Secret Service and the White House.  The Secret Service reviews "whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges."  31 C.F.R. § 409.1.  The White House sets and enforces the remaining criteria for approval.  See Pl.'s Resp. to Defs.' Facts ¶ 1.  These criteria are discussed at length below.

### B.  Simon Ateba

Ateba is the White House correspondent for Today News Africa, "a daily online news publication covering American politics and relations between the United States and African countries."  Verified Compl. [ECF No. 1] ("Compl.") ¶ 3; see Pl.'s Resp. to Defs.' Facts ¶ 6.  He has worked as a journalist for fifteen years, the last five as a White House correspondent.  Compl. ¶¶ 3, 38.  For his first three years as a White House correspondent, he entered the White House with a day pass; from February 2021 through July 2023, he held a hard pass.  Pl.'s Resp. to Defs.' Facts ¶ 7.  During this time, he alleges, he was ignored by the Press Secretary, who generally

3

refused to take his questions or grant him interviews with the President.  See Compl. ¶¶ 42–45; Defs.' Resp. to Pl.'s Facts ¶ 9.

Ateba claims that in response to this alleged treatment, he has taken to speaking over the Press Secretary and other correspondents during White House briefings.  Compl. ¶¶ 45–53; see Pl.'s Resp. to Defs.' Facts ¶ 11.   In one notable incident, on March 20, 2023, he interrupted the Press Secretary's introduction of the cast members of the television show "Ted Lasso," who were at the White House to speak about mental health.  See Compl. ¶ 49; Defs.' Resp. to Pl.'s Facts ¶ 10.  The disturbance resulted in national news coverage.  See id. ¶ 50.  His pattern of disruption has drawn rebuke from the White House Press Secretary and other correspondents.  Id. ¶¶ 48, 50, 52.  Even amid the well-known rough-and-tumble atmosphere of the White House Press Area, see Karem v. Trump, 960 F.3d 656, 665 (D.C. Cir. 2020), Ateba's behavior has turned heads.  See Compl. ¶¶ 45–53; Defs.' Resp. to Pl.'s Facts ¶ 20.

### C.  Changes in White House Policy

On May 5, 2023, the White House announced two new policies relating to White House access.  First, the White House issued a conduct policy, setting forth expectations for behavior in the Press Area, and the process for revoking hard pass credentials of journalists who did not comply ("Conduct Policy").  Pl.'s Resp. to Defs.' Facts ¶ 10; see Compl., Ex. A [ECF No. 1-1] ("May 5, 2023 Letter") at 2.  Second, the White House announced that all hard passes would expire on July 31, 2023, unless the holder met the following criteria ("Hard Pass Policy"):

1. Full-time employment with an organization whose principal business is news dissemination (If you are freelance, we will need letters from two news organizations describing your affiliation, or, if you freelance primarily for one organization, a letter from that organization describing the extent and duration of your relationship with the organization);
2. Physical address (either residential or professional) in the greater Washington, D.C. area;

3.  Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;

4.  Assignment to cover (or provide technical support in covering) the White House on a regular basis;

5.  Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and

6.  Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

Pl.'s Resp. to Defs.' Facts ¶ 8–9.  The White House did not explain the change, except to say that it sought to "be consistent with . . . prior administrations."  May 5, 2023 Letter.  In briefing, the White House suggested the change was made to reduce the number of passes in circulation.  Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. [ECF No. 22-1] ("Defs.' Mot.") at 2 ("[U]nder the now-rescinded policy, hard passes were automatically renewed and there were an excessive number in circulation—including many that were no longer in active use, leading to concerns with administrability and the security risks inherent in the ballooning number of passes that grant access to the White House.").

Principally at issue in this case is Rule No. 5, the requirement that applicants hold credentials from the Supreme Court or one of the congressional press galleries.  Access to the Supreme Court press gallery is determined by the public information office and is limited to journalists who cover the Court full time.  See Defs.' Resp. to Pl.'s Facts ¶ 14.  Ateba has not secured a credential from the Supreme Court.  See id. ¶ 14; Compl. ¶ 77; id, Ex. D [ECF No. 1-4] (Letter to Supreme Court Public Information Office).  Given the undisputed and significant limitations on Supreme Court press passes, the Court credits Ateba's assertion that it would not be possible for him to obtain such a credential. The Court therefore focuses its analysis on the congressional press galleries' rules.

The congressional press galleries have long provided professional credentialing to journalists.  See Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1343–44 (D.C. Cir. 1975) (discussing history of credential press galleries and credentialing rules).  The House and Senate each host four galleries for different types of journalists: daily press, periodical press, radio/TV, and press photographers.  See id.  Committees of journalists administer the credentialing requirements for the galleries, and journalists must renew their credentials every two years.  See Defs.' Resp. to Pl.'s Facts ¶¶ 15–16.  The credentialing requirements for the congressional press galleries are similar to each other.  The rules for the Senate Daily Press Gallery (also known as the Senate Press Gallery)—to which Ateba has sought access—are, in pertinent part:

3.   The Standing Committee of Correspondents shall limit membership in the press galleries to bona fide correspondents of repute in their profession, under such rules as the Standing Committee of Correspondents shall prescribe.

4.   An applicant for press credentials through the Daily Press Galleries must establish to the satisfaction of the Standing Committee of Correspondents that he or she is a full-time, paid correspondent who requires on-site access to congressional members and staff.

Correspondents must be employed by a news organization:

(a)   with General Publication periodicals mailing privileges under U.S. Postal Service rules, and which publishes daily; or

(b)   whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published continuously for 18 months.

The applicant must reside in the Washington, D.C. area, and must not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation, organization, or agency of the U.S. Government, or in prosecuting any claim before Congress or any federal government department, and will not do so while a member of the Daily Press Galleries.

Applicants' publications must be editorially independent of any institution, foundation or interest group that lobbies the federal government, or that is not

6

> principally a general news organization. Failure to provide information to the
> Standing Committee for this determination, or misrepresenting information, can
> result in the denial or revocation of credentials.

Req. for Judicial Notice, Ex. E (U.S. Senate Daily Press Gallery, Governing Rules) [ECF No. 24-6] ("Senate Daily Press Gallery Rules"); <u>see</u> U.S. House Periodical Press Gallery, Rules and Regulations, https://periodical.house.gov/accreditation/rules-and-regulations ("House Periodical Press Gallery Rules") (similar);[2] <u>see</u> Defs.' Resp. to Pl.'s Facts ¶¶ 17–19.

### D. Effect of White House Policy Changes on Ateba

On July 11, 2023, Ateba received a reprimand letter pursuant to the new Conduct Policy. Pl.'s Resp. to Defs.' Facts ¶ 12. The letter outlined four instances when he disrupted press briefings and afforded him an opportunity to respond to the allegations. Compl., Ex. B [ECF No. 1-2] ("Reprimand Letter") (detailing incidents on May 13, 2022, December 8, 2022, March 20, 2023, and June 26, 2023). While the letter contained a warning that Ateba's continued disruptions could result in the suspension or revocation of his hard pass, the White House did not revoke Ateba's hard pass pursuant to the Conduct Policy. <u>Id.</u>; <u>see</u> Pl.'s Resp. to Defs.' Facts ¶ 12. On August 1, 2023, the White House directed the Secret Service to deactivate hard passes for approximately 500 journalists who did not qualify under the new Hard Pass Policy. Pl.'s Resp. to Defs.' Facts ¶ 14.

---

[2] Ateba has submitted an unopposed motion for the Court to take judicial notice of the following documents: (1) Brief of The White House Correspondents' Ass'n as Amicus Curiae Supp. Appellee, <u>Karem v. Trump</u>, Case No. 19-5255 (D.C. Cir. Jan. 13, 2020) [ECF No. 24-2]; (2) Transcript of Oral Decision, CNN v. Trump, 1:18-cv-02610-TJK, at *7:19–22 (D.D.C. Nov. 16, 2018) [ECF No. 24-3]; (3) Congressional News Media and the House and Senate Press Galleries, Congressional Research Service (Apr. 13, 2017) [ECF No. 24-4] at 4; (4) Periodical Press Gallery, Accreditation, House Periodical Press Gallery [ECF No. 24-5]; and (5) Senate Daily Press Gallery Rules. Req. for Judicial Notice [ECF No. 24].

The Court may take judicial notice of facts "not subject to reasonable dispute" that are "generally known within the trial court's territorial jurisdiction" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The motion is granted to the extent the facts are relied upon in this opinion. The Court also takes judicial notice of the rules of the House Periodical Press Gallery, since Ateba has already pointed the Court to another part of that gallery's accreditation procedures. Because Ateba raises a facial challenge to the policy, it is appropriate for the Court to consider different rules under which a journalist can obtain a credential.

Ateba lacked a credential from the Supreme Court or one of the congressional press galleries, as required under Rule No. 5 of the Hard Pass Policy, and his hard pass was deactivated.  Id.

Ateba applied for a credential from the Senate Daily Press Gallery on June 5, 2023.  Defs.' Resp. to Pl.'s Facts ¶ 17; see Compl., Ex. C [ECF No. 1-3] (Letter to Senate Daily Press Gallery). His request is under consideration but, as of October 11, 2023, has not been granted.  Defs.' Resp. to Pl.'s Facts ¶¶ 18–19.  Ateba did not apply to renew his hard pass before it was deactivated.  See Pl.'s Resp. to Defs.' Facts ¶ 13.  Ateba has continued to access the Press Area with a day pass.  Id. ¶ 15; see 3d Fleischer Decl. ¶ 17 (stating that, since Ateba's hard pass was deactivated, he has been granted day pass access to the White House each time he sought it, and that he has "entered the White House on several of those occasions").

## II.   Procedural Background

On August 10, 2023, Ateba sued White House Press Secretary Karine Jean-Pierre, in her official capacity, as well as Director of the United States Secret Service Kimberly Cheatle, in her official capacity, and the United States Secret Service.  Compl. ¶¶ 19–21.  Ateba simultaneously moved for a preliminary injunction to enjoin the Hard Pass Policy and restore his hard pass.  Pl.'s Mot. for Prelim. Inj. [ECF No. 2].

Ateba makes three principal claims.  First, he alleges that the Hard Pass Policy violates the First Amendment on its face, because it confers "unbridled discretion" on the congressional press gallery committees to determine who can obtain a hard pass (Count One).  Compl. ¶¶ 83–89. Second, he alleges that the White House discriminated against him based on his viewpoint by adopting Hard Pass Policy criteria "specifically designed to exclude [him] from eligibility" (Count Two).  Id. ¶¶ 90–95.  And third, Ateba alleges the Secret Service violated the Administrative Procedure Act (APA) by deactivating his hard pass without reasoned explanation (Count Three). Id. ¶¶ 96–103.

The Court denied Ateba's motion for a preliminary injunction, concluding that Ateba had failed to show he was "likely to suffer irreparable harm during the pendency of this litigation." Ateba v. Jean-Pierre, Civ. A. No. 23-2321 (JDB), 2023 WL 5748567, at *1 (D.D.C. Sept. 6, 2023). The Court concluded based on the facts presented that Ateba "remain[ed] able to enter the White House using the day pass system," which the Court found was an "acceptable alternative for the duration of the litigation." Id. at *4. However, "so that the merits of Ateba's challenge [could] be swiftly adjudicated," the Court ordered the parties to submit summary judgment briefing on an expedited schedule. Id. at *1, *6.

The White House submitted a motion for summary judgment on all three counts. Defs.' Mot. Ateba submitted a cross-motion for summary judgment on the facial First Amendment challenge and the APA challenge. Pl.'s Combined Mem. in Supp. of Summ. J. & Opp'n to Defs.' Mot. for Summ. J. [ECF No. 23] ("Pl.'s Cross-Mot. & Opp'n"). Ateba also asked the Court to deny the White House's motion for summary judgment on the viewpoint discrimination challenge and order discovery from the White House. Id. The Court held an oral argument hearing on the summary judgment motions on November 2, 2023. The motions are now fully briefed and ripe for decision.

**Legal Standard**

A movant is entitled to summary judgment if he can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, the court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks omitted). "This mode of analysis serves to separate the jury functions of making credibility determinations, weighing the

9

evidence, and drawing legitimate inferences from the facts from the district court's role as the arbiter of legal questions." <u>Id.</u> (cleaned up). "When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether the Rule 56 standard has been met." <u>Lerch Bates, Inc. v. Michael Blades & Assocs., Ltd.</u>, Civ. A. No. 20-2223 (BAH), 2023 WL 6276643, at *9 (D.D.C. Sept. 26, 2023).

<u>**Analysis**</u>

## I.   First Amendment Injury

The White House claims that Ateba's First Amendment challenges cannot get off the ground because he has not suffered a cognizable First Amendment injury.  Defs.' Mot. at 6. According to the White House, since Ateba has not lost access to the White House press briefings—only expedited hard pass access—he has suffered a mere inconvenience, not a violation of his First Amendment rights.  <u>See</u> Defs.' Combined Opp'n to Pl.'s Mot. for Summ. J. & Reply in Supp. of Defs.' Mot. for Summ. J. [ECF No. 26] ("Defs.' Reply & Opp'n") at 1–3.  The Court considers this argument relevant to Ateba's facial challenge and his viewpoint discrimination claim.[3]

Generally, the First Amendment does not provide journalists any greater right of access to government property or information than it provides to members of the public, despite the fact that access to government information "might lead to more thorough or better reporting."  <u>JB Pictures,</u>

---

[3] At oral argument, counsel for the White House acknowledged that this argument—while described as a challenge to Ateba's "injury"—does not attack Ateba's constitutional standing.  Nor could it.  Ateba is plainly injured by losing the hard pass, which provided him expedited access to the White House briefing room.  <u>See</u> <u>Flynt v. Rumsfeld</u>, 355 F.3d 697, 702 (D.C. Cir. 2004) (appellants had standing where they sought and were denied access to accompany U.S. troops in combat); <u>see also</u> <u>Zukerman v. U.S. Postal Serv.</u>, 567 F. Supp. 3d 161, 170–71 (D.D.C. 2021) ("[F]or Article III standing purposes at least, the required threshold is quite low.").  The loss of the hard pass is traceable to actions of the White House and the Secret Service.  And his injury can be redressed by an order that the defendants reconsider the Hard Pass Policy or reinstate his hard pass.

10

Inc. v. Dep't of Def., 86 F.3d 236, 238 (D.C. Cir. 1996); see Branzburg v. Hayes, 408 U.S. 665, 684 (1972).  As it pertains to the press, the First Amendment primarily protects the right to "communicate information once it is obtained," not the ability to collect it.  Houchins v. KQED, Inc., 438 U.S. 1, 9 (1978) (plurality opinion).  Hence, courts have generally refused to find that the First Amendment requires government entities to admit press into places not otherwise open to the public, provide enhanced access to information under the government's control, or afford journalists heightened access to places open to the general public.  See, e.g., L.A. Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 40 (1999) ("California could decide not to give out arrestee information at all without violating the First Amendment"); Houchins, 438 U.S. at 16 ("[T]he media have no special right of access to [a jail] different from or greater than that accorded the public generally."); Flynt v. Rumsfeld, 355 F.3d 697, 703 (D.C. Cir. 2004) (no First Amendment right for press to travel with the military during combat); JB Pictures, 86 F.3d at 242 (no First Amendment right for media to attend military funerals).

The First Amendment may, however, provide some protections when journalists are denied access to areas the government has specifically opened to the press.  The D.C. Circuit has read the First and Fifth Amendments together to prohibit the denial of a journalist's access to the White House Press Area without due process protections.  Sherrill, 569 F.2d at 129–31; Karem, 960 F.3d at 664–67.  This Court has, correspondingly, concluded that "the First and Fifth Amendments seem to require, at a minimum, that before determining which media organizations receive the limited access available, [a government agency] must not only have some criteria to guide its determinations, but must have a reasonable way of assessing whether the criteria are met."  Getty Images News Servs. Corp. v. Dep't of Def., 193 F. Supp. 2d 112, 121 (D.D.C. 2002).  Thus, where the Department of Defense lacked an articulated process for deciding which journalists could

11

participate in the military's media flights to Guantanamo Bay in the wake of September 11, the plaintiffs had a cognizable injury under the First and Fifth Amendments.  Id.

While the D.C. Circuit did not reach this question in Karem, the Court reads Sherrill to support a First Amendment claim at least when a journalist is excluded from the Press Area for arbitrary reasons.  As the Sherrill court stated, "White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons."  Sherrill, 569 F.2d at 129 (internal citations and footnote omitted).  The White House's contention that Sherrill is a "due process case," "despite [its] First Amendment overtones," Defs.' Reply & Opp'n at 9, skips over a crucial part of Sherrill's analysis: although that court ultimately focused on the Secret Service's need to formalize security standards and provide applicants notice and an opportunity to respond to denials, the court first considered whether the standard articulated by the Secret Service in litigation—"whether the applicant presents a potential source of physical danger to the President and/or his immediate family so serious as to justify his exclusion"—comported with the First Amendment.  Sherrill, 569 F.2d at 130 (footnote omitted).

Recent cases in other circuits have accepted the premise that the denial of a reporter's access to a press briefing is a cognizable First Amendment violation, reviewable in the traditional framework of a First Amendment forum and subject to an order requiring not only due process, but access.  See John K. MacIver Inst. for Pub. Pol'y v. Evers, 994 F.3d 602, 610 (7th Cir. 2021) (reviewing criteria to access a media briefing under a First Amendment analysis for reasonableness and viewpoint neutrality); TGP Commc'ns, LLC v. Sellers, No. 22-16826, 2022 WL 17484331, at *4–5 (9th Cir. Dec. 5, 2022) (same); cf. Huminski v. Corsones, 396 F.3d 53, 88 (2d Cir. 2005)

12

(exclusion of individual journalist from all state courthouses otherwise open to press was "plainly overbroad" and "not 'tailored' to the threat"); Nicholas v. Bratton, 376 F. Supp. 3d 232, 259–60 (S.D.N.Y. 2019) (reviewing journalists' equal access claim to crime scene under the First Amendment).

Unlike the prior cases involving restrictions on White House access, however, this case does not concern a denial of access to the Press Area. Ateba has lost his hard pass, but he can still access the Press Area with a day pass. Accordingly, Ateba asks the Court to find his access to the Press Area has been burdened by the loss of his hard pass, and that this burden constitutes a First Amendment injury. Pl.'s Cross-Mot. & Opp'n at 17–18.[4]

The D.C. Circuit has not considered whether denial of a hard pass, when the reporter can still access the Press Area with a day pass, amounts to a First Amendment injury. See Sherrill, 569 F.2d at 130 (noting that denial of hard pass resulted in "exclusion . . . from White House press facilities"); Karem, 960 F.3d at 665 (describing sanction as "a month-long loss of White House access"). Neither party has cited any case directly addressing whether a burden on access to the Press Area (or any similar press area, for that matter) constitutes a First Amendment injury. Ateba urges the Court to rely on the general principle that "[g]overnmental action that 'burdens' First Amendment activity inflicts a cognizable injury no less than governmental action that 'prohibit[s]' such activity outright." Pl.'s Mot. & Opp'n at 17 (quoting Sorrell v. IMS Health, Inc., 564 U.S. 552, 566 (2011) (citing, inter alia, United States v. Playboy Ent. Grp., 529 U.S. 803, 812 (2000) (limitations on television programming time); and Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 582–83 (1983) (tax on the press))). The White House counters that

---

[4] Ateba also claims that loss of the hard pass itself is a cognizable injury under the First Amendment under Sherrill and Karem. Pl.'s Cross-Mot. & Opp'n at 17–18. While those cases recognized a right in the pass, the loss of a hard pass there was inextricably tied to the complete loss of access.

13

only burdens on the "freedom of the media to <u>communicate</u> information" are actionable, not burdens on obtaining information from the government.  Defs.' Reply & Opp'n at 2 (quoting <u>Houchins</u>, 438 U.S. at 9); <u>see</u> <u>Houchins</u>, 438 U.S. at 4–5 (no First Amendment violation when news reporters were given "only limited access to the jail" on public tours that did not reach area of alleged prisoner abuse); <u>Zemel v. Rusk</u>, 381 U.S. 1, 17 (1965) ("[That] the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information . . . does not make entry into the White House a First Amendment right."); <u>cf. ACLU</u> <u>of Md. v. Wicomico Cnty.</u>, 999 F.2d 780, 786 (4th Cir. 1993) (county did not engage in First Amendment retaliation by revoking an ACLU paralegal's special inmate access due to the ACLU's lawsuit against the jail).   However, as Ateba argues elsewhere, his participation in press conferences is arguably expressive.  Because he "speaks through his questions—broadcast on live television—which express a point of view regarding the events he thinks are worthy of discussion," Pl.'s Cross-Mot. & Opp'n at 8, even burdens on his access to the press area could affect his right to "communicate information," not only his right to collect it.

As an initial matter, the undisputed facts do not support an inference that Ateba's access to the Press Area has been denied.  It is undisputed that a day pass holder may access the same parts of the White House at the same times as a hard pass holder.  And once the journalist reaches the Press Area, a day pass holder is not subject to any restrictions that would not also apply to a hard pass holder.  If a day pass holder misses a spontaneous briefing, that is because he or she did not apply for a day pass, not because he or she has been excluded from the Press Area.  No facts in the record suggest otherwise—that, for example, seats in the Press Area are reserved for hard pass holders, that day pass holders cannot bring in cameras, or that certain events or places are open to hard pass holders only.  This case is, therefore, unlike <u>Stevens v. N.Y. Racing Ass'n</u>, 665 F. Supp.

14

164 (E.D.N.Y 1987), where the court found actionable a restriction prohibiting one journalist from entering a racetrack with a camera, while all other journalists were permitted to do so. Id. at 175.

However, the undisputed facts also demonstrate that being required to use a day pass instead of a hard pass burdens Ateba's Press Area access to some degree. Put differently, the facts in the record support an inference that a hard pass is a preferred form of access to a day pass. Whereas a hard pass holder can enter the White House at a moment's notice, other journalists must apply for a day pass up to a day in advance. Thus, a journalist who does not prophylactically apply for day passes might miss a late-scheduled press event. And while a hard pass holder can walk directly inside after security screening, a day pass holder must wait on an escort, which can take up to forty-five minutes depending on when the journalist arrives. Perhaps it is on account of these differences, or changes in the White House day pass policy over time, that the White House Correspondents Association has remarked in previous litigation that "without the access that a hard pass grants, a White House correspondent cannot effectively perform his or her duties, which include providing the public with on-the-spot news coverage of unforeseen and unscheduled events, along with cataloguing the daily activities of the head of the executive branch." Req. for Judicial Notice, Ex. A (Brief of The White House Correspondents' Ass'n as Amicus Curiae Supporting Appellee at 3, Karem v. Trump, No. 19-5255 (D.C. Cir. Jan. 13, 2020)).

Ultimately, the Court concludes that Ateba has an actionable First Amendment injury. As the D.C. Circuit recognized in Sherrill, the White House has opened the Press Area to journalists who need to report therefrom. 569 F.2d at 129. Although that case preceded modern-day forum analysis, the Sherrill court's characterization of the Press Area is akin to that of a First Amendment forum—government property that public officials have opened to certain members of the public for certain types of communication (here, newsgathering). Other circuits have similarly treated

15

press briefings as First Amendment forums.  See Evers, 994 F.3d at 610; TGP Commc'ns, 2022 WL 17484331, at *4–5.  Accordingly, in deciding whether an injury exists, the Court must consider principally whether a burden on access to a First Amendment forum would amount to an injury. Even in a nonpublic forum—where government authority to restrict access is at its apex—a plaintiff has an actionable claim when the government has allegedly discriminated with respect to "who may use its facilities and on what terms."  Chi. Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 700 (7th Cir. 1998) (emphasis added) (finding actionable government agency's disparate waiver of fees for use of meeting rooms).  Where the White House "press facilities are perceived as being open to all bona fide Washington-based journalists," Sherrill, 569 F.2d at 129 (footnote omitted), disparate forms of access to that forum are likewise actionable under the First Amendment.

This is not a case, as the government urges, where a member of the press seeks greater access—or better terms—than members of the public.  See Houchins, 438 U.S. at 4–5. Nor is it a case about journalists seeking information in the government's possession.  See L.A. Police Dep't, 528 U.S. at 40.  Rather, this case involves a journalist seeking access to a forum—opened by the White House—on the same terms as other journalists.  To conclude that only outright denials of access are actionable would undermine the protections established by Sherrill, for it would suggest that the White House could alter the hard pass criteria—and thereby impose disparate burdens on journalists seeking access to a place generally opened to them—in entirely viewpoint-discriminatory ways, and journalists would have no cause of action.  Counsel for the White House admitted as much at oral argument.  Oral Argument Rough Hr'g Tr. 35:2–16 (agreeing that under the Court's hypothetical policy granting hard passes only to partisan news organizations, a journalist would have no cause of action).

16

That is not to say that every restriction the White House might impose on access to the White House violates the First Amendment.  Indeed, the Court will conclude in this case that the Hard Pass Policy does not facially violate the First Amendment.  However, it does mean that regulations as to who may obtain a hard pass—even when a day pass is available—are subject to First Amendment scrutiny.  As the Court will discuss below, when the White House decides who gets expedited access and who does not, its regulations must be reasonable and viewpoint neutral.

## II.   Facial Challenge to the Hard Pass Policy

Ateba claims the Hard Pass Policy facially violates the First Amendment because the policy is unreasonable and confers "unbridled discretion" on the Press Galleries who supply the requisite credentials for obtaining a hard pass.  The Court concludes that the policy is reasonable, and that discretion is sufficiently cabined to satisfy the First Amendment.

### A.  Legal Standards

When considering "[t]he amount of access to which the government must give the public for First Amendment activities," courts generally apply forum analysis.  Evers, 994 F.3d at 609.  In a forum analysis, a court classifies the government property by type of forum (i.e., public, designated public, limited public, or nonpublic) and applies the appropriate standard to evaluate the constitutionality of limitations on the First Amendment activity.  Id. [5]  Courts have the "least tolerance for restrictions on First Amendment freedoms" in public forums, id.,—places where people have historically "assemble[d] and . . . communicate[d] with others," or which the

---

[5] The White House argues that the Press Area does not lend itself to forum analysis at all, citing Price v. Garland, 45 F.4th 1059 (D.C. Cir. 2022).  In Price, the D.C. Circuit declined to apply the heightened protections of a public forum to commercial filmmaking in a National Park, since "filmmaking, like typing a manuscript, is not itself a communicative activity."  Id. at 1070.  This argument misses the mark because participation in a news conference is expressive, since reporters communicate with White House staff and raise issues of public importance to the President and his team.  See Evers, 994 F.3d at 611–12; TGP Commc'ns, 2022 WL 17484331, at *4; cf. Price, 45 F.4th at 1071 n.2 (distinguishing Evers because it "does not even deal with filming" but rather applied forum analysis to "'gathering information for news dissemination'" (quoting Evers, 994 F.3d at 612)).

government has intentionally opened for that purpose.  Price v. Garland, 45 F.4th 1059, 1067–68 (D.C. Cir. 2022).  In public forums, regulations based on the content of speech are subject to strict scrutiny—they must be necessary to serve a compelling state interest and narrowly drawn to achieve that end.  Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n, 460 U.S. 37, 45 (1983).  Content-neutral time, place and manner restrictions in public forums must meet intermediate scrutiny—they must be narrowly tailored to serve a significant government interest.  Id. at 45–46.  The government has more latitude when regulating access to nonpublic and limited public forums, i.e., places not opened to public communication, or "limited to use by certain groups or dedicated solely to the discussion of certain subjects."  Price, 45 F.4th at 1068 (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 470 (2009)).  In a nonpublic or limited public forum, government regulations need only be viewpoint neutral and "reasonable given the purpose of the forum and all the surrounding circumstances."  Id. (internal quotation marks omitted).[6]

The parties dispute whether the Press Area is a nonpublic or limited public forum.   The White House contends the Press Area is a nonpublic forum because access is "selective" and "limited to those who satisfy the six criteria or are otherwise invited; the White House has not generally opened its grounds to all comers or even to all journalists."   Defs.' Mot. at 8.  Ateba

_____

[6] Ateba also contends that Sherrill offers a test for evaluating the constitutionality of press pass restrictions. Pl.' Cross-Mot. & Opp'n at 5–7.  Specifically, he points to the language in Sherrill stating that "access [should] not be denied arbitrarily or for less than compelling reasons."  Sherrill, 569 F.2d at 129; see id. at 130 ("[R]efusal must be based on a compelling governmental interest").  The White House contests Ateba's assertion that Sherrill dictates any standard under the First Amendment.  Defs.' Reply & Opp'n at 9.

Since Sherrill preceded modern forum analysis, it is difficult to ascertain the precise legal equivalent, but the term "compelling" need not—and should not—be taken to suggest the application of a strict scrutiny standard (nor does Ateba ask the Court to apply strict scrutiny).  Rather, when the Sherrill court briefly addressed the adequacy of the Secret Service's substantive standard for regulating access to the White House—"whether the applicant presents a potential source of physical danger to the President and/or his immediate family so serious as to justify his exclusion"—the court acknowledged the standard was "circumspect" and allowed the Secret Service to "exercise[e] expert judgment which frequently must be subjective in nature."  Id.  The latitude afforded the Secret Service suggested a standard similar to reasonableness.  Accordingly, the Court finds review under the "reasonableness" standard of forum analysis appropriate even under Sherrill.

18

responds that the Press Area is a limited public forum because "[b]y long practice, the White House created and has operated the Press Area for the purpose of allowing journalists access to the White House to communicate with the President and his staff and to gather and disseminate the news." Pl.'s Cross-Mot. & Opp'n at 8.  The parties' positions on this point are at odds with their arguments elsewhere in the litigation.  Where the White House contends elsewhere that access is available to any journalist who can pass a minimal Secret Service screening (i.e., eligible for a day pass), here the White House suggests access is open only to hard pass holders or invited guests.  Ateba elsewhere suggests that a journalist cannot effectively access the Press Area without a hard pass. But here he contends the area is open to all journalists for reporting.  Ultimately, the Court need not wade through the parties' internal inconsistencies, since regardless of the type of forum at issue—nonpublic or limited public—the standard of review is the same: whether a challenged limitation is reasonable and viewpoint neutral.  See ACLU Found. v. Washington Metro. Trans. Auth., 303 F. Supp. 3d 11, 17 (D.D.C. 2018).

In a nonpublic or limited public forum, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Perry Educ. Ass'n, 460 U.S. at 46.  "In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise."  Id.  Thus, in such forums, the government may draw distinctions based on "subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."  Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 806 (1985). "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when

19

it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." Id. (internal citations omitted); see Christian Legal Soc'y Chapter of Univ. of Cal., Hastings College of L. v. Martinez, 561 U.S. 661, 680–82 (2010) (discussing parallel characteristics of a limited public forum).

Reasonableness requires "something more than the toothless 'rational basis' test used to review the typical exercise of a state's police power." Price, 45 F.4th at 1072. However, a regulation can be reasonable without being "the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808. A court must assess limitations in light of the "purpose of the forum and all the surrounding circumstances." Id. at 809. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." Id. "In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." Id. at 808. The reasonableness of a limitation can be established "by evidence in the record or even by a commonsense inference." Price, 45 F.4th at 1072.

The parties dispute whether a reasonableness analysis incorporates the doctrine of "unbridled discretion." That doctrine emerged in the context of prior restraints on expressive activity, i.e., government rules prohibiting individual expression without a license. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 130–31 (1992) (public demonstration permitting); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 753, 763–64 (1988) (newsstand licensing). The Supreme Court has allowed facial challenges and even invalidated challenged regulations when they provide "overly broad licensing discretion" to the administrator. City of Lakewood, 486 U.S. at 764 (quoting Freedman v. State of Maryland, 380 U.S. 51, 56 (1965)). The

Court has stated that "narrow, objective, and definite standards [are needed] to guide licensing authority." Forsyth County, 505 U.S. at 131 (quoting Shuttlesworth v. Birmingham, 394 U.S. 147, 150–151 (1969)).  The doctrine seeks to reduce "the risk of self-censorship" by speakers hoping to obtain a necessary license, "and the risk that the licensing official, not limited by express standards, will use his power to suppress speech."  Southworth v. Bd. of Regents of Univ. of Wisc. Sys., 307 F.3d 566, 576 (7th Cir. 2002) (discussing City of Lakewood, 486 U.S. at 757–58).  As a secondary component of the doctrine, the Supreme Court has sometimes required officials to abide by certain "procedural safeguards," including expeditious judicial review and timelines for decision making.  Thomas v. Chi. Park Dist., 534 U.S. 316, 321–22 (2002).

The White House contends that the unbridled discretion doctrine does not apply to access to the Press Area—a nonpublic or limited public forum—claiming that the Supreme Court silently rejected the application of the unbridled discretion doctrine to nonpublic forums by refusing to embrace the plaintiff's argument in Arkansas Educational Television Commission v. Forbes, 523 U.S. 666 (1998).  See Defs.' Mot. at 9–10.  However, as Ateba points out, the Supreme Court has extended at least some of the protections of the unbridled discretion doctrine to nonpublic forums. See Pl.'s Cross-Mot. & Opp'n at 13–14.  In Minnesota Voters Alliance v. Mansky, 138 S. Ct. 1876 (2018), the Court held that a Minnesota law banning "political" apparel in a nonpublic forum— the polling place—was unreasonable because it contained no "objective, workable standards."  Id. at 1891; see id. at 1888.  Although the state had a legitimate goal of creating "an island of calm in which voters can peacefully contemplate their choices," id. at 1887 (internal quotation marks omitted), it needed a standard that "articulate[d] some sensible basis for distinguishing what may come in from what must stay out," id. at 1888.

The D.C. Circuit has since distilled "unbridled discretion" and the Mansky rule to a "single challenge":

> whether [a regulation] is so broad as to provide [the government] with no meaningful constraint upon its exercise of the power to squelch.  If so, then it is not "reasonable" as that term is used in Mansky, and not constitutional because it provides [the government] with unbridled discretion.  Put the other way around, if [the regulation] is capable of reasoned application, as Mansky demands, then it does not confer unbridled discretion upon [the government].

Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth. ("AFDI"), 901 F.3d 356, 372 (D.C. Cir. 2018); accord Zukerman v. U.S. Postal Serv., 961 F.3d 431, 449 (D.C. Cir. 2020).

The White House urges the Court to read this principle narrowly, arguing that the cases from which it emerged concern "core First Amendment activity: the expression of ideas," Defs.' Reply & Opp'n at 6, not "the distinct context of journalist access to what is, at most, a nonpublic forum," Defs.' Mot. at 10.  But such a limitation is not warranted here.  While the press may not challenge every law involving discretion as censorship, the press may challenge those laws "hav[ing] a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks."  City of Lakewood, 486 U.S. at 759.

White House press conferences involve a communicative exchange between the government and news reporters.  As journalists ask questions, they raise issues important to their readers, and foster public discussion of the President's administration.  See Pl.'s Cross-Mot. & Opp'n at 8.  Other circuits have likewise recognized that participating in press conferences has a "nexus" to expression.  See Evers, 994 F.3d at 611–12 (characterizing "gathering information for news dissemination" as a "form[] of expressive activity); TGP Commc'ns, 2022 WL 17484331, at *4 (describing news conference as a place for "speech on limited topics").  Moreover, the purposes of the unbridled discretion doctrine would be served by its application to White House

22

press access.  See Pl.'s Cross-Mot. & Opp'n at 14.  A rule limiting press access without "objective, workable standards" could encourage journalists to self-censor to obtain access, and shelter decisionmakers from accountability if they excluded reporters based on their comments.  Cf. Pen Am. Ctr. v. Trump, 448 F. Supp. 3d 309, 326–27 (S.D.N.Y. 2019) (concluding journalists adequately pleaded retaliation claim based on credential revocation after speaking critically of former President Trump).  Accordingly, the Court will take account of the unbridled discretion doctrine in reviewing the Hard Pass Policy for reasonableness and viewpoint neutrality.

### B. Reasonableness Review

As an initial matter, neither party argues that the press credentialing requirement is itself viewpoint discriminatory.  Rather, Ateba argues that the requirement of credentialing by the press galleries is "arbitrary and unreasonable."

The White House asserts that it "surely has a legitimate interest in maintaining a degree of control over media access to the White House complex," Defs.' Mot. at 11 (quoting Karem, 960 F.3d at 668), "given the purpose of White House briefings and the limits that must exist, for reasons of security and government efficiency, on access to the White House," id.  The White House further argues that "[i]mplicit in that interest is the ability . . . to limit the press areas to those engaged in journalism."  Id.  The requirement of credentialing by an outside professional organization, it contends, is a reasonable way to do so.  Id.

Ateba concedes that limiting Press Area access to those engaged in journalism is a "legitimate reason for requiring press credentials."  Pl.'s Cross-Mot. & Opp'n at 15.  However, he argues that the requirement of credentialing by the congressional press galleries is unreasonable for two principal reasons: first, because the gallery credentialing requirement is "standardless and susceptible to abuse," id. at 10, and second, that requiring a press gallery credential lacks a

"rational nexus with the government's compelling reason for the restriction," given that "[j]ournalists covering the White House might not want to cover Congress," id. at 15.

The White House has long relied on credentialing by the congressional press galleries as a prerequisite to obtaining a press credential.  See Sherrill, 569 F.2d at 129 n.19 (noting the requirement in 1977); Karem, 960 F.3d at 660 (same in 2020); see id. ("Forty years on [from Sherrill], today's hard pass system is little changed . . . .").  And the requirements for credentialing by the press galleries are functionally the same as they were around the time of Sherrill, including the requirement that journalists be "bona fide . . . reporters of reputable standing."  See Consumers Union of U.S., 515 F.2d at 1344–45 (quoting Rules Governing Periodical Press Galleries in 1975). While not passing directly on the question, the D.C. Circuit has never questioned the requirement of press credentialing or the substance of the standards.  And as the White House points out, it is commonplace for government entities to rely on professional credentialing bodies as a means of determining access.  See Defs.' Mot. at 11 (citing examples).

The standards that the press galleries apply are also directly related to determining whether an applicant is "engaged in journalism," and not a lobbyist or investor seeking to influence or derive benefit from access to government officials.  See Defs.' Reply & Opp'n at 10 (contending that the credentials are a "reasonable heuristic for identifying bona fide journalists and ensuring the White House press areas are properly limited to those genuinely engaged in journalistic pursuits").  Indeed, the rules of the Senate Daily Press Gallery—to which Ateba has sought access—require that the applicant be employed by a news organization "whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published continuously for 18 months," and which is "editorially independent of any institution, foundation, or interest group that lobbies the federal government."  Senate Daily

24

Press Gallery Rules.  Further, "[t]he applicant must . . . not be engaged in any lobbying or paid advocacy," including before Congress or any part of the federal government.  Id.

Ateba's narrow focus on the allegedly "standardless and susceptible to abuse" requirement that an applicant be a "bona fide resident correspondent[] of repute in their profession," Pl.'s Cross-Mot. & Opp'n at 10, removes the important context of the credentialing rules.  While the Court does not undertake to offer a binding or limiting definition of the term "of repute" as used in the press credentialing rules, it is apparent that the term at least draws meaning from the rules that follow.  See Senate Daily Press Gallery Rules.  Unlike in McDaniel v. Lombardi, 227 F. Supp. 3d 1032 (W.D. Mo. 2016), where selection of execution witnesses was based on the naked requirement that the individual be "reputable" in the warden's point of view, id. at 1034, 1038–39, the standard here is followed by detailed regulations suggesting a more definite meaning differentiating "[who] may come in from [who] must stay out."  Mansky, 138 S. Ct. at 1888.  The term "of repute" derives meaning from the central tenets of the regulations—that the person is working as a journalist for an established news organization and that the person does not have any conflicts of interest.[7]

While not directly considering the additional principle of unbridled discretion, the Seventh Circuit has concluded that a very similar set of rules, "adapted from established standards used by . . . the United States Congress" and including the requirement that the journalist be "a bona fide correspondent of repute in their profession," was a reasonable means for the Wisconsin governor to determine access to press conferences.  Evers, 994 F.3d at 606–07, 610–11.  The court determined that the criteria were "reasonably related to the viewpoint-neutral goal[s]" of

---

[7] The additional rules governing eligibility for press credentials also tend to foreclose Ateba's argument that "reputable" is a "transparent classification among journalists" in favor of the "institutional press."  Pl.'s Cross-Mot. & Opp'n at 16 (citing Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 352 (2010)).

"increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories" and "increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying." Id. at 610.  This Court agrees.

Importantly, reliance on a professional credentialing body also tends to reduce the risk Ateba apparently fears most—that the White House will discriminate against journalists based on their relationship with the White House.  See, e.g., Pl.'s Cross-Mot. & Opp'n at 24 (alleging the White House sought to exclude him from the Press Area).  Ateba stresses that the credentialing scheme is "uniquely susceptible to abuse" because the press gallery committees are "comprised of a group of journalists who work for news outlets that have a strong institutional foothold in the Washington, D.C. media ecosystem." Pl.'s Cross-Mot. & Opp'n at 12–13.  But on Ateba's own logic, the gallery-review process seems less susceptible to abuse than the apparent alternative of review by the (allegedly biased) White House.

Under the Hard Pass Policy, the White House has constrained its discretion to exclude speakers it disagrees with (except through the Conduct Policy, which is not challenged here). Instead of employing discretion in determining which journalists are eligible to hold a hard pass, the White House Press Office and the Secret Service employ "six clear and definite standards that are not amenable to discretionary judgments," one of which is whether the applicant holds a Supreme Court or congressional press credential.  Defs.' Mot. at 15.  This procedure reduces the risk highlighted in the unbridled discretion cases that a government official—here, the White House—might allocate licenses (hard passes) based on the views of certain speakers (reporters). See Mansky, 138 S. Ct. at 1891 (expressing concern that "[w]ithout [objective, workable

standards], an election judge's own politics may shape his views on what counts as 'political'"); City of Lakewood, 486 U.S. at 763–64 (explaining that in the absence of "standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or the viewpoint of the speaker").

Ateba's point that a hard pass seeker may not want to cover Congress or the Supreme Court is well-taken, but it does not defeat the other reasonable features of the credentialing gallery requirement.  A regulation can be reasonable without being "the most reasonable or the only reasonable limitation."  Cornelius, 473 U.S. at 808.  If the White House had its own press gallery but required journalists to seek a credential from the gallery of another branch of government, the reasonableness of the requirement might be more significantly undermined.  But those are not the facts presented here.[8]

Finally, Ateba argues that the congressional press credentialing requirement violates the "unbridled discretion" doctrine because the press galleries are not required to make decisions in any specific period of time.  Pl.'s Cross-Mot. & Opp'n at 12.  His concern, as articulated in some prior unbridled discretion cases, is that the decisionmaker will "indefinitely suppress[] permissible speech" without giving a reason.  FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 227 (1990) (Opinion of O'Connor, J.).  The Court is wary of applying the extraordinary procedural protections of content-based prior restraints to the application here of content-neutral criteria for press credentialing.  As the D.C. Circuit has acknowledged, "[m]ost circuits have held content-neutral

---

[8] The extent to which a journalist must actually cover Congress to obtain a congressional press gallery credential is not clear.  The Senate Daily Press Gallery rules state that an applicant must establish that he or she "requires on-site access to congressional members and staff."  Senate Daily Press Gallery Rules.  The House Periodical Press Gallery rules, by contrast, only require that an applicant "justify the need of Congressional press credentials."  House Periodical Press Gallery Rules.  From the White House's long history of requiring such credentials as a prerequisite to obtaining a hard pass, the Court infers that such credentials can be obtained even by journalists who focus their attention on covering the White House.  See Sherrill, 569 F.2d at 129 n.19 (noting that the White House "stated that the applicant is required to have a pass to the House and Senate galleries because this verifies the 'professional credentials' of the applicant").

licensing schemes need not contain explicit timeframes for processing permit applications." Boardley v. U.S. Dep't of Interior, 615 F.3d 508, 518 (D.C. Cir. 2010); see Griffin v. Sec'y of Veterans Affs., 288 F.3d 1309, 1328 (Fed. Cir. 2002) (noting that the procedural safeguards requirement generally "comes into play" where "an explicit censorship scheme—which by definition is not content-neutral—is under attack").  Here, the press gallery regulations are content-neutral, and Ateba does not face a prior restraint on the publication of news articles.  Moreover, he still has access to the Press Area with his day pass during the credentialing process, such that his speech there is not entirely curtailed while he awaits a decision.  Accordingly, the Court does not find it appropriate to apply the strict procedural safeguards of timely decision-making.

In sum, the Court concludes that the Hard Pass Policy, as it incorporates the requirements of the congressional press galleries, is facially reasonable and viewpoint neutral.

## III.   Viewpoint Discrimination Challenge to the Hard Pass Policy

Ateba separately claims that the White House violated the First Amendment by engaging in unconstitutional viewpoint discrimination against him.  His argument is not that the Hard Pass Policy itself discriminates on the basis of viewpoint—by, for example, providing access only to reporters working for liberal-leaning news organizations.  Rather, his allegation is that "the White House intentionally rejiggered its hard-pass criteria and canceled existing passes because of Mr. Ateba's protected speech."  Pl.'s Reply in Supp. of Mot. for Summ. J. [ECF No. 29] ("Pl.'s Reply") at 14.  The White House seeks summary judgment on this claim, while Ateba urges the Court to deny summary judgment and afford him the opportunity to obtain discovery.  Because the Court

28

concludes that Ateba has failed even to state a plausible claim, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009), discovery will be denied, and the Court will dismiss the claim.[9]

The government may violate the First Amendment when it regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." <u>Reed v. Town of Gilbert</u>, 576 U.S. 155, 168 (2015) (quoting <u>Rosenberger v. Rector and Visitors of Univ. of Va.</u>, 515 U.S. 819, 829 (1995)).  The government may not "den[y] access to a speaker solely to suppress the point of view he espouses." <u>Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.</u>, 508 U.S. 384, 393 (1993) (quoting <u>Cornelius</u>, 473 U.S. at 806).  Viewpoint discrimination occurs when the government "target[s] 'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.'" <u>People for the Ethical Treatment of Animals v. Tabak</u>, Civ. A. No. 21-2380 (BAH), 2023 WL 2809867, at *13 (D.D.C. Mar. 31, 2023) (quoting <u>Rosenberger</u>, 515 U.S. at 831).

The thrust of the Complaint is that the White House "generally ignore[d]" Ateba's written and oral questions and refused him access to President Biden.  Compl. ¶¶ 42–44.  Frustrated, he took to "assert[ing] himself in the briefing room, speaking over other reporters and the White House Press Secretary in an attempt to make his concerns known." <u>Id.</u> ¶ 5.  As examples, he highlights one "notable incident" in which he interrupted the Press Secretary's introduction of the "Ted Lasso" cast by "questioning why he has not received any responses to his written inquiries or been given the opportunity to ask a question during the press briefing," <u>id.</u> ¶ 49, and "a number of other occasions" since December 2021 in which he "asserted himself during briefings . . .

_____

[9] After the Court denied Ateba's motion for a preliminary injunction, the Court ordered the parties to file expedited summary judgment briefing.  The White House has, thus, not filed a motion to dismiss (apart from a footnote in its opposition to Ateba's motion for a preliminary injunction, requesting that the Court alternatively dismiss the Complaint).  <u>See</u> Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. [ECF No. 17] at 6 n.2.  However, at oral argument on the summary judgment motions, the parties agreed that the issue of the viewpoint discrimination claim's plausibility had been sufficiently briefed for decision.

seeking answers to his questions," id. ¶ 52.  He claims that the "significant media coverage focusing on [his] conduct in the briefing room prompted the Biden White House to act" by adopting the Hard Pass Policy that resulted in deactivation of his pass.  Id. ¶¶ 54, 62.[10]

Assuming the truth of Ateba's allegations, he has alleged discrimination based on his conduct in the briefing room, not any view he holds or shares in his reporting.  His claim is that the White House sought to exclude (or limit his access to) the Press Area to prevent his disruptive behavior.  But Ateba's conduct is not itself a viewpoint.  See Oberwetter v. Hilliard, 639 F.3d 545, 553 (D.C. Cir. 2011) (regulations that "prohibit disruptive speech regardless of its message" "plainly do not discriminate on the basis of viewpoint"); Eichenlaub v. Township of Indiana, 385 F.3d 274, 281 (3d Cir. 2004) (concluding that "a motive . . . to prevent [] badgering, constant interruptions, and disregard for the rules of decorum" is "sustainable and content-neutral."); see also Cornelius, 473 U.S. at 811 ("The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose.").

In his summary judgment reply brief (his fourth substantive brief in this case), Ateba belatedly pivots and suggests that the White House disliked "his focus on U.S. relations with African nations, which Mr. Ateba seeks to cover at the White House."  Pl.'s Reply at 14 (citing Compl. ¶¶ 3–4, 44).  "[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief."  Benton v. Laborers' Joint Training Fund,

---

[10] While Ateba's viewpoint discrimination claim reads more like a First Amendment retaliation claim, he has not briefed it as such.  In the D.C. Circuit, "[t]o state a claim for First Amendment retaliation, a plaintiff must allege that: '(1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her.'"  Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016)).  The Court does not pass judgment on whether revocation of a hard pass is sufficiently adverse action as to "deter a person of ordinary firmness in plaintiff's position from speaking again," and, thus, whether Ateba's claim could survive if briefed within the retaliation framework.  See Pen Am. Ctr., 448 F. Supp. 3d at 326–27.

121 F. Supp. 3d 41, 51 (D.D.C. 2015) (internal quotation marks omitted).   Doing so is not only unfair to the defendant, but also risks "an improvident or ill-advised opinion on the legal issues tendered." Id. (quoting McBride v. Merrell Dow & Pharm., 800 F.2d 1208, 1211 (D.C. Cir. 1986)). But even if the Court were to consider the argument, the Complaint alleges no facts supporting an inference that the White House adopted the Hard Pass Policy to silence discussion of U.S.-African relations or because of Ateba's focus on this topic. [11]   Ateba does not claim, for example, that the White House has generally sought to shut down discussion of that topic, or that others who cover that topic similarly lost their press passes.   "That [the White House] put in place a much broader ban . . . suggests it was not discriminating against the views of [Ateba]." AFDI, 901 F.3d at 367.

While the facts alleged in the Complaint support an inference that the White House Press Office disfavored Ateba even before he began disrupting press conferences, those facts do not support the further inference that his viewpoint, or even the content of his speech, has anything to do with this disfavor.   He alleges that over five years as a correspondent, he has "rarely received any response" to his questions and has been permitted to attend a press conference with President Biden just once.   Compl. ¶¶ 42–43; see id. ¶ 3 (alleging he has had "almost no opportunity to meaningfully communicate with the White House"); id. ¶¶ 46–53 (suggesting that Ateba's outbursts were treated differently from his colleagues').

It is true that the Supreme Court has at times suggested that speaker-based discrimination suffices to raise a speech discrimination claim. [12]   See Citizens United, 558 U.S. at 340–41 (holding unconstitutional campaign finance regulations based on the corporate identity of the speaker); see

---

[11] In the Complaint, Ateba briefly asserts a claim for content-based discrimination, the general category into which viewpoint discrimination falls.  Compl. ¶ 91.  However, he has failed to elaborate on this theory in any of his briefing on the preliminary injunction or summary judgment.  The Court, therefore, considers the argument forfeited. Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019).

[12] Ateba primarily raised this argument in his preliminary injunction briefing.  See Pl.'s Reply in Supp. of Mot. for Prelim. Inj. [ECF No. 18] at 13.

also Surita v. Hyde, 665 F.3d 860, 870–71 (7th Cir. 2011) (holding unconstitutional mayor's exclusion of one particular speaker from participating in a public meeting). However, before and after Citizens United, the Supreme Court has primarily followed the principle that speaker-based discrimination is prohibited when and because it accompanies content discrimination. See Sorrell, 564 U.S. at 565; Asaf Weiner, A Speaker-Based Approach to Speech Moderation and First Amendment Analysis, 31 Stan. L. & Pol'y Rev. 187, 214 (2020). Thus, as the Court summarized in Reed, "[c]haracterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." 576 U.S. at 170. Although the Court recognized there that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," it proceeded to suggest that speaker-based concerns arise "when the legislature's speaker preference reflects a content preference." Id. (alteration in original) (first quoting Citizens United, 558 U.S. at 340; then quoting Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 658 (1994)). Ateba's Complaint does not raise any plausible connection between the viewpoint of his speech (or even its content) and the White House's alleged animosity toward him. Thus, the Court concludes that the Complaint lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The factual allegations, if proved, would not "allow the court to draw the reasonable inference," Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up), that the White House adopted the Hard Pass Policy with the "inten[t] sub silentio to suppress [Ateba's] views." AFDI, 901 F.3d at 365. The viewpoint discrimination claim thus fails.

## IV.    APA Challenge to Cancellation of Ateba's Hard Pass

Ateba's final claim is that the Secret Service "violated the [APA] by cancelling [his] hard pass." Pl.'s Cross-Mot. & Opp'n at 19. He asserts that the cancellation was "arbitrary and capricious" because the Secret Service never gave him a reason for canceling the hard passes ex

ante, and the ex post explanation (offered in litigation) that too many passes were in circulation, including many that were no longer actively used, "makes no sense applied to Mr. Ateba, who did actively use his hard pass."  Id.  The White House and Secret Service have not in litigation offered any rationale (beyond the Hard Pass Policy) for cancelling Ateba's hard pass, but rather argue that the Secret Service's cancellation of Ateba's hard pass is immune from APA review because it was done at the direction of the White House Press Office.  Defs.' Mot. at 21–25.[13]

The President's actions are not subject to review under the APA.  Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992).  This preclusion of review also extends to certain executive offices carrying out the President's directives.  See, e.g., Soucie v. David, 448 F.2d 1067, 1073–75 (D.C. Cir. 1971); cf. Wang v. Exec. Off. of the President, Civ. A. No. 07-0891 (JR), 2008 WL 180189, at *1 (D.D.C. Jan. 18, 2008) (holding that the White House Press Office is not "an 'agency' within the meaning of FOIA" because it "lacks . . . regulatory authority or government function" independent from the office of the President).  Ateba does not challenge the immunity of the White House Press Office from APA review.  See Pl.'s Reply at 11.  Accordingly, he appears to concede that he cannot challenge the Hard Pass Policy—a policy devised by the White House— under the APA.  See id.  He focuses instead on the Secret Service's cancellation of his hard pass. See Pl.'s Reply at 11.

Defendants do not dispute that actions of the Secret Service, a component of the Department of Homeland Security, may be reviewable under the APA.  See Defs.' Mot. at 22; see also Oryszak v. Sullivan, 576 F.3d 522, 524 (D.C. Cir. 2009) (affirming dismissal of claim without questioning the general applicability of the APA to the actions of the Secret Service); Citizens for

---

[13] The White House also argues that the Secret Service's "purely mechanical action of issuing a credential" is not "final agency action" subject to review under the APA. Defs.' Mot. at 24–25.  The Court will assume without deciding that cancellation of Ateba's credential was final agency action.

33

Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec., 527 F. Supp. 2d 101, 102, 111–112 (D.D.C. 2007) (similar).  However, the White House and Secret Service argue that APA immunity extends to agency actions when taken to carry out "discretionary authority vested in the President."  Detroit Int'l Bridge Co. v. Gov't of Canada, 189 F. Supp. 3d 85, 104 (D.D.C. 2016).  Defendants cite a line of district court cases holding unreviewable certain agency actions taken within the authority of the President.  See Defs.' Mot. at 23.  In Detroit International Bridge, for example, the court concluded that when the President delegated his discretionary bridge permitting authority to the State Department, the decision remained unreviewable as if it were made by the President.  Id. at 100–02.

Ateba claims that these cases are factually distinguishable, as they involve special intrusions into presidential power inapplicable here.  See Pl.'s Reply at 11–12.  He asserts the defendants' position would "prove[] too much" since "[t]he whole of the executive power rests with the President," id. at 11, and he directs the Court instead to various cases in which courts have reviewed agency decisions that implement a presidential directive, see Pl.'s Cross-Mot. & Opp'n at 19–20, 20 n.8; see also Hawaii v. Trump, 878 F.3d 662, 680–81 (9th Cir. 2017) (per curiam) (reviewing APA suit against "the President . . . [and] the entities charged with carrying out his instructions" to exclude certain foreign nationals from entering the United States), rev'd and remanded on other grounds, 138 S. Ct. 2392 (2018); O.A. v. Trump, 404 F. Supp. 3d 109, 147 (D.D.C. 2019) (undertaking APA review of an agency rule implemented pursuant to a presidential proclamation pertaining to asylum seekers).

The White House and Secret Service reply in turn that Ateba's cited cases are "inapposite" because they hold only that "when the President directs agencies to exercise their authority, the agencies' exercise of their own authority in the form of a regulation or other final agency action is

not insulated from review merely because the President started that process."  Defs.' Reply & Opp'n at 11; see also Detroit Int'l Bridge Co., 189 F. Supp. 3d at 104 ("[W]hen the challenge is to an action delegated [by Congress] to an agency head but directed by the President, . . . the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." (quoting Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2351 (2001)).

The line between agency action attributable to the President versus that of an agency is concededly blurry.  Courts have not always articulated the clear rule offered by the White House, and they have reviewed the legality of presidential orders incorporated into agency actions.  See, e.g., Hawaii, 878 F.3d at 680–81.  But wherever courts should draw the line, purely administrative and ministerial actions by a federal agency effectuating the final step of a discretionary presidential decision fall within the scope of presidential immunity from the APA.  To hold otherwise would seriously undermine the protection afforded to the President from APA review and, in certain cases, raise concerns about separation of powers.  See Detroit Int'l Bridge Co., 189 F. Supp. 3d at 103.   Further, finding such actions reviewable "would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action."  Tulare Cnty. v. Bush, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001).

Here, defendants assert, and Ateba does not contest, "the invitation of members of the press into the White House by the Press Office" and the "authority to set the non-security standards for White House press passes" is "discretionary authority committed to the President" carried out by the Press Office.  Defs.' Mot. at 23; Defs.' Reply & Opp'n at 11; see Pl.'s Reply at 11–12.  The undisputed facts further demonstrate that while the Secret Service has discretionary authority to

determine when a reporter is a security risk, it has no discretionary authority or role in determining whether a journalist meets the other press-based criteria.  Pl.'s Resp. to Defs.' Facts ¶ 1 ("White House press access is determined by the White House Press Office, subject to a U.S. Secret Service security review." (citations omitted)).

> The Secret Service has no role in generating the list of press members that the White House Press Office authorizes for a hard pass.  The Secret Service's role in the process of authorizing entry into the White House complex is limited to conducting the necessary security checks and the issuance/renewal of the physical hard pass to the individual press member.

3d Fleischer Decl. ¶ 13.  Thus, when the Hard Pass Policy went into effect on August 1, 2023, "the White House Press Office instructed the Secret Service to deactivate the hard passes that did not meet the White House Press Office's requirements for renewal, including Mr. Ateba's."  Id. ¶ 5.  The Secret Service simply rubber-stamped the White House's decision.

That the Secret Service has an independent statutory and regulatory role in determining White House access, Pl.'s Reply at 11, does not make the deactivation of Ateba's hard pass reviewable.  Unlike in Sherrill, the Secret Service did not deactivate Ateba's pass for security reasons.  If the President sought a change in security protocols, and the Secret Service enacted a new rule to enforce them, such action might be reviewable.  But that is not what we have.  Here, the deactivation reflected the White House's change in policy as to which journalists were entitled to expedited access.  The Secret Service's mere involvement at the final step does not warrant review.

The futility of APA review in these circumstances further supports the Court's conclusion that the Secret Service's decision is unreviewable.  Ateba's Complaint is that the Secret Service "failed to provide any reason to justify terminating Mr. Ateba's hard pass, let alone a 'good reason' or a 'reasoned explanation.'"  Compl. ¶ 101.  Yet, his own Complaint acknowledges that "the Secret Service appears to be relying on a policy issue[d] by the White House Press Office."  Id.

The Secret Service declaration confirms his suspicion.  If the Court held in favor of Ateba, the appropriate remedy would be a remand to the Secret Service to provide a reasoned explanation. But remand here would either be entirely unrevelatory—"the White House told us to"—or it would provide a backdoor to review the White House's decision-making.  Cf. Judicial Watch, Inc. v. U.S. Secret Serv., 726 F.3d 208, 225 (D.C. 2013) (refusing to permit plaintiff to access White House visitor log records from the Secret Service, when such records would disclose otherwise exempt information about the appointment calendars of members of the White House Office). Accordingly, the Secret Service is entitled to summary judgment on Ateba's APA claim.

## V. Conclusion

For the reasons explained above, the Court will grant summary judgment to the White House and the Secret Service on Counts One and Three and dismiss Count Two without prejudice. A separate Order to this effect accompanies this Memorandum Opinion.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: December 7, 2023